JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

KAREN ARCHULETA, ET AL., individually and on behalf of all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff: Denver, CO
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Richard Shenkan, Shenkan Injury Lawyers, LLC.
6550 Lakeshore St., West Bloomfield, MI 48323
(412) 716-5800

## DEFENDANTS

WELLS FARGO & COMPANY

County of Residence of First Listed Defendant: San Francisco, CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [X] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [X] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
28 U.S.C. § 1332(d)

Brief description of cause:
Challenging Wells Fargo's Marketing and Sales Practices (See Multi-District Case Referenced in Designation Form)

## VII. REQUESTED IN COMPLAINT:

[X] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ +150,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*: JUDGE ______ DOCKET NUMBER ______

DATE 11/6/26

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

10/2024

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## DESIGNATION FORM

Place of Accident, Incident, or Transaction: Nationwide Practice / Incidents Involving Rep. Plaintiffs Occurred in CA and CO.

**Multi District Lit. (Closed)** ***In Re: Wells Fargo Insurance Marketing and Sales Practices*** **Litigation, Case No. SAML 17-02797 AG**

***RELATED CASE IF ANY:*** Case Number:________________ Judge:____________________

1. Does this case involve property included in an earlier numbered suit? Yes ☐
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

***A. Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief ***see certification below***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:________________

***B. Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury (*Please specify*):____________
- ☐ 7. Products Liability
- ☒ 8. All Other Diversity Cases: *(Please specify)* ***28 USC 1332(d) – UNIFORM COMMERCIAL CODE***

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☒ **does** / ☐ **does not** have implications beyond the parties before the court and ☒ **does** / ☐ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

[ X ] Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

[ ] None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| ARCHULETA, ET. AL. | : | CIVIL ACTION |
| v. | : | |
| WELLS FARGO, ET. AL. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) CLASS ACTION (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks. ( )

| 11/6/26 | [signature] | RICHARD E. SHENKAN |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** PLAINTIFFS |
| 248-562-1320 | 888-769-1774 | RSHENKAN@SHENKANLAW.COM. |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

American LegalNet, Inc.
www.FormsWorkFlow.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KAREN ARCHULETA, MICHAEL MCCARTHY, and MILAGROS AMY RITCHIE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., and NATIONAL GENERAL HOLDINGS CORP., and NATIONAL GENERAL INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION – LAW<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED.** |

**CLASS ACTION COMPLAINT**

Representative Plaintiffs Karen Archuleta, Michael McCarthy, and Milagros Amy Ritchie, by and through their undersigned counsel, hereby file this Class Action Complaint against Wells Fargo & Company, Wells Fargo Bank, N.A. (collectively, "Wells Fargo"), National General Holdings Corp., and National General Insurance Company (collectively, "National General")(together with Wells Fargo, the "Defendants"), on behalf of themselves and all others similarly situated, averring as follows:

**NATURE OF ACTION**

1. For more than fourteen years, Wells Fargo and its predecessors, together with auto insurance underwriter National General and its predecessors ("CPI Vendor") engaged in a scheme to defraud hundreds of millions of dollars from millions of unsuspecting Wells Fargo consumers by knowingly force-placing insurance – commonly known as Collateral Protection Insurance ("CPI") – that was not needed or wanted. Defendants did this with intentional disregard for the

information in their possession showing that these consumers already had their own insurance.

2. Not only were these policies not necessary, the CPI rates were exorbitant, and accompanied by interest. On top of that, Defendants failed to properly disclose that they had placed the CPI and/or the resulting automatic deductions from consumer's bank accounts, sending consumers into a financial tailspin and causing their accounts to go delinquent, and ultimately, their collateral vehicles to be repossessed. These repossessions caused major collateral damage for consumers, including loss of employment, ruined credit, and immense stress in their personal lives and the lives of their families.

3. Defendants have been sued repeatedly over this scheme, by the United States government and by consumers, and have paid over $1 billion in penalties, over $520 million in remediation to customers, and over $393 million more to customers from lawsuits after insufficient remediation efforts.

4. And yet, given the astronomical amount of damage done by Defendants' scheme, the renumeration done remains insufficient. There are ***still*** consumers swindled by Defendants' scheme that have not been compensated, reimbursed, or made whole for the damage that was done to them.

5. The Representative Plaintiffs are such persons.

6. In fact, many affected consumers have been left behind in all these remedial efforts because despite this scheme beginning in 2002 and continuing until 2016, Defendants have only remediated or compensated consumers affected after 2005. As a result, all borrowers who had force-placed CPI charges between 2002 and 2005, like the Representative Plaintiffs have, amidst all the relief granted so far, received nothing.

7. In addition, as a result of Defendants fraudulent concealment, as alleged herein,

many of these affected consumers have no knowledge they were victims of Defendants illegal scheme.

8. Indeed, Plaintiff Archuleta was only made aware of this scheme in 2023 because she had two other vehicle loans through Wells Fargo and those loans were part of the remediation efforts. If not for those other loans, Plaintiff Archuleta herself would still be unaware of her claims against Defendants.

## PARTIES

9. Plaintiff Karen Archuleta is an adult individual residing at 1896 South Alcott St., Denver, CO 80219.

10. Plaintiff Michael McCarthy is an adult individual residing at 26 Angell Rd., Apt. 1, Lee, New Hampshire 03861.

11. Plaintiff Milagros Amy Ritchie (nee Barraza) is an adult individual residing at 7324 Harvest Bay San Antonio, TX 78253.

12. Defendant Wells Fargo & Company is a Delaware corporation and bank holding company with its principal place of business in San Francisco, California. Wells Fargo & Company is one of the nation's largest corporations, providing a wide-range of financial services to customers throughout the United States. Wells Fargo & Company participated in the force-placement of CPI alleged herein and decided (and/or ratification of the decision) to enter into agreements with its CPI Vendor to wrongfully force-place CPI on hundreds of thousands of borrowers throughout the United States, including in this district.

13. Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in San Francisco, California. Wells Fargo Bank, N.A. owns the automobile loans secured by Class members' vehicles, which are

located throughout the United States, including in this district. Wells Fargo Bank, N.A. is the primary entity used by Wells Fargo & Company for the origination and servicing of automobile loans. Wells Fargo Bank, N.A., originates and services loans to consumers through its Wells Fargo Dealer Services division, headquartered in Irvine, California.

14. Wells Fargo Dealer Services is the successor-in-interest to Wachovia Dealer Services, Inc. ("Wachovia") and WFS Financial Inc. ("WFS"), both of which served the same roles and functions in the CPI scheme as Wells Fargo Dealer Services. WestFin Insurance Agency, Inc. ("WestFin") is also a wholly-owned subsidiary of Wells Fargo Bank, N.A.

15. At all material times herein, each Wells Fargo defendant and their predecessors and affiliates were the agents, servants, or employees of, and acted within the purpose, scope and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Wells Fargo defendants, and ratified and approved the acts of the other Wells Fargo defendants.

16. Wells Fargo & Company exercises specific and financial control over the operation of Wells Fargo Bank, N.A. and its affiliates, and it dictates the policies and practices of Wells Fargo Bank, N.A. Wells Fargo & Company also exercises power and control over the specific activities in this lawsuit, and it is the ultimate recipient of the revenue and profits from the conduct described herein.

17. Defendant National General Holdings Corp. is a Delaware corporation and an insurance holding company headquartered in New York, New York. National General Holdings Corp. is a specialty personal lines insurance holding company that traces its roots to 1939, and provides personal and commercial automobile, homeowners, umbrella, recreational vehicle, motorcycle, supplemental health, and other niche insurance products. National General Holdings

Corp. participated in the force-placement of CPI alleged herein, including the decision (and/or ratification of the decision) to enter into agreements with Wells Fargo to wrongfully force-place CPI on hundreds of thousands of borrowers throughout the United States, including in this district.

18. Defendant National General Insurance Company ("National General" or "NGIC") is a national insurance agency incorporated in Missouri, with its principal place of business in Winston-Salem, North Carolina. National General administers the CPI division of the National General Lender Services business on behalf of its parent corporation, National General Holdings Corp. National General also provides insurance tracking and CPI throughout the United States. National General was the CPI Vendor for all aspects of Wells Fargo's CPI Program from 2015 until the termination of the CPI Program in September 2016. The scope of its services included, among other things, insurance tracking, borrower identification, policy placement, and underwriting CPI that Wells Fargo force-placed on auto loan borrowers throughout the United States, including in this district.

19. National General is the successor-in-interest to several other entities that operated as Wells Fargo's CPI Vendor. Those entities included Newport Management Corporation ("Newport"), Meritplan Insurance Company ("Meritplan"), and Balboa Insurance Company ("Balboa") which underwrote CPI and provided insurance tracking services during the period 2002 to 2011.

20. At all material times herein, each National General defendant and their predecessors and affiliates were the agents, servants, or employees of, and acted within the purpose, scope and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other National General defendants, and ratified and approved the acts of the other National General defendants.

21. Whenever, in this Complaint, reference is made to any act, deed or conduct Defendants committed in connection with Defendants' force-placed CPI scheme and the related enterprise, the allegations mean that each of the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives, each of whom was actively engaged in the management, direction, control or transaction of Defendants' ordinary business and affairs, and the affairs of the enterprise.

## JURISDICTION AND VENUE

22. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

23. This Court may exercise supplemental jurisdiction over Plaintiffs' and the putative class members' state-law claims pursuant to 28 U.S.C. § 1367 because all of Plaintiffs' and putative class members' state-law claims are derived from a common nucleus of operative facts and are of the kind Plaintiffs would ordinarily expect to try in one judicial proceeding.

24. The practices of Wells Fargo challenged in this case were adjudicated in the class action, multi-district litigation. *See, In Re: Wells Fargo Insurance Marketing and Sales Practices Litigation*, SAML 8:17-02797 AG-KES.

25. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and 12 U.S.C. § 1975.

26. Venue is proper in this district because all Defendants routinely conduct business within this district.

27. Wells Fargo recently settled a class action involving approximately 20,000 class

members within the Eastern District of Pennsylvania, also involving Pennsylvania Commercial Code (UCC) claims. *See Sorace v. Wells Fargo Bank, N.A.*, 2:20-CV-4318-GJP (E.D. Pa. 2023).

28. Plaintiffs allege that there are more than 39 putative class members in Pennsylvania who have fallen victim by the alleged wrongdoing, a national practice.

## DEFINITIONS

29. **Debtor**: The term "Debtor" is "A: (1) person having an interest, other than a security interest or other lien, in the collateral, whether or not the person is an obligor …" *See* Uniform Commercial Code ("UCC") §9-102.[1]

30. **Good Faith**: The term "Good Faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing. UCC §1-201; See, "*Obligation of Good Faith*" below.

31. **Notice of Repossession**: The term "Notice of Repossession" refers to a post-repossession consumer disclosure notice and has the same meaning as the term "notification of disposition" in UCC §§9-611, 9-613, and 9-614 and respective corollary UCC statutes nationally. Wells Fargo used at least one standardized, uniform form throughout the Class Period. The only information modified in the Notices of Repossession that are unique to each customer principally consists of amounts, personally identifiable information, unique data pertaining to the repossessed vehicle, the customer's loan information, and the date after which the disposition of the chattel is to occur.

32. **Obligation of Good Faith**: The term "Obligation of Good Faith" refers to the requirement that "[e]very contract or duty within this title imposes an obligation of good faith in its performance and enforcement." UCC §1-304 and corollary statutes nationally.

---

[1] Throughout the Complaint, Plaintiff cites to the sections of the official text of the UCC. All states have adopted the cited sections of the UCC, with no material variations.

33. **Post-Sale Notice**: The term "Post-Sale Notice" is a post-sale consumer disclosure notice which has the same meaning as the term "Explanation of Calculation of Surplus or Deficiency" in Section 9616 of the UCC. UCC §9-616 and corollary statutes nationally. Principally, the only information modified in Post-Sale Notices that are unique to each customer consists of amounts, personally identifiable information, unique data pertaining to the repossessed vehicle, the customer's loan information, and dates.

34. **Redeem/Redemption**: Unless stated otherwise, the term "Redemption" means a "buy back" of the repossessed vehicle by terminating the contract upon payment of the unpaid portion of the amount financed and the finance charge, plus late charges, and reimbursement of reasonable expenses incurred by Wells Fargo attributed to the retaking, repairing and storing the repossessed vehicle, and any other amounts lawfully due under the contract or permitted by law.

35. **Relevant Period of Class Period**: The term "Relevant Period" or "Class Period" refers to the time period of March 1, 2002 through October 15, 2005 for purposes of all putative classes. ***This Class Period was expressly excluded from the nationally settled class action***. *In Re: Wells Fargo Insurance Marketing and Sales Practices Litigation*, SAML 8:17-02797 AG-KES.

## FACTUAL ALLEGATIONS

### A. The Force-Placed Insurance Industry

36. Lenders "force place" insurance when a borrower fails to obtain or maintain proper insurance coverage on vehicles, real estate, or other property that secures a loan. Under the typical loan agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the security and then charge the premiums to the borrower.

37. However, some lenders, such as Wells Fargo, have set up illegal practices related to force-placed insurance. The lenders have entered into collusive relationships with certain force-

placed insurance providers, such as National General, that result in exceptional profits to both the lenders and the force-placed insurers, to the detriment of borrowers.

38. The arrangements represent an extremely lucrative profit-making scheme that reaps hundreds of millions of dollars annually for its participants. Insurance companies that offer force-placed insurance policies and their affiliates and agents enter into exclusive relationships with lenders to provide the policies.

39. Conceptually, force-placed insurance is designed to protect the lender's interest in the collateral that secures the loan and thus, should not exceed that interest. Lenders, however, often purchase coverage from their exclusive insurers in excess of that required to cover their own risk.

### B. The Defendants CPI Scheme

40. As described in detail throughout this Complaint, Wells Fargo purchased CPI from National General and its predecessors, force-placed CPI on its auto loan borrowers' accounts, and tacked on CPI charges for premium, interest, and unearned commissions to the borrowers' principal, thus raising the borrowers' monthly payments.[2] The unearned commissions were paid by the CPI Vendor as kickbacks to one of Wells Fargo's affiliates for the force-placement of CPI. These kickbacks ensured that the CPI charges to Wells Fargo's borrowers were more expensive than the premiums for coverage borrowers obtained on their own.[3]

41. These unearned commissions generated undisclosed charges even when CPI was

---

[2] The allegations made throughout this Complaint are supported by the allegations and discovery documents cited in *In re Wells Fargo Collateral Protection Insurance Litigation*, Case No. 8:17-ML-2797-AG-KES (C.D. Cal. 2017)(herein "MDL Litigation"). Amended Consolidated Class Action Complaint, ECF 182, attached as **Exhibit A**. Plaintiff intends to obtain the documents referenced therein during discovery, and cites to the document and allegation in the MDL Litigation Amended Complaint until that time.

[3] *See* Exhibit A, ¶44, WFCPI_00030113.

properly placed on borrowers' accounts. Even after Wells Fargo stopped receiving commissions in 2013, it continued to assess CPI charges on borrowers' accounts in excess of the cost of CPI or other auto insurance products.

42. In this regard, the CPI market created by the partnership between Wells Fargo, National General, and their predecessors was "rigged" against the borrower because it pushed up costs for consumers, rather than down.[4]

43. Instead of competing in the open insurance marketplace, the CPI Vendor offered compensation and other considerations to Wells Fargo, which Wells Fargo accepted, for its CPI business. The compensation and considerations—in other words, kickbacks—were paid for by the CPI Vendor through unreasonable expenses included in the CPI premium charged to Wells Fargo, which were then passed-on to the unsuspecting borrowers.

44. These expenses included not only the unearned commissions but also the cost of tracking services for Wells Fargo's indirect auto loan portfolio, which were passed-on at a disproportionate rate only to those borrowers who paid charges for force-placed CPI. The structure of the CPI Program so benefitted Wells Fargo that it did not seek to obtain a competitive insurance product or conduct a request for proposals ("RFP") for 12 years from the inception of the CPI Program in 2002 until 2014.[5]

45. The CPI market was characterized by "reverse competition" in that borrowers who were forced to pay CPI charges lacked the ability to exert market power over prices. Wells Fargo's auto loan borrowers were vulnerable to excessive CPI charges, because they did not request CPI

---

[4] Kristin Broughton, Do problems with lender-placed auto insurance go beyond Wells? American Banker (August 8, 2017, 5:31 p.m. EST), available at https://www.americanbanker.com/news/do-problems-with-lender-placed-auto-insurance-go-beyond-wells.

[5] *See* Exhibit A, ¶45, WFCPI_17004 at 009; WFCPI_40990 at 992.

but were forced to pay for it at a cost far greater than an independent auto insurance policy. In fact, for hundreds of thousands of borrowers, they had no choice but to pay the CPI charges that were crammed onto their accounts, despite the fact that they had their own independent auto insurance.[6]

46. After Defendants force-placed a CPI policy on a Wells Fargo borrower, Wells Fargo assessed a full year's worth of CPI charges against the borrower's account, and then charged interest each month on the CPI before applying payments to the principal loan balance. This ensured that Wells Fargo's CPI charges got paid first, and any deficiency resulted in the borrower falling short on the underlying loan.[7]

47. The core decisions concerning the force-placed CPI scheme were made by Defendants in their California offices and headquarters. These decisions implemented a nationwide practice of force-placing Defendants' unnecessary CPI on Wells Fargo's automobile loan customers and assessing improperly inflated premiums against their accounts in exchange for lucrative kickbacks from the CPI Vendors.

**C. Defendants Unlawfully Force-Place CPI on Millions of Borrowers' Automobile Loan Accounts for More Than 14 Years**

48. Wells Fargo's CPI Program existed from 2002 to 2016. During that time period, Wells Fargo and its predecessors forced-placed CPI on millions of auto loan borrowers, even when borrowers maintained sufficient insurance to protect Wells Fargo's collateral. Wells Fargo effectuated the CPI Program with and through its CPI Vendors including National General and its predecessors under Insurance Administration Agreements ("IAA") and General Agency Agreements ("GAA"). The Wells Fargo companies involved in the CPI Program were WFS, Wachovia, WestFin, and WFDS. The National General companies involved in the CPI Program

[6] *See* Exhibit A, ¶46.
[7] *See* Exhibit A, ¶47

were Newport, Meritplan, Balboa, QBEF, and NGIC.

**1. The CPI Vendor Provided Tracking Services and Insurance Placement Services for the CPI Program**

49. On March 15, 2002, Wells Fargo's predecessor, WFS, entered into the original IAA with National General's predecessor, Newport.[8] Like Wells Fargo, WFS was engaged in the business of extending credit and financing for automobile buyers and lessors.[9]

50. WFS and Newport replaced the original IAA with another IAA effective October 1, 2005.[10]

51. Pursuant to the IAA, Newport provided "Tracking Services." Specifically, Newport was charged with tracking the vast majority of the loans in WFS's indirect auto loan portfolio to determine whether the borrowers maintained acceptable insurance covering the underlying collateral, namely, the vehicles.[11]

52. Under the IAA, Newport provided daily reports to WFS of borrowers which Newport did not verify had obtained or maintained acceptable insurance. Newport also identified those borrowers to its affiliates, Meritplan and Balboa, both of which had issued a CPI Master Policy to WFS for the placement of CPI on individual borrowers' accounts.

53. Under the CPI Master Policy, which covered all eligible vehicles in WFS's indirect auto loan portfolio, certificates of coverage for specific vehicles were added (or removed) if WFS and the CPI Vendor determined these vehicles required CPI coverage. Meritplan and Balboa added CPI to those borrowers' accounts and billed WFS, which in turn, charged the borrowers for CPI.

54. The CPI Vendor's Tracking Services were distinct from its Insurance Placement

---

[8] *See* Exhibit A, ¶52; WFCPI_00015256 at 296.
[9] *Id.*
[10] *Id.*; WFCPI_00015256 at 296-322.
[11] *Id.*

Services. Tracking Services included loading insurance information into a database, maintaining and monitoring the insurance tracking database, contacting borrowers, insurance companies and agents about inadequate insurance, and providing customer service to borrowers submitting evidence of adequate insurance.

55. These Tracking Services were the responsibility of WFS (and later Wells Fargo) which, here, outsourced them to the CPI Vendor. The CPI Vendor performed Tracking Services for most of the loans in WFS's indirect auto lending portfolio, irrespective of whether CPI was force-placed on those borrowers' accounts. WFS paid a Tracking Fee to the CPI Vendor for each loan that it tracked.[12]

56. In contrast, the CPI Vendor's Insurance Placement Services were specific to those borrowers' accounts on which CPI was force-placed. Insurance Placement Services included notifying WFS that CPI would be force-placed, adding a certificate of coverage for individual borrowers' accounts to the CPI Master Policy, collecting premium payments from WFS, providing premium refunds to the lender following cancellation, and providing customer service about insurance claims made against the CPI policy.

**2. The CPI Vendor Paid an Undisclosed Kickback in the Form of an Unearned Commission to Wells Fargo's Subsidiary**

57. On March 4, 2002, WestFin, which is presently a subsidiary of Wells Fargo,[13] entered into the original GAA with Meritplan and Balboa. On October 18, 2005, WestFin, Meritplan and Balboa replaced the original GAA with another GAA.[14] Under each GAA,

---

[12] *See* Exhibit A, ¶56, Rule 30(b)(6) Deposition of Wells Fargo & Co. and Wells Fargo Bank, N.A. By and Through its Designee James William McLawhorn ("McLawhorn Dep.") at 213:9-11. A copy of this deposition will be obtained in the Rule 26 disclosures / discovery.

[13] *See* Exhibit A, ¶58; WFCPI_00002776 at 778.

[14] *See* Exhibit A, ¶58; WFCPI_00003667 at 372-97.

Meritplan and Balboa designated WestFin as their insurance agent. The GAA enabled WestFin to collect a commission on the net written premium for CPI placed on individual borrowers' accounts. That WestFin was an insurance agency was critical to the CPI scheme, because the lender (WFS and its successors through and including Wells Fargo) were banks that could not legally receive a commission on CPI.[15]

58. Insurance companies commonly pay commissions to their licensed agents, even those affiliated with commercial lenders, to compensate those agents for actual services performed. Agency services that are compensable by commissions include promoting and selling the insurance product, collecting insurance premiums from customers, and forwarding those premiums to insurers. In contrast, the payment of commissions to a bank-affiliated insurance agent that fails to perform these services should internally raise red flags of improper, and even unlawful business practices. These commissions are in essence an undisclosed and unearned kickback.

59. According to the GAA, WestFin's primary responsibility was to produce insurance business for Meritplan and Balboa, but at no point did WestFin do so. WestFin did not take a single action to produce insurance business. WestFin did not sell, market or promote CPI to borrowers; collect insurance premiums; communicate with borrowers; or handle inbound or outbound calls with the CPI Vendor, borrowers, or their insurance agencies.[16] In fact, under the GAA, Meritplan and Balboa were responsible for the collection of premiums and issuing refunds, not WestFin.[17]

60. Nor did WestFin have any other management or administrative role in the CPI Program. WestFin did not engage in the management or oversight of the CPI Vendor or provide the CPI Vendor with support related to uninsured accounts, claims processing, or vehicle

[15] *See* Exhibit A, ¶59.
[16] *See* Exhibit A, ¶61; McLawhorn Dep. at 35:7-15, 271:10-20, 273:3-5, 273:19-22, 274:3-14.
[17] *Id.*

inspections.[18]

61. Instead, WestFin was merely there to collect unearned commissions. WestFin received commissions from the CPI Vendor on every CPI policy placed on individual borrowers' accounts, despite the fact that it did not perform any work traditionally associated with an insurance agent. The traditional role of an insurance agent is to assist the policyholder in determining her insurance needs, shopping the market for the insurance product that meets the policyholder's needs, and seeking the most competitive price for the product. WestFin did not perform any of these functions. In reality, and unbeknownst to customers, Wells Fargo's internal documents reveal that "Commissions are obtained as part of the WFDS CPI program with QBE in order ***to offset the expenses WFDS incurs as a result of the program***."[19]

62. As a subsidiary of Wells Fargo, WestFin's commissions were booked as revenue to the bank.

63. The CPI Vendor's payment of commissions to WestFin was not justified by any service provided by WestFin or any other legitimate business reason. Instead, these unearned commissions, which generated undisclosed charges, were a kickback to WFS and its successors (through and including Wells Fargo) for force-placing CPI on the accounts of unsuspecting borrowers.

### 3. Defendants Operated the CPI Program as a Single, Continuous Enterprise Since Inception

64. Wells Fargo, National General, and their predecessors operated the CPI Program as a single, continuous enterprise from its inception in March 2002 until its termination in September 2016. Defendants were systematically linked through continually coordinated activities

[18] *See* Exhibit A, ¶62; McLawhorn Dep. at 273:25-274:2, 274:18-275:12.
[19] *See* Exhibit A, ¶63; WFCPI_00017004 a 016 (emphasis added).

to operate the CPI Program.

65. Throughout the duration of the CPI Program, Defendants employed the use of U.S. wire facilities by electronically exchanging information and money with each other about the CPI Program and individual borrower's accounts on a daily basis. These electronic exchanges included files on new loans within Wells Fargo's portfolio to be tracked by the CPI Vendor; lists of accounts on which CPI would be placed or cancelled and removed; dollar amounts of premium to be paid to, and refunded from, the CPI Vendor by Wells Fargo; and dollar amounts of commissions to be paid to, and refunded from WestFin by the CPI Vendor. Throughout the duration of the CPI Program, Defendants settled premium payments and refunds with each other on a daily basis via wire transfer.[20]

66. Throughout the duration of the CPI Program, Defendants held monthly management review meetings by telephone to discuss the CPI scheme including its performance, metrics (including volume of telephone calls with borrowers, number of claims made against CPI, and dollar amount of claims), and additional action items.

67. The CPI Vendor prepared a "scorecard" of metrics for the CPI Program and circulated the scorecard to Wells Fargo, generally by electronic mail, in advance of the monthly management review meetings. Participants in the monthly management review meetings from Wells Fargo regularly included John Van Fossen (Operations Manager, supervisor of the CPI team), James McLawhorn (Customer Services Manager), James Tann Pace (Customer Service Manager), Brian Cheeseman (Insurance Support Manager), and others from Wells Fargo's finance team or remarketing team.[21]

---

[20] *See* Exhibit A, ¶67; WFCPI_00046240 at p.2.

[21] *See* Exhibit A, ¶68; McLawhorn Dep. at 119:4-124:2; Defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s Initial Disclosures; National General Defendants' Initial

68. Throughout the duration of the CPI Program, Defendants also held quarterly business review meetings in-person to discuss the CPI scheme including its performance, metrics, and additional action items. Participants in the quarterly business review meetings discussed these topics in much more detail than they did during monthly management review meetings. The CPI Vendor prepared a business review deck which it circulated to Wells Fargo, generally by electronic mail, in advance of the quarterly business review meetings.

69. The business review deck contained detailed data about the CPI Program including loan volume and CPI penetration; gross and net written premium; average premium per loan; CPI premium and commission trends; CPI distribution by state; borrower account balances and premium rate percentages; CPI letter volume; CPI cancel percentages; CPI loss experience and trends including by month and policy year; CPI financial results; year-over-year comparisons; CPI claims experience and performance; CPI claim severity, frequency, and payments; and other operational statistics and results.[22]

70. Although referred to as "quarterly" business review meetings, these meetings occurred two to four times per year at Wells Fargo's offices or the CPI Vendor's offices. Many of the individuals who attended quarterly business review meetings also attended monthly management review meetings. Participants in the quarterly business review meetings from Wells Fargo regularly included John Van Fossen, James McLawhorn, James Tann Pace, Brian Cheeseman, Lori Millard (Customer Contact & Collection Manager), and others from Wells

---

Disclosures. ***Copies of these documents and other documents referenced in Exhibit A will be obtained in discovery.***

[22] *See* Exhibit A, ¶69; McLawhorn Dep. at 124:3-125:15; NatGen00292685; WFCPI_00004484-522; WFCPI_00004272-306; WFCPI_00008247-279.

Fargo's finance team or remarketing team.[23]

71. Wells Fargo's Rule 30(b)(6) witness testified, consistent with internal documents, that there were no material changes in the way the CPI Program was administered throughout its duration.[24] This was the case despite the fact that the companies running the CPI Program changed over time and modified the IAA and GAA accordingly. Although the names of the specific Wells Fargo and National General entities changed, their roles and responsibilities did not.

72. As explained above, WFS and Newport replaced the original IAA with another IAA effective October 1, 2005.[25] Around the same time, WestFin, Meritplan and Balboa replaced the original GAA with another GAA effective October 1, 2005.[26] These agreements did not otherwise materially change the operation or administration of the CPI Program.

73. WFS changed its name to Wachovia effective March 1, 2007. WFS and Newport amended the IAA to replace all references to WFS with Wachovia. This amendment did not materially change the operation or administration of the CPI Program.[27]

74. Wachovia changed its name to Wells Fargo Dealer Service, Inc. ("WFDS") effective March 20, 2010. WFDS was a wholly-owned subsidiary of Wells Fargo Bank, N.A. Wachovia and Newport amended the IAA to replace all references to Wachovia with WFDS. This amendment did not materially change the operation or administration of the CPI Program.[28]

---

[23] *See* Exhibit A, ¶70; McLawhorn Dep. at 124:3-125:15; Defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s Initial Disclosures; National General Defendants' Initial Disclosures.

[24] *See* Exhibit A, ¶71; McLawhorn Dep. at 18:19-29:1.

[25] *See* Exhibit A, ¶72; WFCPI_00015256 at 296-322.

[26] *See* Exhibit A, ¶72; WFCPI_00003667 at 372-97.

[27] *See* Exhibit A, ¶73; WFCPI_00015256 at 284.

[28] *See* Exhibit A, ¶74; WFCPI_0015256 at 281.

75. Effective July 1, 2011, Wells Fargo Dealer Services, Inc. dissolved its separate corporate status, merged into Wells Fargo Bank, N.A., and was renamed Wells Fargo Dealer Services. This change to the corporate structure of WFDS did not materially change the operation or administration of the CPI Program.[29]

76. Effective May 1, 2012, Balboa and Meritplan assigned their duties, obligations, liabilities, rights, title, and interest under the GAA to QBEF. QBEF also succeeded to Newport's roles and responsibilities with respect to the IAA. Wells Fargo's internal documents confirm that these changes did not materially change the operation or administration of the CPI Program.[30] For example, according to an internal Wells Fargo presentation entitled "Collateral Protection Insurance" from 2012, the "WFDS/QBE relationship started in 2002[.] QBE provides tracking, placement and claims processing[.] Minimal changes to pricing or structure of program since inception."[31]

77. Effective on or about July 15, 2015, National General acquired the assets and liabilities of QBE, and succeeded to QBEF's roles and responsibilities with respect to the IAA. Wells Fargo's internal documents confirm that this change did not materially change the operation or administration of the CPI Program. For example, an internal Wells Fargo presentation entitled "CPI Update: Collateral Protection Insurance" from April 2016 explains that the relationship between Wells Fargo and National General dated to 2002, and states that "National General is formerly known as QBE and Balboa."[32]

78. Wells Fargo terminated the CPI Program effective September 30, 2016.[33]

---

[29] *See* Exhibit A, ¶75; WFCPI_0015256 at 279.
[30] *See* Exhibit A, ¶76; WFCPI_00003367 at 369.
[31] *See* Exhibit A, ¶76; WFCPI_00008981 at 982.
[32] *See* Exhibit A, ¶77; WFCPI_00052015 at 016.
[33] *See* Exhibit A, ¶78; WFCPI_00051954.

### 4. Wells Fargo Assessed Borrowers Unlawful Fees & Predatory Practices

79. Between March 2002 and February 2013, Wells Fargo and its predecessors paid a Tracking Fee of to the CPI Vendor for Tracking Services.[34]

80. Although the Tracking Fees pertained to every eligible loan in Wells Fargo's indirect auto lending portfolio, Wells Fargo did not apply those fees to all auto loan borrowers. Rather, Wells Fargo passed-on the entire cost of the Tracking Fees only to those borrowers on whom it force-placed CPI. Forcing borrowers to pay the cost of the Tracking Fees associated with servicing the entire loan portfolio was unlawful, because those expenses were not part of the cost to insure the individual borrower's collateral and were not disclosed to borrowers.[35]

81. Charges for CPI that Wells Fargo assessed to borrowers were not insurance premiums and were not subject to state insurance rate regulation. Instead, CPI was a commercial insurance policy purchased by Wells Fargo from the CPI Vendor. Wells Fargo was both the policyholder and the insured. Throughout the duration of the CPI Program, Wells Fargo paid the premium for CPI to the CPI Vendor.[36]

82. Wells Fargo then assessed charges to borrowers for CPI. As explained in an internal Wells Fargo presentation, Wells Fargo "lends the Obligor [borrower] funds equivalent to the CPI premium and charges the Obligor interest at the same rate as appears on their retail installment contract."[37]

83. Although Wells Fargo purchased CPI in 12-month terms, it assessed a full-year of premiums on borrowers' accounts over a 9-month period.

---

[34] *See* Exhibit A, ¶87; McLawhorn Dep. at 216:12-19.
[35] *See* Exhibit A, ¶93.
[36] *See* Exhibit A, ¶94; McLawhorn Dep. at 146:3-6.
[37] *See* Exhibit A, ¶95; WFCPI_00002776 at 780.

84. Wells Fargo structured customers' loan payments to maximize the interest customers paid on CPI over the life of their automobile loan.

85. Wells Fargo describes the order in which it applies payments as follows:

> Loan interest - the daily amount due on your loan;
> Collateral Protection Insurance (CPI) Interest - the amount of interest on your insurance premium (if applicable);
> Principal - the principal payment amount due on your loan;
> CPI principal - the principal payment on your insurance premium (if applicable)
> Payment variance - any amount remaining due from previous payments;
> CPI variance - any amount remaining due from previous insurance premium payments (if applicable); and
> Other charges - fees such as nonsufficient funds[38]

86. Wells Fargo's deliberate decision to structure payments in this order had the predictable effect of increasing the overall interest customers paid to Wells Fargo on their loans, because less of their payment went to the actual outstanding loan principal each month. This increased the likelihood of underpayments, late payments, fees for insufficient funds, and ultimately repossessions.

87. The payment structure was lucrative for Wells Fargo, in part because Wells Fargo knew that the CPI Program disproportionately affected subprime borrowers with high interest rates on their auto loans, and accordingly high CPI interest. Wells Fargo deliberately excluded super prime borrowers, expensive luxury vehicles, and Tesla owners from the CPI Program,[39] instead

---

[38] Wells Fargo Dealer Services, Financial Education, *Understanding Your Auto Loan*, available at https://www.wellsfargodealerservices.com/consumers/financialeducation/understandingyourautoloan/default.asp#fees.

[39] Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, five types of loans were excluded from the CPI Program: (1) super prime (A0) loans, Tesla customers, and loans with balances greater than $75,000, on which Wells Fargo concluded the risk of loss was minimal; (2) loans made in Ohio and New Hampshire, which prohibited the use of collateral

choosing to target subprime borrowers aggressively, because their high interest rates and greater likelihood of delinquencies translated into more revenue for the bank. As one National General executive explained, Wells Fargo was "financing car loans from 0% **to 29.99%**. Considering they were adding a finance charge to the loans, that would be killer to have a loan at 18.99%, then add the CPI insurance to the car payment across 8 payments and the Finance Charge."[40]

88. According to an internal Wells Fargo presentation dated February 2016, Defendants were 10 times more likely to force-place CPI on subprime loans than on prime loans: "High risk/non-prime loans have a much higher proportion of CPI than lower risk, prime loans. (20% of highest risk loans have CPI vs. 2%-3% on lowest risk loans.)"[41] Similarly, an internal Wells Fargo presentation dated June 2016 illustrates this fact: "CPI is more prevalent among lower credit grade customers who may have difficulty obtaining insurance through a major carrier, or refuses to secure such coverage."[42]

89. Neither the CPI policy nor state insurance laws required Wells Fargo to assess premium and interest charges to borrowers. In fact, lenders generally pay for CPI through a "blanket policy" covering the collateral for an entire class of loans without assessing charges for the premium on borrowers, a fact well-known by Wells Fargo as it maintained this type of blanket insurance on loans originated by motor vehicle dealers in Ohio, which precludes the use of CPI.[43]

---

protection insurance by state law; (3) loans financing recreational vehicles, which were longer term loans and luxury items that Wells Fargo concluded were not beneficial to insure; (4) bankruptcy accounts, because the bankruptcy laws prevented the increase of funds owed to Wells Fargo; and (5) loans with balances less than $2,500, which Wells Fargo determined did not benefit the borrower and were low risk to the bank. *See* WFCPI_00052720 at 730. These loans were deemed "not eligible" for the CPI Program. All other loans in Wells Fargo's indirect auto loan portfolio were deemed "eligible" for force-placement of CPI.

[40] *See* Exhibit A, ¶98; NatGen00033469 at 472 (emphasis in original).

[41] *See* Exhibit A, ¶99; WFCPI_00029418 at 421.

[42] *See* Exhibit A, ¶99; WFCPI_00052720 at 721.

[43] *See* Exhibit A, ¶100; WFCPI_00015256 at 314-15; McLawhorn at 242:6-10.

90. Wells Fargo's baseline practice of conditioning auto loans on borrowers paying Wells Fargo for CPI was not a customary industry banking practice—even when isolated from the bank's deceptive billing procedures and duplicative CPI placements. Wells Fargo knew the CPI scheme was an industry outlier. According to an internal Wells Fargo presentation entitled "CPI—Program Review Executive Summary" dated August 25, 2016, "WFDS is the only large auto finance company with a CPI program."[44]

91. While self-insuring would have been far more efficient, Wells Fargo chose not to self-insure because doing so would have cost it money. Instead, Wells Fargo kept the CPI Program in place to obtain lucrative kickbacks in the form of unearned commissions and other compensation, inflated interest charges, and other fees and charges for late payments, insufficient funds, and the like, all of which went straight to the bottom line as essentially pure profit.

### 5. Wells Fargo and its CPI Vendor Unlawfully Force-Placed CPI

#### a) Wells Fargo Obtained Borrowers' Insurance Information from the Automobile Dealer at the Time of Sale

92. Throughout the duration of the CPI Program, consumers who purchased or leased automobiles through a dealer either had financing approved directly from a lender in advance of the transaction or worked with the dealer to obtain financing indirectly from a lender, such as Wells Fargo. In the latter case, the financing contract was a standard form agreement, called a Retail Installment Sale Contract ("RISC"). The financial obligations under the RISC were later assigned to the lender.

93. The RISC was an integrated agreement that typically contained the following language: "This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes

---

[44] *See* Exhibit A, ¶101; WFCPI_00035207 at 214.

are binding."[45]

94. The RISC required the borrower to maintain physical damage insurance on the vehicle to protect the collateral. A standard disclosure in a RISC was as follows:

> Insurance you must have on the vehicle. You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.[46]

95. Throughout the duration of the CPI Program, Wells Fargo allegedly expected that its indirect auto loan borrowers would learn about the collateral protection insurance requirement from the dealer at the time of the transaction.[47] Wells Fargo relied upon the dealer to disclose that requirement through the standardized RISC.[48] Wells Fargo did not customize the RISC for its own purposes.[49]

96. Wells Fargo also relied on the dealer to verify that the borrower had adequate insurance to satisfy the collateral protection insurance requirement at the time of the transaction.[50] The dealer typically photocopied the borrower's proof of insurance[51] and filled out a standard form document called, an "Agreement to Furnish Insurance (To Be Used with Security Agreement on

[45] *See* Exhibit A, ¶104; WFCPI_00000045.
[46] *Id.* at 046.
[47] *See* Exhibit A, ¶106; McLawhorn Dep. at 41:2-10.
[48] *See* Exhibit A, ¶106; McLawhorn Dep. at 41:15-18, 44:7-15.
[49] *See* Exhibit A, ¶106; McLawhorn Dep. at 41:3-43:3.
[50] *See* Exhibit A, ¶107; McLawhorn Dep. at 50:2-11.
[51] *See* Exhibit A, ¶107; *E.g.*, WFCPI_00000045 at 057.

Sale of Vehicle)," which identified the borrower's insurance carrier, the carrier's address and/or phone number, and policy number.[52] In the Agreement to Furnish Insurance, the dealer also identified Wells Fargo (or its predecessor) as the "Loss Payee," i.e., the entity to which the claim from any loss should be paid.[53]

97. Upon completion of the transaction, the dealer submitted to Wells Fargo all documents pertaining to the origination of the loan—including proof of insurance and the Agreement to Furnish Insurance—either through U.S. mail, overnight mail or courier, or electronic file transfer.[54] Wells Fargo then saved electronic documents or imaged hard copy documents in its imaging repository.[55]

**b) Defendants Disregarded Borrowers' Proof of Insurance**

98. Wells Fargo opened a loan file on a borrower after it received the loan origination documents. Wells Fargo then electronically transferred a "Daily New Loan File" to its CPI Vendor. That electronic transmission identified information about each day's new loan originations including the borrower's name, address, vehicle, VIN number, year, make, model, and other unique account identifiers.[56]

99. The CPI Vendor was responsible for identifying the insurance policy that matched up with the borrower's account.[57] Nonetheless, Defendants deliberately disregarded the available information about a borrower's auto insurance—including the borrower's proof of insurance or Agreement to Furnish Insurance provided by the borrower with the origination of the loan—in favor of force-placing CPI.

---

[52] *See* Exhibit A, ¶107; *E.g.*, WFCPI_00000045 at 053.
[53] *Id.*
[54] *See* Exhibit A, ¶108; McLawhorn Dep. at 54:14-55:25.
[55] *See* Exhibit A, ¶108; McLawhorn Dep. at 56:1-57:17.
[56] *See* Exhibit A, ¶109; McLawhorn Dep. at 66:24-67:20.
[57] *See* Exhibit A, ¶110; McLawhorn Dep. at 68:6-17.

100. The CPI Vendor performed Tracking Services either by receipt of paper files from insurance carriers or, more generally, through an electronic data interchange ("EDI") throughout the duration of the CPI Program. EDI was an agreement among insurance companies to share information electronically with the identified loss payee (or its third-party vendor) whenever there was a change in the status of insurance on a vehicle, such as the addition of a vehicle on an insurance policy or the cancellation of an insurance policy.[58]

101. Although the CPI Vendor received EDI information when there was a change in the status of insurance on a vehicle, Wells Fargo chose not to obtain this data itself.[59] Nor did Wells Fargo attempt to obtain such information in hard copy. Wells Fargo instead relied on the CPI Vendor to perform Tracking Services and did not independently confirm the existence or non-existence of insurance on vehicles in its indirect auto loan portfolio.[60]

**c) Defendants Sent False and Misleading "Insurance Request" Letters to Borrowers**

102. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor sent via U.S. mail a first letter entitled "Insurance Request" to any "eligible" borrower 42 days after a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[61] Regardless of whether a given borrower maintained adequate auto insurance, and regardless of whether proof of that insurance was available to Defendants, the Insurance Request invariably stated that proof of the borrower's insurance was lacking.

103. The Insurance Request was a standardized form letter sent to borrowers that

[58] *See* Exhibit A, ¶111; McLawhorn Dep. at 68:18-73:1.
[59] *See* Exhibit A, ¶112; McLawhorn Dep. at 79:1-7.
[60] *See* Exhibit A, ¶112; McLawhorn Dep.79:8-80:1.
[61] *See* Exhibit A, ¶113; WFCPI_00045980 at p.6.

included the borrower's contact, vehicle, and loan information.[62] The Insurance Request was written and sent by the CPI Vendor and reviewed and approved by Wells Fargo (or its predecessors).[63] As a result, the representations in the Insurance Request letter are attributable to both companies.

104. Although drafted by the CPI Vendor, the Insurance Request was placed on Wells Fargo's letterhead and signed by Wells Fargo.[64] Wells Fargo approved the use of its letterhead.[65] And, although the address beneath Wells Fargo's logo was for the CPI Vendor, the name of the CPI Vendor did not appear anywhere in the Insurance Request,[66] leaving the borrower to believe that he or she was receiving correspondence from Wells Fargo.

105. Wells Fargo reviewed and approved the Insurance Request letters sent to borrowers, but did nothing to confirm their accuracy.[67]

106. Nor did the CPI Vendor do anything to determine whether a vehicle had auto insurance for the seven-week period from the time it had received a Daily New Loan File on an account until it sent the Insurance Request, despite the fact that such insurance information was generally available.

107. The Insurance Request falsely stated, "Please be advised that we have not received insurance information for your financed vehicle."[68] That statement contained a false or misleading representation of material fact, as Wells Fargo had received proof of the borrower's insurance from the dealer at the time of the purchase transaction. Insurance information was also available through

---

[62] *See* Exhibit A, ¶114; *See, e.g.*, NatGen00576109.
[63] *See* Exhibit A, ¶114; McLawhorn Dep. at 76:12-24.
[64] *See* Exhibit A, ¶115; McLawhorn Dep. at 75:19-22, 76:12-20; *see also, e.g.*,NatGen00576109.
[65] *See* Exhibit A, ¶115; McLawhorn Dep. at 76:25-77:4.
[66] *See* Exhibit A, ¶115; *See, e.g.*, NatGen00576109; see also McLawhorn Dep. at 80:18-20.
[67] *See* Exhibit A, ¶116; McLawhorn Dep. at 79:16-22.
[68] *See* Exhibit A, ¶118; NatGen00576109.

EDI.

108. The Insurance Request further falsely stated, "If we do not receive evidence of adequate insurance with an effective date on or before [42 days prior to the date on the Insurance Request], we may buy insurance to protect our interest in your vehicle."[69] This statement was false or misleading as Wells Fargo knew at the time that it did not need to purchase insurance to protect its interest in the borrower's vehicle. The Insurance Request also identified the cost of the annual insurance premium and provided the approximate amount by which the borrower's monthly payment would increase.[70]

109. Letters issued before February 2013 also falsely stated that "the insurance agency, which is an affiliate of Wells Fargo Dealer Services [or its predecessors], will earn a commission if this insurance is purchased."[71] This statement contained a false or misleading representation of material fact. At no point during the CPI Program was the commission "earned" by Wells Fargo's insurance agent affiliate, WestFin. As described above, WestFin did nothing to earn the commission it received. WestFin did not sell, market or promote CPI to borrowers; collect insurance premiums; communicate with borrowers or the CPI Vendor; assist the policyholder in determining her insurance needs; shop the market for the insurance product that meets the policyholder's needs; or seek the most competitive price for the product. The commission that Wells Fargo's affiliate received was an unlawful kickback for the placement of CPI on borrowers' accounts.

110. Wells Fargo internally acknowledged that WestFin did not "earn" a commission for producing CPI business. Instead, Wells Fargo attempted to justify WestFin's receipt of a

---

[69] *See* Exhibit A, ¶119; *Id.*
[70] *See* Exhibit A, ¶119; *Id.*
[71] *See* Exhibit A, ¶120; *Id.*

commission because WFDS incurred expenses to administer the CPI Program: "Commissions are obtained as part of the WFDS CPI program with QBE in order to offset the expenses WFDS incurs as a result of the program. WFDS still has to maintain management oversight, handle inbound and outbound calls with QBE, customers and insurance agencies, provide QBE with support related to uninsured accounts, cliams [sic] processing, inspections, and many other associated tasks."[72] But nothing within the RISC permitted Wells Fargo to charge borrowers for administrative fees to run the CPI Program, and Wells Fargo concealed from borrowers that they were being charged for these administrative fees. None of the communications, including the post-repossession consumer disclosures such as the Notices of Repossession and Post-Sale Notices, Wells Fargo sent to consumers disclosed such charges.

111. Some letters also stated that the commission was "15% of the premium."[73] That statement contained a false or misleading representation of material fact. No commissions during that time period were 15 percent of the premium. Under the GAA and its addenda, the commissions for the vast majority of this time period were 17.3 percent, and ranged from 17.2 to 17.25 percent for CPI force-placed during a few months in late 2005.

112. The Insurance Request included specified means by which the borrower could provide information in response to the letter. The borrower's options included an "Insurance Service Center" post office box, toll-free telephone number, fax number, and the website www.ihaveinsurance.com.[74] Although the CPI Vendor owned each of these points of contact, the Insurance Request never identified the CPI Vendor by name.[75] As a result, a borrower who

---

[72] *See* Exhibit A, ¶121; WFPI_00017004 at 016 (emphasis added).
[73] *See* Exhibit A, ¶122; *See, e.g.*, NatGen00576109.
[74] *See* Exhibit A, ¶123; *See id.*
[75] *See* Exhibit A, ¶123; *See id.*

engaged with any of these points of contact would have reasonably believed that he or she was communicating directly with Wells Fargo. The CPI Vendor never identified itself when answering inbound telephone calls from Wells Fargo's auto loan borrowers, and instead began calls, "Thank you for calling the Insurance Service Center."[76]

113. Wells Fargo reviewed and approved the scripts the CPI Vendor devised for its customer services representatives to respond to borrowers.[77]

#### d) Wells Fargo Had No Practice of Monitoring the CPI Vendor's Telephone Calls to Borrowers

114. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor used the facilities of the U.S. wires by placing outbound telephone calls to the borrower, the borrower's insurance agent (if known), or the borrower's insurance company (if known), 63 days after a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[78]

115. The CPI Vendor satisfied this obligation if it merely attempted to make one outbound telephone call. Nothing required the CPI Vendor to speak with the borrower before force-placing CPI.[79]

116. The CPI Vendor was required to make notations of these outbound telephone calls and borrowers' responses in its online database, Client Source. Wells Fargo had access to Client Source to verify that the CPI Vendor had in fact made those telephone calls in order to ensure that its borrowers' interests were protected. However, Wells Fargo had no practice of doing so at any

---

[76] *See* Exhibit A, ¶123; NatGen00563655 at p.5.
[77] *See* Exhibit A, ¶124; McLawhorn Dep. at 81:16-82:5.
[78] *See* Exhibit A, ¶125; McLawhorn Dep. at 85:25-86:19; WFCPI_00045980 at p.6.
[79] *See* Exhibit A, ¶126; McLawhorn Dep. at 91:2-16.

time during the CPI Program, instead only reviewing Client Source on an "as needed" basis.[80]

117. In fact, Wells Fargo did not have any internal controls over the CPI Program in place during the program's operation.[81]

**e) Defendants Sent False and Misleading "Coverage Issued" Letters to Borrowers**

118. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor sent via U.S. mail a second letter entitled "Coverage Issued" to the borrower 77 days after a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[82]

119. Like the Insurance Request, the Coverage Issued Letter was a standardized form letter sent to borrowers that included the borrower's contact, vehicle, and loan information.[83] The Coverage Issued Letter was written and sent by the CPI Vendor and reviewed and approved by Wells Fargo (or its predecessors).[84] As a result, the representations in the Coverage Issued Letter are attributable to both companies.

120. Like the Insurance Request, the Coverage Issued Letter was placed on Wells Fargo's letterhead and signed by Wells Fargo.[85] Wells Fargo approved the use of its letterhead. Although the address beneath Wells Fargo's logo was for the CPI Vendor, the name of the CPI Vendor did not appear anywhere in the Coverage Issued Letter,[86] leaving the borrower to believe that he or she was receiving correspondence from Wells Fargo.

---

[80] *See* Exhibit A, ¶127; McLawhorn Dep. at 86:20-89:11.
[81] *See* Exhibit A, ¶128; Rule 30(b)(6) Deposition of Mark Turner dated Aug. 16, 2018 ("Turner Dep.") at 62:15-63:13.
[82] *See* Exhibit A, ¶129 McLawhorn Dep. at 89:18-90:1; WFCPI_00045980 at p.6.
[83] *See* Exhibit A, ¶130; *See, e.g.*, NatGen00576035.
[84] *See* Exhibit A, ¶130; McLawhorn Dep. at 90:14-18.
[85] *See* Exhibit A, ¶131; McLawhorn Dep. at 90:19-20; *see also, e.g.*, NatGen00576035.
[86] *See* Exhibit A, ¶131; *See, e.g.*, NatGen00576035.

121. The Coverage Issued Letter falsely stated, "Our records indicate an absence of required insurance coverage since [77 days prior to the date on the Coverage Issued Letter]." This statement contained a false or misleading representation of material fact. In fact, Wells Fargo had received proof of the borrower's insurance from the dealer at the time of the purchase transaction. Wells Fargo maintained that proof of insurance in its records. Moreover, such proof existed through electronic records.

122. The Coverage Issued Letter further falsely stated, "Since we have not received proof of the required coverage, we have exercised our contractual right to purchase insurance coverage at your expense to protect our interest in your financed vehicle."[87] This statement was likewise false or misleading as Wells Fargo knew it did not need to purchaser insurance coverage to protect its interest in the vehicle.

123. The Coverage Issued Letter falsely represented that Defendants were exercising their "contractual right to purchase coverage" at the borrower's expense.

124. Nothing in the RISC disclosed to borrowers that Defendants would charge borrowers for a commission, the cost of administering the CPI Program, or the cost to pay for Tracking Services for Wells Fargo's indirect auto loan portfolio. Also, nothing in the RISC disclosed to borrowers that Defendants would force place a CPI policy without verifying that the borrower failed to maintain adequate collateral insurance.

125. The Coverage Issued Letter also identified the cost of the annual insurance premium, finance charge, and the amount by which the borrower's monthly payment would increase.[88]

---

[87] *See* Exhibit A, ¶133; *Id.*
[88] *See* Exhibit A, ¶135; *See id.*

126. The Coverage Issued Letter was also false or misleading as it failed to disclose the material fact that the identified premium included an unearned commission paid to WestFin for CPI issued during the period from March 2002 to February 2013.[89]

127. Throughout the duration of the CPI Program, the Coverage Issued Letter was also false or misleading as it indicated that CPI was forced-placed effective on the date a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[90] In other words, Defendants back-dated the force-placed CPI by 77 days. However, Defendants chose not to do anything to determine the condition of the vehicle before force-placing CPI.[91] As a result, Defendants collected payments for two and one-half months of CPI premiums for which they knew the likelihood they would have to pay claims was minimal.

128. This was not the only way in which Defendants employed the CPI Program to minimize the likelihood of paying claims. As explained above, Wells Fargo admitted that Defendants force-placed duplicative and unnecessary CPI on the accounts of hundreds of thousands of borrowers who already had adequate auto insurance of their own. In the event a claim was made on a vehicle with duplicative CPI and private insurance coverage, the CPI Vendor would forward the claim to the private insurance carrier, thus avoiding having to for claims on CPI for which borrowers had been charged.[92] Moreover, borrowers who maintained private insurance coverage were less likely to place a claim through CPI in the first place, because their first recourse generally was to place a claim with their own auto insurance company.

---

[89] *See* Exhibit A, ¶136; McLawhorn Dep at 93:3-9.
[90] *See* Exhibit A, ¶137; *E.g.,* NatGen00576111; McLawhorn Dep. at 97:18-98:3.
[91] *See* Exhibit A, ¶137; McLawhorn Dep. at 98:10-18.
[92] *See* Exhibit A, ¶138; McLawhorn Dep. at 99:8-100:10.

129. Wells Fargo also employed the CPI Program to avoid losses on repossessed, damaged vehicles in its auto loan portfolio that lacked insurance at the time of damage. Upon discovering that such a vehicle had been repossessed, Wells Fargo purchased CPI for that vehicle, which the CPI Vendor backdated to cover the claim. Then Wells Fargo included the cost of the premium as an expense to the borrower's account post-repossession.[93] This practice minimized the risk to Wells Fargo, enabling the bank to pass costs for CPI to the borrower who had never received disclosures that they would be so charged.

**f) Wells Fargo Sent Admittedly Deceptive Account Statements to Borrowers**

130. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor billed Wells Fargo for the placement of CPI, and Wells Fargo added CPI premiums and interest charges to the borrower's account, 100 days after a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[94]

131. However, Wells Fargo concealed CPI charges—for premium, interest, and commissions—on borrowers' billing statements at all times between inception of the CPI Program in March 2002 and September 2016, less than one month before Wells Fargo terminated the CPI Program. An internal Wells Fargo audit in August 2015 concluded in its own words that the bank's CPI billing practices were "deceptive":

> Current billing statement does not provide an itemized break down of charges including CPI that makes up the total due balance. As a result the monthly statements do not clearly identify monthly payment requirements, payment allocation, and charges and fees. ***Customers may not be aware that CPI charges are included and***

[93] *See* Exhibit A, ¶139; McLawhorn Dep. at 228:17-229:10.
[94] *See* Exhibit A, ¶140; WFCPI_00045980 at p.6.

> ***balance due has increased and are negatively impacted with potential NSF and late fees.***
> ***Risks: Negative impact to customer (deceptive)*** and violation of regulations (CFBP)
> Note: There is a statement re-design project that doesn't address the issue [emphasis added.][95]

132. Wells Fargo's deceptive billing practices harmed borrowers including Plaintiffs and Class members. Wells Fargo's failure to disclose on customer billing statements the addition of charges for CPI premiums and interest increased the likelihood that borrowers would suffer adverse consequences such as underpayments, late payments, fees for insufficient funds, and repossessions. Wells Fargo's deliberate decision to omit CPI charges on customer billing statements decreased the likelihood that borrowers would call to complain or notice that their payments were deficient. Defendants' actions also caused significant damage to the credit reports of thousands of auto loan borrowers.

#### g) Wells Fargo's Management, Risk Officers, and Board of Directors Knew That the CPI Program Harmed Its Customers

133. WFDS personnel reported on issues concerning the CPI Program to Wells Fargo Bank's Executive Risk Management Committee ("ERMC") in April and July 2012.[96] The ERMC was comprised of some of Wells Fargo's most senior executives including Pat Callahan (former Chief Administrative Officer), Kenneth Zimmerman (former Executive Vice President, Deposit Products Group), James Strother (former Executive Vice President and General Counsel), David Julian (Chief Auditor), Michael Loughlin (former Chief Risk Officer), Kevin Mosse (former Head of Home Equity Lending, Diversified Products Group), and others.

134. The ERMC were briefed on numerous critical issues related to the structure and operation of the CPI Program including the bank's potential loss exposure under the CPI Program

---

[95] *See* Exhibit A, ¶141; WFCPI_00048650; see also WFCPI_00006404.
[96] *See* Exhibit A, ¶162; WFCPI_00017004.

versus an alternative product, the total premium paid, cost comparisons to other insurance products, Wells Fargo's failure to conduct an RFP for vendors since inception of the program in 2002, the commission structure, the payment hierarchy for borrowers, the backdating of CPI certificates, and other matters.[97] Notwithstanding that concerns with the CPI Program were brought to the attention of senior management in 2012, the force-placed CPI scheme remained in place with "[m]inimal changes to pricing or structure of [the] program since inception" for four more years.[98]

135. In June and July 2016, WFDS and the Wells Fargo Risk Team identified and escalated three issues concerning the CPI Program to Tim Sloan (Wells Fargo's Chief Executive Officer), Michael Loughlin (Wells Fargo's former Chief Risk Officer), the Operating Committee, the ERMC, and the Board of Directors.[99] Those issues were:

> i. Inadequacy of a 3rd party vendor's process to validate customer had their own insurance, resulting in unnecessary CPI placement
>
> ii. Resulting impact on a borrower's delinquency status leading to potentially adverse credit reporting impacts which were corrected on a reactive rather than proactive basis; and
>
> iii. Potential repossession based solely on past due CPI amounts, contrary to [line of business] policy.[100]

136. In August 2016, Wells Fargo senior executives began contemplating terminating the CPI Program, because "[k]eeping the program could lead to reputational risk and potential legal exposure."[101]

137. Defendants discontinued their unusual practice of force-placing CPI on Wells

---

[97] *See* Exhibit A, ¶163; *Id.*
[98] *See* Exhibit A, ¶163; WFCPI_00045980 at p.2.
[99] *See* Exhibit A, ¶164; WFCPI_00062871 at 872.
[100] *See* Exhibit A, ¶164; *Id.*
[101] *See* Exhibit A, ¶165; WFCPI_00035207 at 208.

Fargo's auto loan borrowers' accounts effective September 30, 2016. Nonetheless, Wells Fargo chose to continue assessing CPI charges on borrowers for whom it had previously force-placed CPI.[102]

138. In October 2016, Wells Fargo formed a Steering Committee of executive leaders from four teams—Consumer Lending, Risk Management, Legal and Audit—to identify and address legal and reputational issues and to devise proposals to mitigate further harm to borrowers on whose accounts Defendants had force-placed CPI.[103] The Steering Committee communicated about CPI issues with Wells Fargo's CEO Tim Sloan.[104]

139. In November 2016, Wells Fargo hired outside counsel, McGlinchey Stafford, and outside consulting firm, Oliver Wyman, to investigate the CPI Program and develop a "remediation plan" to address the harm Defendants had caused to the bank's auto loan borrowers.[105] Wells Fargo established a Working Group of executives who, along with McGlinchey Stafford and Oliver Wyman, conducted a large number of interviews to understand how the CPI Program worked, but the Working Group never even bothered to interview any of the hundreds of thousands of customers who were defrauded.[106]

140. Following reviews by the Steering Committee of executive leaders and outside advisors, on June 27, 2017, Franklin Codel, Wells Fargo's former Senior Executive Vice President of Consumer Lending, reported to the Board of Directors the following "key findings" and "weaknesses" about the CPI Program:

i. Placement of insurance followed a limited insurance verification process outsourced to a vendor.

---

[102] *See* Exhibit A, ¶166; WFCPI_00062871 at 872.
[103] *See* Exhibit A, ¶167; *Id.*
[104] *See* Exhibit A, ¶167; Turner Dep. at 97:15-20.
[105] *See* Exhibit A, ¶168; WFCPI_00062871 at 872.
[106] *See* Exhibit A, ¶168; Turner Dep. at 38:10-40:8.

ii. Until September 2016, CPI amounts assessed were not itemized on periodic statements, making it difficult for customers to understand that CPI was the cause of payment increase.

iii. Customer complaints reflect that customers were required to submit proof of insurance multiple times to achieve cancellation of unneeded coverage.

iv. The complaint groups were not sufficiently staffed to handle complaint volume, resulting in a backlog and delay in getting customers' concerns addressed.

v. There was limited attempt to look holistically at complaint trends and identify root causes both with respect to internal complaints and complaints made to National General.

vi. Customer payments were allocated to CPI interest prior to loan principal, resulting in delinquency if customers continued to make their scheduled principal and interest payments without additional CPI amounts owed.

vii. Interest charges related to the pro-rated premiums refunded were not always reversed when CPI was partially cancelled.

viii. Late fees resulting from CPI were not always refunded adequately.

ix. When CPI was cancelled, credit reporting may not have been updated to remove delinquency marks caused by charges for unneeded CPI coverage unless affirmatively requested by consumer.[107]

141. Nonetheless, Wells Fargo did not publicly acknowledge the CPI scheme until information about it was leaked to the press.

**h) The New York Times Exposed Defendants' Forced-Placed CPI Scheme**

142. Defendants' fraudulent CPI scheme finally came to light on July 27, 2017, when *The New York Times* ran an investigative report on the scandal.[108] The *Times* report, was based on a copy of the internal report commissioned by and prepared for Wells Fargo by consulting firm

---

[107] *See* Exhibit A, ¶169; WFCPI_00062871 at 873.

[108] Gretchen Morgenson, The New York Times, *Wells Fargo Forced Unwanted Auto Insurance on Borrowers*, July 27, 2017, available at https://www.nytimes.com/2017/07/27/business/wells-fargounwanted-auto-insurance.html.

Oliver Wyman that detailed the scheme (the "Oliver Wyman Report").

143. The Oliver Wyman Report was commissioned in 2016 and completed in February 2017—five months before it was leaked to the press. The Oliver Wyman Report investigated Defendants' CPI practices, but only between January 2012 and July 2016. It found that Defendants charged roughly 800,000 consumers for CPI they did not need, with an estimated 274,000 becoming delinquent on their account. Approximately 25,000 vehicles were wrongfully repossessed as a result of Defendants' CPI practices. The report estimated Wells Fargo owed $73 million to its customers.[109]

144. But, the scheme began well before 2012, and Wells Fargo's borrowers sustained financial damages far beyond the costs of the insurance.[110] The harm also included repossession costs, late fees, charges for insufficient funds, time spent dealing with overdrafts, unfair charges, bank account deficiencies, attempts to reverse the Defendants' wrongful charges, and damage to consumers' credit reports.

**D. <u>Attempts at Remediation, Federal Prosecutions, and Ensuing Litigation</u>**

145. In a press release posted to its Dealer Services website on the same day the Times story first ran, Wells Fargo announced a purported "remediation" program: "In total, approximately $64 million of cash remediation will be sent to customers in the coming months, along with $16 million of account adjustments, for a total of approximately $80 million in

---

[109] *See* Exhibit A, ¶172; The Oliver Wyman Report; *See* WFCPI_00030101 at 103.

[110] The New York Times reported that the scheme began as early as 2006. Id. But, after a subsequent Times article questioned the time period of Wells Fargo's study, Wells Fargo subsequently admitted that the CPI scheme began as early as 2005. See Wells Fargo, SEC and Other Regulatory Filings, Q3 2017 Form 10-Q, at p.3, November 3, 2017, available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2017/third-quarter-10q.pdf. As detailed herein, the scheme began in March 2002.

remediation."[111]

146. The core decisions concerning the nationwide remediation program were made by Wells Fargo from it California offices and headquarters.

147. But, Wells Fargo's "remediation" program is not what it purports to be. Wells Fargo has not offered consumers remediation of the financial harm they suffered, and left a chunk of borrowers without remediation entirely. Wells Fargo has informed borrowers that if they submit proof of insurance, they "may be eligible for a refund." Wells Fargo offered no "remediation" for its scheme to apply unnecessary, unauthorized and inflated CPI premiums, and Wells Fargo's remediation program offers no relief for the lucrative kickbacks it received in the form of unearned commissions.[112]

148. Moreover, as the remediation program limited eligible borrowers to those who had force-placed CPI between 2005 and 2016, and the program started in 2002, it specifically excluded borrowers who were affected between 2002 and 2005, like Plaintiff Archuleta who was a victim of this scheme starting in 2003.

149. Wells Fargo's announced "remediation" program drew criticism from federal regulators. On October 20, 2017, The New York Times ran a follow-up article after having reviewed a preliminary report on the CPI scandal prepared by the Office of the Comptroller of the

---

[111] Wells Fargo, Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage, July 27, 2017, available at https://newsroom.wf.com/pressrelease/consumer-lending/wells-fargo-announces-plan-remediate-customers-auto-insurance.

[112] *See* Exhibit A, ¶176; WFCPI_00030101 at 113; Turner Dep. at 107:6-9, 108:10-13 ("Q. And 2 A says customers that paid higher premiums for CPI due to commissions charged. Do you see that? A. Yes. … Q. And it was a business decision of the bank's not to include that category in the remediation plan; right? A. The – yes.").

Currency ("OCC").[113] The report stated that Wells Fargo had most likely underestimated how much it would cost to reimburse harmed customers.

150. The OCC found that Wells Fargo's claimed $80 million fund to compensate consumers was not enough money to properly reimburse consumers, nor did the money sufficiently cover all of the consumers impacted. The OCC also found that Wells Fargo used "an overly complicated reimbursement methodology, which lacked clear support for addressing all the customer costs incurred," according to the report.

151. As noted by the Times, "[t]he report paints a damning picture of a bank that didn't monitor its contractors, that lacked the impetus to correct problems once they were uncovered and that proved unresponsive to complaints from its customers."[114]

152. Whereas Wells Fargo initially claimed that Defendants' force-placed CPI practices affected only 570,000 borrowers between January 2012 and 2016 and would require $80 million in remediation, Wells Fargo's 2017 3rd Quarter Form 10-Q, filed on November 3, 2017, paints a different picture.[115]

153. Wells Fargo then admitted that "[t]he time period in which customers may be eligible to claim or otherwise receive remediation compensation for certain CPI placements has now been extended back to October 15, 2005."[116] And, whereas Wells Fargo originally pledged $80 million to remediate Defendants' fraudulent practices, Wells Fargo increased its estimate to approximately $130 million.[117] Again, this proposed remediation was insufficient.

---

[113] Gretchen Morgenson, The New York Times, *Regulator Blasts Wells Fargo for Deceptive Auto Insurance Program*, October 20, 2017, available at https://www.nytimes.com/2017/10/20/business/wellsfargo-auto-insurance-comptroller.html.
[114] *Id.*
[115] Q3 2017 Form 10-Q, supra at n.5.
[116] *See* Exhibit A, ¶180; *Id.*
[117] *Id.*

154. In 2017, more than a dozen class action complaints were filed against Defendants in California and New York. On October 18, 2017, the United States Judicial Panel on Multidistrict Litigation centralized the litigation in the Central District of California, Case No. 8:17-ML-2797-AG-KES. The MDL Litigation alleged multiple claims against Defendants including violations of RICO, the Bank Holding Company Act, California Unfair Competition Law, Fraud by Concealment, and Unjust Enrichment, and had a nationwide class, as well as a number of state-specific classes, for borrowers who were assessed CPI charges and/or related fees on or after March 1, 2002, which was the date of the inception of the CPI Program.

155. Extensive discovery took place in the MDL Litigation, including Defendants production of 663,880 documents totaling about 4,472,564 pages, another approximately 40,000 pages from the third-party consulting form, Oliver Wyman, that was retained to analyze Wells Fargo's CPI program and devise its 2017 remediation program. Discovery also included ten (10) corporate designee and employee depositions between Defendants.

156. In a pair of Consent Orders announced on April 20, 2018, the Consumer Financial Protection Bureau and the OCC found that Wells Fargo's CPI practices violated multiple federal statutes and warranted some of the largest fines in recent memory. Wells Fargo agreed to pay $1 billion to federal regulators in part to settle claims it improperly charged auto loan customers for duplicative, unnecessary, and overpriced CPI.[118]

157. In 2019, parties to the MDL Litigation settled the claims, with Defendants agreeing to pay "at least $393.5 million" to the Settlement Class. Although the MDL Litigation Complaint

[118] *See In the Matter of Wells Fargo Bank*, No. 2018-BCFP-0001 (April 20, 2018), available at https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bankna_consent-order_2018-04.pdf; *In the Matter of Wells Fargo Bank, N.A.*, No. AAEC-2018-16, (April 20, 2018), available at https://www.occ.gov/static/enforcementactions/ea2018-026.pdf.

contemplated the class period beginning at inception of the CPI Program in March 2002, in settlement the class was limited and excluded borrowers who had CPI force-placed from March 2002 to October 15, 2005. As a result, a class of borrowers, like Plaintiff Archuleta, who were charged CPI premiums a related fees prior to October 2005, were once again excluded from relief, and received nothing.

158. In 2024, the United States sued National General over the CPI scheme, alleging six (6) counts of violation of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") for mail fraud, wire fraud, and bank fraud. This action is ongoing to today and appears to be embroiled in discovery disputes.

159. Together, these facts paint a picture of a company—Wells Fargo—driven entirely by profit and its willing co-conspirator—National General—who together rigged an already abusive insurance practice for their own ill-gotten gain.

160. This class action seeks to redress that harm on behalf of Plaintiffs and these classes of consumers, who, despite repeated attempts to save their reputation after scandal, have still left borrowers like Plaintiff Archuleta without remedy for Defendants illegal and abusive CPI scheme.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCE

### Karen Archuleta

161. Representative Karen Archuleta entered into a retail installment sales contract ("RISC") on or about September 17, 2003 to purchase a 2002 35th Anniversary Edition Chevrolet Camaro from Stevinson Chevrolet in Lakewood, Colorado.

162. The RISC also included a standard provision that required her to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Plaintiff Archuleta failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance

for itself and charging Plaintiff Archuleta for the premiums.

163. Archuleta's loan agreement was financed through Wells Fargo.

164. Wells Fargo knew that Archuleta had vehicle insurance through State Farm at the time she financed the vehicle though deliberately disregarded such.

165. Indeed, Archuleta provided the dealership with a copy of her insurance card, which included her policy number and the contact information of her insurance agent. Wells Fargo's records reflect that the dealership verified that Archuleta had the required insurance before turning the vehicle over to her. A copy of the retail installment sales contract is not within the possession of McCarthy though will be obtained through discovery.

166. Subsequently, Wells Fargo added a $1,999.00 CPI charge to Archuleta's outstanding balance. Wells Fargo added these CPI charges even though Archuleta had provided evidence of the required insurance when she purchased her vehicle, and even though she continued to maintain the required insurance.

167. Archuleta was not notified that Wells Fargo had added a CPI charge to her loan. She was unaware of the scheme until she received the letter sent by Wells Fargo dated November 7, 2023.

168. The premiums charged to Archuleta were inflated to include and hide kickbacks to Defendants, as set forth in this Complaint.

169. At no time did Wells Fargo or any other party disclose to Archuleta that the amounts charged covered kickbacks to the insurer, reinsurance profits, or any of the other impermissible charges or services described in this Complaint.

170. Archuleta continued to make regular payments based on the original amount, however, unbeknownst to her, she was accumulating interest and late charges on the additional

amount added by the CPI charge.

171. The CPI charge and accompanying accumulations prevented her from keeping her loan current and as a result, Archuleta's account defaulted and Wells Fargo repossessed her vehicle.

172. Over the following approximately 15 years, Archuleta had two other vehicles whose loans were secured by Wells Fargo, and Wells Fargo did the exact same thing on those accounts as well, illegally force-placing CPI while being in possession of adequate insurance coverage, leading to eventual vehicle repossession.

173. Because Wells Fargo concealed the CPI charges, Archuleta did not learn that Wells Fargo had charged her for CPI coverage until November 2023 when she received a remediation letter from Wells Fargo with a check for $8,183.42 enclosed. The letter did not indicate which loan this refund applied to or how it was calculated.

174. The letter gave Archuleta the option to mediate, and she chose to do so.

175. In connection with her mediation, Archuleta reviewed Wells Fargo's auto loan documents folder. Within Wells Fargo's auto loan file was the document forwarded to Wells Fargo from the dealership, Stevinson Chevrolet, dated September 17, 2003, titled "Confirmation of Accidental Physical Damage Insurance," which included the insurance policy carrier, policy number, and insurance agent's contact information.

176. After mediation, Wells Fargo determined she was eligible for an additional $7,673.05 in connection with a second vehicle, but refused to compensate her for the CPI policy placed on her vehicle in 2003, stating only that it was ineligible for remediation. When Archuleta attempted to pursue it further, Wells Fargo sent her a formal denial letter, telling her that all mediation options had been exhausted and they considered the matter resolved.

**Michael McCarthy**

177. Representative Michael McCarthy entered into a retail installment sales contract ("RISC") in 2003 to purchase a 2002 Ford Focus from a dealership in Washington.

178. The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Plaintiff McCarthy failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Plaintiff McCarthy for the premiums. A copy of the retail installment sales contract is not within the possession of McCarthy though will be obtained through discovery.

179. McCarthy's loan agreement was financed through Wells Fargo.

180. McCarthy provided the dealership with a copy of his insurance card, which included his policy number and the contact information of his insurance agent. Wells Fargo's records reflect that the dealership verified that McCarthy had the required insurance before turning the vehicle over to him.

181. Subsequently, Wells Fargo added a CPI charge to McCarthy's outstanding balance. Wells Fargo added these CPI charges even though McCarthy had provided evidence of the required insurance when he purchased his vehicle, and even though he continued to maintain the required insurance.

182. McCarthy was not notified that Wells Fargo had added a CPI charge to his loan.

183. The premiums charged to McCarthy were inflated to include and hide kickbacks to Defendants, as set forth in this Complaint.

184. At no time did Wells Fargo or any other party disclose to McCarthy that the amounts charged covered kickbacks to the insurer, reinsurance profits, or any of the other impermissible charges or services described in this Complaint.

185. McCarthy continued to make regular payments based on the original amount, however, unbeknownst to him, he was accumulating interest and late charges on the additional amount added by the CPI charge.

186. The CPI charge and accompanying accumulations prevented him from keeping him loan current and as a result, McCarthy's account defaulted and Wells Fargo repossessed her vehicle in California.

187. McCarthy had no knowledge of this Wells Fargo scheme until November 6, 2026.

**Milagros Amy Ritchie**

188. Representative Milagros Amy Ritchie entered into a retail installment sales contract ("RISC") approximately in 2004 to purchase a 2004 Chevrolet Trail Blazer.

189. The RISC also included a standard provision that required her to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Plaintiff Ritchie failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Plaintiff Ritchie for the premiums. A copy of the retail installment sales contract is not within the possession of Ritchie though will be obtained through discovery.

190. Ritchie's loan agreement was financed through Wells Fargo.

191. Ritchie provided the dealership with a copy of her insurance card, which included her policy number and the contact information of her insurance agent. Wells Fargo's records reflect that the dealership verified that Ritchie had the required insurance before turning the vehicle over to her.

192. Subsequently, Wells Fargo added a CPI charge to Ritchie's outstanding balance. Wells Fargo added these CPI charges even though Ritchie had provided evidence of the required insurance when she purchased his vehicle, and even though she continued to maintain the required

insurance.

193. Ritchie was not notified that Wells Fargo had added a CPI charge to her loan.

194. The premiums charged to Ritchie were inflated to include and hide kickbacks to Defendants, as set forth in this Complaint.

195. At no time did Wells Fargo or any other party disclose to Ritchie that the amounts charged covered kickbacks to the insurer, reinsurance profits, or any of the other impermissible charges or services described in this Complaint.

196. Ritchie continued to make regular payments based on the original amount, however, unbeknownst to her, she was accumulating interest and late charges on the additional amount added by the CPI charge.

197. The CPI charge and accompanying accumulations prevented her from keeping her loan current and as a result, Ritchie's account defaulted and she surrendered the vehicle as part of a bankruptcy.

198. Ritchie had no knowledge of this Wells Fargo scheme until November 6, 2026.

## STATUTE OF LIMITATIONS

### A. The Discovery Rule

199. The discovery rule tolls any statutes of limitation otherwise-applicable to any claims asserted herein.

200. Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants conspired to force-place unnecessary CPI on hundreds of thousands of borrowers.

201. Defendants' CPI scheme was elaborate and well-concealed. Despite having received proof of insurance at loan origination, Defendants falsely represented that they had never

received such information. Moreover, Wells Fargo chose not to disclose CPI charges, including premium, interest and unearned commissions, in its regular billing statements to consumers at any point between inception of the CPI Program in 2002 and just before termination in September 2016.

202. As previously asserted, Wells Fargo admitted its practices were deceptive and that borrowers were potentially unaware that CPI charges were included in their balances.

**B. Fraudulent Concealment** [119]

203. Defendants' affirmative and active concealment of their conduct also tolls any otherwise-applicable statute of limitations to any claims asserted herein.

204. Under the fraudulent concealment doctrine, the causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' concealment of the material facts.

205. Plaintiffs and members of the Class, as defined below, were kept ignorant by Defendants of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the true nature of the Defendants' force-placed CPI scheme, including the kickbacks to Wells Fargo from the CPI Vendor.

206. Even after the *Times* article came out, these borrowers had no reason to know they were affected, as the article incorrectly set forth the time period of affected borrowers as beginning in 2005.

---

[119] The fraudulent concealment doctrine operates to stop the statute of limitations from running in circumstances when the accrual date of a claim has passed but the "plaintiff's cause of action has been obscured by the defendant's conduct." In re Linerboard Antitrust Litig., 305 F.3d 145, 160 (3d Cir.2002). *In re Cmty. Bank of N. Virginia Mortgage Lending Practices Litig.*, 795 F.3d 380, 400–01 (3d Cir. 2015).

207. Plaintiff Archuleta discovered the CPI scheme when Wells Fargo contacted her regarding the CPI remediation program because she had multiple vehicle loans with Wells Fargo during the CPI scheme, two of which were included in the remediation program. Had she not had multiple loans affected by CPI, she might not have ever learned she was a victim of this scheme in 2003.

208. Plaintiffs McCarthy and Ritchie were not part of CPI remediation program and therefore was never notified of the CPI scheme. Indeed, because Plaintiffs McCarthy and Ritchie and other affected borrowers were excluded from the remediation program and MDL Litigation, many of the affected borrowers may not know they were affected by the scheme even today.

209. Defendants are under a continuous duty to disclose, to Plaintiffs and Class members, the true character, quality and nature of the charges they assess on borrowers' accounts. Defendants actively and affirmatively concealed the true character, quality, and nature of their assessment of force-placed charges for CPI polices on borrowers' accounts.

210. Defendants' concealment includes their false and misleading statement and omissions of material fact in their Insurance Request letters, Coverage Issued letters, billing statements, customer service telephone calls, and elsewhere. Plaintiffs and members of the Classes reasonably relied on Defendants' affirmative and active concealment.

211. Defendants' concealment also includes their continued rejection of Plaintiff Archuleta's efforts to obtain remediation on her 2002 vehicle loan, which persisted through Wells Fargo's most recent communication with Archuleta, on March 11, 2026.

212. McCarthy and Ritchie were not included in / participated in any remediation program.

## CLASS ALLEGATIONS

### A. Class Definitions

213. Plaintiffs bring this action against Defendants pursuant to §23(a)(1) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.

214. Plaintiffs seek to represent a "Nationwide Class" composed of all residents of the United States of America who obtained an auto loan that was held or serviced by Wells Fargo Bank, N.A. or its predecessors, subsidiaries or divisions, and who were assessed charged for CPI and/or related fees on or after March 1, 2002. Excluded are persons whose claims were released by a final judgment or settlement.

215. Plaintiffs also seek to represent a Nationwide UCC Subclass, composed of people in the Nationwide Class whose motor vehicle purchased via their subject auto loans was repossessed by Wells Fargo Bank, N.A. or its predecessors, subsidiaries, or divisions, and who Wells Fargo sent (or caused to be sent) a Notice of Repossession and/or Post-Sale Notice during the applicable Class Period.

216. In addition, Plaintiffs seek to represent a California Subclass, composed of people in the Nationwide Class who, during the applicable Class Period, entered into a retail instalment sales contract for the purchase of a motor vehicle primarily for personal, family, or household use in California, or whose contract is otherwise governed by California law.

217. The determination that the loan was a consumer loan is readily available by language on each loan document and by way of information readily available in Wells Fargo's business records. The FTC Holder Rule Notice is found in each consumer loan at issue.

218. Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

219. Defendants subjected Plaintiffs and the respective class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

## B. Numerosity

220. More than 39 people comprise the putative classes. The proposed classes are so numerous that joinder of all members would be impracticable.

221. Wells Fargo provides loans secured by vehicles, real property, and other property, to hundreds of thousands of consumers every year. A substantial number of these borrowers fail to maintain insurance and are required by Wells Fargo to pay for force-placed insurance.

222. The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Wells Fargo.

223. The precise number of class members can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.

224. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

## C. Commonality

225. There are questions of law and fact that are common to Plaintiffs' and class members' claims. These common questions predominate over any questions that go particularly to any individual member of the class. Among such common questions of law and fact are the following:

a. Whether Wells Fargo repossessed more than 39 class member's vehicles and forced-placed CPI on their loans, including the loans of the Representative Plaintiffs;

b. Whether Defendants engaged in the unlawful conduct alleged herein:

c. Whether Defendants force-placed CPI on Wells Fargo auto loan customers who maintained independent automobile insurance;

d. Whether Defendants assessed CPI charges to Plaintiffs and other Class members including charges for premiums, interest, unearned commissions, and other fees as a result of their force-placement of CPI;

e. Whether Defendants wrongfully threatened collections, repossessed vehicles, and made adverse notations on credit reports of Plaintiffs and other Class members as a result of their force-placement of CPI; Whether Defendants made misrepresentations and omissions of material fact regarding their loans and their procedures for force-placing CPI;

f. Whether Wells Fargo received kickback payments in the form of unearned commissions from the CPI Vendor for force-placing CPI and, as a result, whether Plaintiffs and Class members were charged unlawfully inflated CPI premiums;

g. Whether Defendants knew or should have known that they failed to properly confirm whether borrowers had independent automobile insurance;

h. Whether Defendants' conduct violates RICO, the UCC, consumer protection statutes, and other causes of action herein;

i. Whether Plaintiffs and other Class members are entitled to equitable relief, including but not limited to, restitution or injunctive relief;

j. Whether such equitable relief includes Defendants' remediation of Plaintiffs' and Class members' credit reports;

k. Whether Plaintiffs and the other Class members are entitled to damages, including treble damages, punitive

damages, exemplary damages and statutory damages (where allowed by state law) and other monetary relief and, if so, in what amount; and

l. Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

m. Whether Wells Fargo advanced or charged for collateral protection insurance without satisfying California Civil Code section 2982.8;

n. Whether Wells Fargo included CPI premiums, related interest, or fees not legally owed in amounts stated or used in pre-disposition notices, redemption quotations, or post-disposition explanations of surplus or deficiency;

o. Whether the challenged notices or explanations failed to comply with the applicable state enactments of UCC sections 9-611, 9-614, 9-615, 9-616, and 9-623; and

p. Resulting damages and statutory remedies under section 9-625 and the Rees-Levering Act.[120]

**D. Typicality**

226. Plaintiffs are members of the classes they seeks to represent.

227. Plaintiffs' claims are typical of the classes' claims because of the similarity,

[120] "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of *427 the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir.2013) (internal quotation marks omitted). "Their claims must depend upon a common contention ... that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2545, 180 L.Ed.2d 374 (2011). Meeting this requirement is easy enough: "[W]e have acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, when class members did not have identical claims, and, most dramatically, when some members' claims were arguably not even viable." *In re Cmty. Bank*, 795 F.3d at 397 (internal citations omitted). *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 427 (3d Cir. 2016), as amended (May 2, 2016).

uniformity, and common purpose of the Defendants' unlawful conduct.[121]

228. Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

### E. Adequacy of Representation

229. Plaintiffs are adequate representative of the classes they seek to represent and will fairly and adequately protect the interests of those classes.

230. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.

231. There is no conflict between Plaintiffs and the unnamed class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

232. To prosecute this case, Plaintiffs have chosen the undersigned law firm, which is experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F. Predominance

233. The questions of law or fact common to Plaintiffs' and each class member's claims predominate over any questions of law or fact affecting only individual

---

[121] Rule 23(a)(3) requires that the class representatives' claims be "typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3). This "ensures the interests of *428 the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir.2001) (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir.1998)). We also have set a "low threshold" for typicality. Id. at 183. " 'Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir.1998) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir.1994)) (alteration omitted). *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 427–28 (3d Cir. 2016), as amended (May 2, 2016).

members of the class. All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies and Defendants' egregious actions in inflating the amounts of the policy premiums for the purpose of profit at the expense of the Plaintiffs and class members.

234. Common issues predominate when, as here, liability can be determined on a class- wide basis, even when there will be some individualized damages determinations.

235. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the classes as is the case at bar, common questions will be held to predominate over individual questions.[122]

**G. <u>Superiority</u>**

236. A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside throughout the state;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

---

[122] Courts have found predominance satisfied in multi-state class actions. See e.g. *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 217 (E.D. Pa. 2012) (finding predominance satisfied where plaintiffs sued under multiple state's laws on monopolization, unfair and deceptive trade practices, and unjust enrichment and the issues relevant to proving liability could be proven through class-wide common evidence focusing on the defendant's conduct, not on the actions of individual class members); *In re Wellbutrin, supra*, (finding predominance satisfied where plaintiffs sued under antitrust laws of five states and consumer protection laws of two states, when proof of liability involved common issues, and would likely use the same documents and evidence focusing on the defendants' conduct, rather than the conduct of the plaintiffs).

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and,

(f) The action is manageable as a class action.

237. Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class or subclass.

238. Defendants have acted or failed to act in a manner generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the classes as a whole.

239. There are no unusual legal or factual issues that would cause management problems not normally and routinely handled in class actions. Damages may be calculated with mathematical precision.

240. Because most class members either do not know that their rights have been violated, could not economically justify the effort and expense required to litigate their individual claims or have little interest in or ability to prosecute an individual action, due to the complexity of the issues involved in this litigation, a class action is the most practical proceeding in which they can recover.

## RICO ALLEGATIONS

241. The following allegations pertain to Plaintiffs' claim for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964, against all Defendants.

242. Plaintiffs and the members of the Class are each "persons" as that term is

defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

243. Defendants are, and at all relevant times were, "persons" within the meaning of 18 U.S.C. § 1961(3) because they are entities capable of holding legal or beneficial interest in property. Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

244. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."18 U.S.C. §1962(c).

245. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise generally has three structural features, including: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

246. As alleged below and throughout this Complaint, the Wells Fargo and National General companies orchestrated a scheme to extract millions of dollars from Plaintiffs and members of the Class by force-placing inflated, unlawful, unnecessary and undisclosed CPI in connection with automobile loans issued and held by Wells Fargo. Wells Fargo, National General, and their predecessors conducted their business through an association-in-fact enterprise in

violation of section 1962(c) by a pattern of racketeering activity, including mail and wire fraud, for the purpose of improperly profiting from unlawfully force-placed CPI. The CPI scheme enabled Wells Fargo to enjoy kickbacks in the form of unearned commissions and other compensation for force-placing CPI. The CPI scheme also afforded National General a captive audience of millions of accounts on which it could force-place CPI, earning hundreds of millions of dollars in net written premiums at a low risk of payout on insurance claims.

247. Defendants' endeavor had the desired effect. Defendants secured unlawful profits during the pendency of the enterprises. And, as collateral damage, unsuspecting borrowers were charged millions of dollars in excessive premiums, interest, overdraft fees, late fees, and experienced negative credit occurrences and repossession as a result of Defendants' conduct.

**COUNT I**
**Violations of the Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. §1962(c)**
**(Against All Defendants)**

248. Plaintiffs re-allege and incorporate the above paragraphs as if fully set forth herein and further allege as follows.

249. Plaintiffs bring this claim for relief on behalf of themselves and the members of the Nationwide Class pursuant to 18 U.S.C. §§ 1962(c) and 1964 of RICO against Wells Fargo and National General (for purposes of this cause of action, "Defendants").

**A. The CPI Enterprise**

250. Defendants Wells Fargo, National General, and their predecessors as detailed throughout this Complaint, formed an association-in-fact enterprise, referred to herein as the "CPI Enterprise." The CPI Enterprise included: (a) Wells Fargo, its predecessors, subsidiaries, employees, and agents including WFS, Wachovia, WestFin, and WFDS; and (b) National General,

its predecessors, subsidiaries, employees, and agents including Newport, Meritplan, Balboa, and QBEF. The CPI Enterprise was formed for the purpose of unlawfully extracting significant revenue and profits from Plaintiffs and the Class by force-placing CPI on their automobile loans, and sharing kickbacks in the form of unearned commissions and other payments between the members of the enterprise.

251. At all relevant times, each member of the CPI Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

252. Each member of the CPI Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But, at all relevant times, the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

253. The members of the CPI Enterprise are systematically linked through continually coordinated activities (including the transmission of the Daily New Loan File, agreements to force-place CPI on borrowers, monthly management meetings, and quarterly business reviews), financial ties (including daily payments of premium, refunds, and commissions), and contractual business arrangements (including the IAAs and GAAs). The CPI Enterprise was an ongoing and continuous enterprise from March 2002 to September 2016.

254. Defendants could not have accomplished the purpose of the CPI Enterprise without the assistance of each other, and all Defendants profited financially from the scheme.

255. The CPI Enterprise described above involved regular communications between Wells Fargo and National General in which insurance and customer information, and payments were exchanged to facilitate the goals of the enterprise. As described below, such communications occurred through the mail and wire facilities of the United States.

256. The members of the CPI Enterprise functioned as a continuing unit for the purposes of implementing the scheme. All members agreed to take actions to hide the existence of the scheme and the CPI Enterprise from others including Wells Fargo's auto loan borrowers. The members of the CPI Enterprise functioned as a continuing unit for the purposes of implementing the scheme. All members agreed to take actions to hide the existence of the scheme and the CPI Enterprise from others including Wells Fargo's auto loan borrowers.

257. The CPI Enterprise engaged in and affected interstate commerce because, *inter alia*, it affected the price and terms of auto loans and/or CPI that was force-placed on millions of Class members throughout the United States. The CPI Enterprise further required that Class members make payments for CPI premiums, interest, and unearned commissions in interstate commerce to Wells Fargo.

The effects of the CPI Enterprise are still felt today, as many Wells Fargo auto loan customers continue to be damaged by CPI-related negative reports to credit reporting agencies.

**B. Conduct of the CPI Enterprise**

258. During the Class Period, Wells Fargo, National General, and their predecessors identified in this Complaint exerted control over the CPI Enterprise and participated in the operation and management of its affairs, directly and indirectly.

259. Wells Fargo and its predecessors participated in the operation and management of the enterprise as described throughout this Complaint, including but not limited to the following ways:

a. Misrepresenting to customers, and failing to adhere to, the terms of its auto loans at loan origination;

b. Transmitting borrower information to the CPI Vendor in the form of the Daily New Loan File;

c. Disregarding the borrowers' proof of insurance provided at the time of loan origination;

d. Misrepresenting the circumstances under which it would force-place CPI on borrowers' accounts;

e. Authorizing the issuance of false and misleading Insurance Request Letters and Coverage Issued Letters to borrowers;

f. Force-placing unnecessary and undisclosed CPI on borrowers' accounts;

g. Concealing CPI charges on borrowers' billing statements, a practice which the bank itself deemed to be "deceptive";

h. Receiving concealed kickbacks in the form of unearned commissions and other compensation from the CPI Vendor for force-placing CPI;

i. Participating in monthly management review meetings and quarterly business review meetings with the CPI Vendor, during which it discussed the high percentage of flat and partial cancellations due to the force-placement of duplicative and unnecessary CPI;

j. Paying CPI premiums to the CPI Vendor;

k. Assessing CPI charges and collecting monthly payments from Class members, including premium charges and interest, which falsely represented that those charges were due and owed;

l. Misrepresenting to credit agencies and to Class members that there were delinquencies when CPI premiums and insurance were not paid; and,

m. Misrepresenting to credit agencies, Class members, and the Courts

that repossession of Class members' vehicles was authorized because Class members were delinquent on their loan accounts.

260. Far from being a mere outside service provider, National General and its predecessors also were knowing, willing, and active participants in the CPI Enterprise. National General and its predecessors participated in and conducted the affairs of the CPI Enterprise as described throughout this Complaint, including but not limited to the following ways:

a. Underwriting CPI that Wells Fargo force-placed, with the knowledge and intent that it be used in the CPI Enterprise's fraudulent scheme;

b. Misrepresenting that it did or would search hard copy and electronic data to determine whether borrowers maintained adequate insurance on their vehicles;

c. Issuing CPI certificates for loans it knew or should have known were secured by sufficient automobile insurance;

d. Ignoring and/or disregarding proof of insurance submitted by borrowers after they learned about force-placed CPI;

e. Accepting payments from Wells Fargo for premiums due on CPI;

f. Paying kickbacks in the form of unearned commissions and other compensation to Wells Fargo for the force-placement of CPI;

g. Drafting and sending false and misleading Insurance Request Letters and Coverage Issued Letters to borrowers;

h. Participating in monthly management review meetings and quarterly business review meetings with the CPI Vendor, during which it discussed the high percentage of flat and partial cancellations due to the force-placement of duplicative and unnecessary CPI; and,

i. Transmitting to Wells Fargo lists accounts on which CPI was force-placed or removed.

## C. Pattern of Racketeering Activity

261. Defendants carried out their force-placed CPI scheme through a pattern of racketeering activity that employed the use of United States mail and wire facilities. Defendants

accomplished this scheme by committing, conspiring to commit, and/or aiding and abetting the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.

262. Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) including, but are not limited to:

a. Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending and/or receiving, or causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI.

b. Wire Fraud: Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI.

263. The CPI Enterprise's pattern of racketeering involved thousands of separate instances wherein the U.S. Mail or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering activity, including mail and wire fraud. These instances included but were not limited to the following:

a. Daily use of interstate wire facilities for the electronic transmission of the Daily New Loan File between members of the CPI Enterprise;

b. Daily use of interstate wire facilities for the electronic transmission of lists accounts on which CPI was force-placed or removed between members of the CPI Enterprise;

c. Daily use of interstate wire facilities between members of the CPI Enterprise to settle premium and refund payments;

d. The CPI Vendor's use of the U.S. mail to send false and misleading Insurance Request Letters to Wells Fargo's auto loan borrowers on or about 42 days after a borrower appeared in the Daily New Loan file or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled;

e. The CPI Vendor's use of interstate wire facilities to attempt to contact via telephone the borrower, the borrower's insurance agent

(if known), or the borrower's insurance company (if known) on or about 63 days after a borrower appeared in the Daily New Loan file or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled;

f. The CPI Vendor's use of the U.S. mail to send false and misleading Coverage Issued Letters to Wells Fargo's auto loan borrowers on or about 77 days after a borrower appeared in the Daily New Loan file or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled;

g. Wells Fargo's use of the U.S. mail and wire facilities to send billing statements with charges for CPI premium, interest, and unearned commissions—which an internal Wells Fargo audit acknowledged were deceptive—to borrowers on or about 100 days after a borrower appeared in the Daily New Loan file or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled;

h. Use of interstate wire facilities for the electronic transmission of a "scorecard" of metrics between members of the CPI Enterprise in advance of each monthly management review meeting; and

i. Use of interstate wire facilities for the electronic transmission of quarterly business review presentations between members of the CPI Enterprise in advance of each quarterly business review meeting.

264. The CPI Enterprise also communicated by U.S. Mail, interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the CPI Enterprise's mail and wire fraud.

265. Defendants knew, and intended that, Plaintiffs and the members of the Class would be induced by their fraudulent scheme to pay for unnecessary and unlawful CPI charges. Defendants further knew, and intended that, Plaintiffs and members of the Class would rely on their false and misleading representations and omissions of material fact and would incur increased costs as a result. Indeed, if Plaintiffs and the Class did not pay for unnecessary and unlawful CPI, the CPI Enterprise could not succeed.

266. Each of these mailings and interstate wire transmissions constitutes "racketeering

activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Defendants intended to and did defraud Plaintiffs and members of the Class.

267. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

268. The pattern of racketeering activity alleged herein and the CPI Enterprise are separate and distinct from each other. Likewise, Wells Fargo, National General, and their predecessors, subsidiaries, and affiliates identified in this Complaint are distinct from the CPI Enterprise. They each have separate existences from the CPI Enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

269. Defendants' final racketeering activity occurred within five years of the commission of a prior incident of racketeering.

**D. Damages**

270. Defendants' pattern of racketeering activity, directly and proximately, caused Plaintiffs and members of the Nationwide Class injury in their business and property because Plaintiffs and class members paid charges for CPI—including premiums, interest, and unearned commissions—that were inflated, unlawful, unnecessary, and undisclosed, as well as increased interest on their automobile loans, diminished credit scores, and the costs of repossession.

271. Plaintiffs and the class are the most directly harmed individuals and entities and there is no other Plaintiff better suited to seek a remedy from Defendants for the economic harms at issue here.

272. Plaintiffs seek all legal relief as allowed by law, including, *inter alia*, actual damages and treble damages. Plaintiffs seek equitable relief, including but not limited to the elimination of adverse notations on their credit reports and remediating reduced credit scores, as deemed proper by the Court. Plaintiffs also seek attorneys' fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**UNJUST ENRICHMENT**
**Against All Defendants**

273. Plaintiffs re-allege and incorporate the above paragraphs as if fully set forth herein and further allege as follows.

274. National General received from Plaintiffs and the class members' benefits in the form of funds for insurance premiums related to force-placed insurance policies.

275. National General paid significant monies to Wells Fargo in kickbacks, commissions, uncompensated services, and/or reinsurance profits tied directly to the cost of the force-placed insurance premium. Commissions or kickbacks were paid directly to Wells Fargo in order to be able to provide force-placed insurance policies, or in the alternative to exclusively provide force-placed insurance policies, and receive the corresponding insurance premiums.

276. Wells Fargo also collected amounts for premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' retail installment sale contracts, and in excess of that required to protect the lender's interest in its collateral.

277. Wells Fargo acted as a conduit for the delivery of insurance premiums to National General, who received the excess coverage from inflated premiums.

278. As a result, Plaintiffs and the Class have conferred a benefit on National General and Wells Fargo.

279. National General had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

280. These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**COUNT III**
**FRAUD BY CONCEALMENT**
**Against All Defendants**

281. Plaintiffs re-allege and incorporate the above paragraphs as if fully set forth herein and further allege as follows.

282. Plaintiffs bring this claim for relief on behalf of themselves and the Nationwide Class, and, in the alternative, on behalf of the California Subclass (for purposes of this claim, the "Class").

283. Each Defendant committed fraud through their scheme to force-placing unlawful, unnecessary and undisclosed CPI on the automobile loans of the Plaintiffs and Class members. Defendants concealed from Plaintiffs and the Class members that they engaged in a pattern of practice of force-placing CPI on borrowers' automobile loans and sharing in kickbacks in the form of unearned commissions and other compensation for the force-placed CPI, without regard for the insurance policies already maintained by Plaintiffs and the Class members.

284. Wells Fargo began requiring insurance on automobile loans as early as March 2002. In conjunction with the insurance requirement, Wells Fargo represented to Plaintiffs and Class members that they needed to maintain active comprehensive and collision insurance naming Wells Fargo as a loss payee, and that proof of insurance was required. Force-placed CPI was not applicable unless the Plaintiffs or Class members did not maintain insurance on their vehicles.

285. But, when Wells Fargo made these representations, it intentionally concealed, suppressed, omitted and failed to disclose the material facts that Wells Fargo, National General, and their predecessors force-placed CPI polices without regard for the insurance Plaintiffs or Class members maintained on their vehicle. Wells Fargo intentionally concealed, suppressed, omitted, and failed to disclose the material fact that it received kickbacks in the form of unearned commissions and other compensation from the CPI Vendor for force-placing CPI, all of which resulted in excessive charges or premiums.

286. National General and its predecessors represented to Plaintiffs and Class members that premiums for the force-placed CPI were necessary and proper because they were required by Wells Fargo. National General and its predecessors also represented that they would not force-place CPI if the Plaintiffs and putative Class Members maintained insurance on their vehicles. But National General and its predecessors intentionally concealed, suppressed, omitted, and failed to disclose the material facts that they, in conjunction Wells Fargo, force-placed CPI without regard for the insurance Plaintiffs or Class members maintained on their vehicle. National General and its predecessors intentionally concealed, suppressed, omitted, and failed to disclose the material fact they paid kickbacks in the form of unearned commissions and other compensation to Wells Fargo for force-placing CPI.

287. A reasonable consumer who maintained the insurance coverage required by Defendants would not have expected to be charged premiums or interest for force-placed CPI, or to contribute to the kickbacks between Wells Fargo and its CPI Vendor. Plaintiffs and the members of the Class did not know of the facts which were concealed from them by Defendants. Moreover, as consumers, Plaintiffs and the members of the Class did not, and could not, unravel the deception on their own.

288. Defendants had a duty to disclose that they had a pattern and practice of force-placing CPI without regard for the insurance policies maintained by Plaintiffs or the Class members, and sharing kickbacks in the form of unearned commissions and other compensation for force-placing CPI. Defendants had such a duty because they had superior knowledge. The true facts were known only to them and they knew that these facts were not known to or reasonably discoverable by Plaintiffs or members of the Class. Defendants also had a duty to disclose the true nature of their CPI scheme because they actively concealed the truth from Plaintiffs and the members of the Classes.

289. Finally, Defendants had a duty to disclose the true nature of their fraudulent CPI scandal in light of their statements and partial representations about the circumstances under which they would force-place CPI, the validity of their CPI practices, and the charges for CPI premiums, interest, and unearned commissions, as alleged herein. Having volunteered to provide information to Plaintiffs and the Class members, Defendants had the duty to disclose the whole truth.

290. Plaintiffs and the Class members reviewed documents that were made available to them in connection with their auto loans. Wells Fargo also intentionally concealed CPI charges on borrowers' billing statements, a practice which the bank itself deemed to be "deceptive."[123]

291. Had the truth concerning the CPI scheme been disclosed, Plaintiffs and the Class members would have seen and been aware of it, and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI

[123] *See* Exhibit A, ¶403; WFCPI_00048650; WFCPI_00006404; McLawhorn Dep. at 135:25-143:23.

charges and demanded full compensation. Defendants should have disclosed this material information in the RISC, Insurance Request Letters, telephone calls with borrowers, Coverage Issued Letters, and billing statements.

292. Plaintiffs and members of the Class sustained damages because they were forced to pay inflated premiums and insurance for unlawful, unnecessary and undisclosed CPI. Plaintiffs and members of the Class also sustained damages when the incurred late fees, insufficient funds fees, damage to their credit scores, and repossession of their vehicles. Accordingly, Defendants are liable to Plaintiffs and the members of the Class for damages in an amount to be proven at trial.

## COUNT IV
## VIOLATION OF THE CALIFORNIA AUTOMOBILE SALES FINANCE ACT (REES-LEVERING ACT)

### California Subclass against Wells Fargo Bank, N.A. only

293. Plaintiffs re-allege and incorporate the above paragraphs as if fully set forth herein and further allege as follows. Plaintiff McCarthy's vehicle was repossessed in California and Wells Fargo is believed to have sent him the post-repossession disclosure notices in California.

294. The California Rees-Levering Act, Civil Code sections 2981 through 2984.6, governs qualifying conditional sale contracts for motor vehicles. Wells Fargo Bank, N.A. was the holder of the conditional sale contracts at issue and is subject to the Act to the extent the contracts are governed by California law.

295. The contracts required buyers to maintain physical-damage insurance protecting the vehicle. The contracts permitted the holder to procure insurance at the buyer's expense only upon the contractual and statutory conditions being satisfied, including a failure to maintain the required coverage.

296. Wells Fargo added collateral protection insurance charges to borrowers' accounts after execution of the contracts, including premiums and related finance charges, without first establishing that the borrowers had failed to maintain the required insurance. Plaintiff McCarthy alleges that he supplied proof of insurance at origination, continued to maintain coverage, and nevertheless had a CPI charge added to his balance.

297. California Civil Code section 2982.8(a) permits finance charges on post-contract insurance advances only where the buyer is obligated to maintain insurance and thereafter fails to maintain it or requests that the holder procure it. Where those conditions are met, section 2982.8(b) requires written notice of the buyer's repayment options, and subdivision (c) requires specified disclosures concerning the amount advanced and the repayment plans. Subdivision (e) limits the finance charge on such advances to no more than the annual percentage rate disclosed in the contract.

298. To the extent Wells Fargo treated CPI premiums as post-contract insurance advances and imposed finance charges, it violated section 2982.8 by, among other things, charging for insurance when the buyer had not failed to maintain coverage, failing to provide the required written notice and repayment options, failing to provide the required advance and amortization disclosures, and/or imposing finance charges above the contract APR. The precise application of each subsection will be established from the contracts, account histories, notices, and CPI records.

299. The redemption amount and the deficiency amounts in the consumer post-repossession disclosure notices (i.e., a notice of repossession and post-sale notice),[124] were improperly inflated as a matter of a systemic procedure, policy, and practice due to the CPI scheme.

300. As a direct and proximate result, subclass members paid unauthorized

[124] *See* Cal. Civ. Code 2983.2 (a) and (b).

premiums and finance charges, incurred additional interest, late fees and other charges, and suffered account delinquency and related economic injury. Plaintiffs and subclass members seek actual damages and all other relief available under the Act and applicable law, including reasonable attorney's fees and costs where authorized by Civil Code section 2983.4.

301. Plaintiff McCarthy seeks to represent the California Subclass defined above. The claims of this subclass arise from California-governed conditional sale contracts and the uniform post-contract CPI practices alleged herein.

## COUNT V

## VIOLATION OF UCC ARTICLE 9 — DEFECTIVE NOTICES OR REPOSSESSION AND POST-SALE DEFICIENCY NOTICES

**Nationwide UCC Subclass against Wells Fargo Bank, N.A. only**

302. Plaintiffs re-allege and incorporate the above paragraphs as if fully set forth herein and further allege as follows.

303. UCC §9-610 (b) prohibits the sale of the collateral if the sale is not commercially reasonable. The statute states, in relevant part, as follows:

> (b) Commercially reasonable disposition – EVERY aspect of a disposition of collateral, including the method, manner, time, place and other terms, MUST BE commercially reasonable. [Only] IF commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels and at any time and place and on any terms.
> (Emphasis added).

304. "The notice requirement is easy to understand and apply; it is inspired by the forlorn hope that the debtor if he is notified, will either acquire enough money to redeem the collateral or send his friend to bid for it." J.J. White and R.S. Summers, UNIFORM

COMMERCIAL *44 CODE, Section 26-9 (Second Edition, 1980) (Footnote omitted). [125]

305. The retail installment contracts and related security agreements created security interests in motor vehicles used primarily for personal, family, or household purposes. In enforcing those security interests, Wells Fargo Bank, N.A. acted as a secured party subject to Article 9 of the Uniform Commercial Code as enacted in each applicable state.

306. Under the applicable state enactments of UCC sections 9-611 and 9-614, a secured party disposing of consumer-goods collateral generally must send a reasonable authenticated pre-disposition notification containing specified information, including a description of any deficiency liability and a means of obtaining the amount required to redeem the collateral. Under section 9-623, the redemption amount is the amount of the obligations secured by the collateral plus expenses and attorney fees to the extent permitted by that section; amounts not lawfully secured or owing cannot properly be demanded as a condition of redemption. Wells Fargo assessed unauthorized CPI charges to borrowers' secured vehicle loan accounts, including the $1,999 CPI charge on Plaintiff Archuleta's Camaro loan despite the dealer's confirmation of existing insurance. It is unknown how much the CPI was for the other Plaintiffs and putative class members; this will be determined in discovery. The disputed amounts were carried forward into loan balances, default or cure amounts, and amounts claimed following repossession.

307. Wells Fargo sent Plaintiff a Notice of Repossession by mail, stating the amount needed to redeem the collateral.

308. The redemption amount in Notice of Repossession included the unlawful CPI-related amounts that resulted from Defendant's CPI Scheme, as alleged above. These unlawful

[125] Cited authoritatively in *Industrial Valley v. Nash*, 349 Pa. Superior Ct. 27, 502 A.2d 1254 (1985).

CPI amounts artificially inflated the redemption amount in Plaintiff's Notice of Repossession, rendering it inaccurate, and thus, the notice itself is defective.

309. The repossessed motor vehicle was disposed of, and Wells Fargo sent Plaintiff a Post-Sale Notice stating a claimed deficiency. The calculation included unlawful CPI-related amounts, producing an artificially inflated and thus, inaccurate deficiency balance and defective notice.

310. On information and belief, Wells Fargo used substantially similar loan-servicing, CPI assessment, repossession, and deficiency-calculation processes across the proposed subclass.

311. Under UCC section 9-615, the secured party must apply disposition proceeds as prescribed and account for any surplus or deficiency. Under section 9-616, when applicable to a consumer-goods transaction involving a deficiency or surplus, the secured party must provide the prescribed explanation of the calculation, including the secured obligation, sale proceeds, expenses, credits, and resulting balance, at the statutory time. Inclusion of CPI-related sums not legally owed may overstate the secured obligation or deficiency or understate the surplus, and may render the explanation materially inaccurate or noncompliant. The section 9-616 duty to send an explanation without a request arises in the circumstances specified by that section; no section 9-210 request is alleged or required for this theory.

312. To the extent Wells Fargo included unlaw CPI amounts in redemption figures, pre-sale deficiency descriptions, or post-sale calculations, it thereby furnished misleading and/or noncompliant information required by Article 9. As a result, Wells Fargo failed to comply with the applicable state enactments of sections, including but not limited to, Sections 9-611, 9-614, 9-615, 9-616, and/or 9-623.

313. UCC §9-623(b)(2) allows a debtor to redeem his vehicle by tendering, *inter alia*, the reasonable expenses and attorney fees described in UCC §9-615(a)(1). Section 9-615(a)(1) limits these expenses to "the reasonable expenses of retaking, holding, preparing for disposition, processing and disposing… incurred by the secured party." The "safe harbor" notice language set forth in UCC §9-614(3) also makes clear that only expenses ***actually incurred*** **by the secured party** can be passed on to the vehicle owner:

> "You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including **our** **expenses**." (emphasis added).

314. Thus, Wells Fargo's Notices of Repossession, which claims to inform the debtor how much he/she will have to tender to Redeem the vehicle, can only include in the amount required to redeem those expenses listed §9-615(a)(1).

315. At all relevant times, the redemption amount listed in the Notice of Repossession, and, the deficiency balances in the case of the Post-Sale Notice, contained un-incurred expenses and fees in connection with the forced-placed insurance pattern of practice, consistent with a practice of noncompliance as a direct result of the systematically inflated figures.

316. At all relevant times, Wells Fargo had an "Obligation of Good Faith" to ensure to ensure that "[e]very contract or duty within this title imposes an obligation of good faith in its performance and enforcement." UCC §1-304 and corollary statutes nationally. At all time, it had to conduct itself in "Good Faith," honestly and to observe reasonable commercial standards. UCC §1-201. By systematically inflating the redemption and deficiency figures in the post-repossession disclosure notices, it breached these duties.

317. Wells Fargo's actions were also commercially unreasonable in violation of section 9-610(b) of the UCC.

318. As a direct and proximate result of the Article 9 violations alleged, Plaintiffs and subclass members suffered losses including excessive redemption demands, lost opportunities to redeem, inflated or improperly collected deficiencies, reduced surpluses, and other provable losses. Under the applicable enactments of section 9-625, they seek damages caused by noncompliance and, where all statutory prerequisites are met, the consumer-goods minimum recovery provided by section 9-625(c)(2).

319. Comment 4 to UCC §9-625 makes clear that these statutory damages are intended to establish a secured party's liability for violations of, *inter alia*, the notice provisions in consumer goods transactions, regardless of whether "actual damages" are greater, lesser, or even absent. That Comment states in pertinent part:

> 4. **Minimum Damages in Consumer-Goods Transactions.** Subsection (c)(2) provides a minimum, statutory, damage recovery for a debtor and secondary obligor in a consumer-goods transaction. It is patterned on former Section 9507(1) and is designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, ***regardless of any injury that may have resulted***. Official Comment to §9625(c)(2).

320. Minimum statutory damages can be calculated easily and with mathematical precision and can be easily determined, *inter alia,* by accessing the electronically stored records of Wells Fargo. If necessary, retail installment sales contracts may need to be reviewed as each contract contains a Schumer Box [126] whereby damages can be determined by looking at the Finance Charge and Amount Financed.[127]

---

[126] The term "Schumer box" is a table with a standardized format that discloses the rates, fees, terms and conditions of a credit card or other lending agreement as required under the federal Truth in Lending Act (TILA).

[127] The Third Circuit has held that "[t]he size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification" *Byrd v. Aaron's Inc.*, 784 F.3d 154, 170-171 (3d. Cir. 2015). "To hold otherwise would seriously undermine the purpose of a Rule 23(b)(3) class to aggregate and vindicate meritorious individual claims in an efficient

321. Plaintiffs and the Post-Sale Notice Class Members also seek damages under UCC §9-625(e)(5) which provides for $500 in statutory damages for each Post-Sale Notice violation, to each debtor/co-obligor separately.

322. Plaintiffs also seek, pursuant to UCC §9-625(a) to impose a constructive trust on all ill-gotten proceeds; to order an accounting of all such proceeds, and their expedited return, with interest, by ordering the Bank to disgorge all moneys received from any Class Member as a payment towards a disputed deficiency balance or as a payment towards a loan for a disputed deficiency balance, nullifying any such loan.

323. Plaintiffs seek no double recovery for any claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes, respectfully requests that the Court grant certification of the proposed Classes, including the designation of Plaintiffs as the named representatives of the Classes, the appointment of the undersigned as Class Counsel, and the designation of any appropriate issue classes and/or subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A. A declaration that any applicable statute of limitations are tolled under the discovery rule or due to the fraudulent concealment alleged in this Complaint, and that Defendants are estopped from relying on any statutes of limitation as a defense;

B. An order enjoining, temporarily and permanently, from continuing the unlawful, deceptive, fraudulent and unfair business practices

manner." *Id.* Ascertainability does not require that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that "class members can be identified." *Id.* at 163.

alleged in this Complaint;

C. Injunctive and equitable relief in the form of a comprehensive program to fully reimburse and make whole all Class members for all costs and economic losses, including credit repair and the costs of vehicle repossession;

D. Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under RICO and the UCC, Rees-Levering Act, and punitive and exemplary damages as may be applicable under law;

E. Rescission of all force-placed CPI, including reimbursement of and/or compensation for the full cost of CPI, including any interest, taxes, license and other fees;

F. A determination that Defendants are financially responsible for all Class notice and administration of Class relief;

G. Any and all applicable statutory and civil penalties;

H. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I. An award of attorneys' fees and costs, including expert costs;

J. Leave to amend this Complaint to conform to the evidence produced in discovery and at trial;

K. Statutory and equitable damages pursuant to the UCC and Rees-Levering counts above; and,

Such other or further relief as the Court may deem appropriate, just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of any and all issues in this action so triable by right, pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted,
SHENKAN INJURY LAWYERS, LLC.

Richard Shenkan
*Attorney for Plaintiffs*

# EXHIBIT A

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Sterling L. Cluff (SBN 267142)
scluff@baronbudd.com
David B. Fernandes, Jr. (SBN 280944)
dfernandes@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

Roman M. Silberfeld (SBN 62783)
rsilberfeld@robinskaplan.com
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, California 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5580

Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041

*Plaintiffs' Co-Lead Counsel*
**Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

IN RE WELLS FARGO COLLATERAL PROTECTION INSURANCE LITIGATION

Case Number: 8:17-ML-2797-AG-KES

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Hon. Andrew J. Guilford

**REDACTED VERSION**

75946874.1

## Table of Contents

I. NATURE OF ACTION ........ 1

II. THE PARTIES ........ 3

A. Plaintiffs ........ 3

B. Defendants ........ 6

III. JURISDICTION AND VENUE ........ 8

IV. INTRA-DISTRICT ASSIGNMENT ........ 9

V. FACTS COMMON TO ALL COUNTS ........ 10

A. Collateral Protection Insurance and Force-Placed Insurance ........ 10

B. Defendants Unlawfully Force-Place CPI on Millions of Borrowers' Automobile Loan Accounts for More Than 14 Years ........ 14

1. The CPI Vendor Provided Tracking Services and Insurance Placement Services for the CPI Program ........ 14

2. The CPI Vendor Paid an Undisclosed Kickback in the Form of an Unearned Commission to Wells Fargo's Subsidiary ........ 16

3. Defendants Operated the CPI Program as a Single, Continuous Enterprise Since Inception ........ 18

4. The CPI Program Was Lucrative for Defendants ........ 22

5. Charges to Wells Fargo's Auto Loan Borrowers Were Not Insurance Premiums ........ 25

6. Wells Fargo and Its CPI Vendor Unlawfully Force-Placed CPI ........ 29

a. Wells Fargo Obtained Borrowers' Insurance Information from the Automobile Dealer at the Time of Sale ........ 29

b. Defendants Disregarded Borrowers' Proof of Insurance ........ 31

c. Defendants Sent False and Misleading "Insurance Request" Letters to Borrowers ........ 32

d. Wells Fargo Had No Practice of Monitoring the CPI Vendor's Telephone Calls to Borrowers .................................. 36

e. Defendants Sent False and Misleading "Coverage Issued" Letters to Borrowers ............................................................ 37

7. Wells Fargo Sent Admittedly Deceptive Account Statements to Borrowers ............................................................................. 40

8. Wells Fargo Identified Other Features of the CPI Program That Harmed Borrowers ....................................................................... 43

9. Defendants Knowingly Ignored and Failed to Track Consumer Complaints About CPI ............................................................. 46

C. Wells Fargo's Management, Risk Officers, and Board of Directors Knew That the CPI Program Harmed Its Customers ..................................... 48

D. The *New York Times* Exposes Defendants' Force-Placed CPI Scheme ....... 51

VI. PLAINTIFFS' EXPERIENCES .................................................................. 56

Plaintiff Angelina Camacho ........................................................................ 56

Plaintiff Odis Cole ...................................................................................... 58

Plaintiff Nyle Davis .................................................................................... 59

Plaintiff Duane Fosdick .............................................................................. 60

Plaintiff Regina Gonzalez ........................................................................... 62

Plaintiff Brandon Haag ............................................................................... 64

Plaintiff Paul Hancock ................................................................................ 66

Plaintiff Dustin Havard ............................................................................... 67

Plaintiff Brian Miller ................................................................................... 69

Plaintiff Analisa Moskus ............................................................................. 70

Plaintiff Keith Preston ................................................................................ 72

Plaintiff Victoria Reimche ........................................................................... 73

Plaintiff Dennis Small ..... 74

Plaintiff Bryan Tidwell ..... 74

VII. STATUTE OF LIMITATIONS ..... 77

A. Discovery Rule ..... 77

B. Fraudulent Concealment ..... 78

VIII. CLASS ACTION ALLEGATIONS ..... 79

A. Class Definitions ..... 79

B. Class Certification Requirements: Federal Rule of Civil Procedure 23 ..... 81

IX. RICO ALLEGATIONS ..... 83

X. CAUSES OF ACTION ..... 85

FIRST CLAIM FOR RELIEF: Violations of the Racketeer Influenced and Corrupt Organizations Act ..... 85

A. The CPI Enterprise ..... 85

B. Conduct of the CPI Enterprise ..... 87

C. Pattern of Racketeering Activity ..... 89

D. Damages ..... 92

SECOND CLAIM FOR RELIEF: Violation of the Bank Holding Company Act ..... 93

THIRD CLAIM FOR RELIEF: Violation of the California Unfair Competition Law ..... 98

FOURTH CLAIM FOR RELIEF: Fraud by Concealment ..... 99

FIFTH CLAIM FOR RELIEF: Unjust Enrichment ..... 102

XI. PRAYER FOR RELIEF ..... 104

XII. DEMAND FOR JURY TRIAL ..... 105

Plaintiffs Angelina Camacho, Odis Cole, Nyle Davis, Duane Fosdick, Regina Gonzalez, Brandon Haag, Paul Hancock, Dustin Harvard, Brian Miller, Analisa Moskus, Keith Preston, Victoria Reimche, Dennis Small, and Bryan Tidwell bring this action on behalf of themselves and all others similarly situated (collectively "Plaintiffs") against Defendants Wells Fargo & Company, Wells Fargo Bank, N.A. (collectively, "Wells Fargo"), National General Holdings Corp. and National General Insurance Company (collectively, "National General") (together with Wells Fargo, the "Defendants"). Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## I. NATURE OF ACTION

1. On September 27, 2016, following the announcement of its $185 million settlement with federal regulators concerning its fraudulent bank account scheme, Wells Fargo's Board of Directors promised "to ensur[e] that *all* aspects of the Company's business are conducted with integrity, transparency, and oversight."[1] Unfortunately, however, even under its new management, Wells Fargo's fraudulent practices continue.

2. For more than fourteen years, Wells Fargo and its predecessors, together with auto insurance underwriter National General and its predecessors ("CPI Vendor"), engaged in a scheme to bilk millions of dollars from approximately 2 million unsuspecting Wells Fargo customers. Through this scheme, Wells Fargo and the CPI Vendor forced millions of customers to pay for auto insurance—commonly known as Collateral Protection Insurance ("CPI")—they did not need or want. Making matters worse, Defendants possessed information showing that these customers already had their own insurance but

[1] *See* Business Wire, Independent Directors of Wells Fargo Conducting Investigation of Retail Banking Sales Practices and Related Matters, September 27, 2016, available at https://www.businesswire.com/news/home/20160927006772/en/Independent-Directors-Wells-Fargo-Conducting-Investigation-Retail; Business Wire, Wells Fargo Issues Statement on Agreements Related to Sales Practices, September 8, 2016, available at http://www.businesswire.com/news/home/20160908006266/en/Wells-Fargo-Issues-Statement-Agreements-Related-Sales (emphasis added); Wells Fargo, Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage, July 27, 2017, available at https://newsroom.wf.com/press-release/consumer-lending/wells-fargo-announces-plan-remediate-customers-auto-insurance.

intentionally ignored this information when they forced-placed CPI. When Wells Fargo's customers complained and informed Defendants that they maintained independent insurance on their vehicles, making CPI unnecessary, Wells Fargo refused to remove the unlawful charges.

3. Defendants' force-placed CPI scheme was first reported by the *New York Times* on July 27, 2017, after the *Times* obtained an internal report commissioned by Wells Fargo's executives. The internal report revealed that more than 800,000 auto loan customers, including active military personnel, paid for unnecessary CPI, pushing nearly 275,000 of them into delinquency, and resulting in nearly 25,000 unlawful vehicle repossessions. As a result the CPI scheme, these individuals suffered financial harm including inflated premiums, delinquency charges, late fees, repossession costs, increased interest rates, overdraft fees, and damage to their credit reports.

4. When confronted by the *Times* article, Wells Fargo's spokesperson Jennifer A. Temple publicly stated, "[w]e take full responsibility for these errors and are deeply sorry for any harm we caused customers." This lawsuit tests Wells Fargo's commitment to its customers and seeks full compensation for all damages Defendants caused.

5. As alleged in more detail below, Defendants sought to unlawfully generate profits by force-placing unnecessary CPI on unsuspecting customers and then collected payments for insurance premiums, interest, and other fees, while also sharing in undisclosed kickbacks in the form of unearned commissions and other compensation, thereby increasing the costs paid by every individual on whose accounts Defendants force-placed CPI. These concealed kickbacks increased the charges to all borrowers on whom Defendants had force-placed CPI, whether duplicative or not, and provided Defendants with the financial incentive to perpetuate the CPI scheme.

6. To carry out the scheme, Wells Fargo provided borrower information to its CPI Vendor. The CPI Vendor, in turn, was supposed to check electronic and hard copy insurance information to confirm whether Wells Fargo's customers had insurance coverage. A CPI policy was only lawfully authorized if Wells Fargo's customers did not maintain

sufficient insurance to cover the amount owed on their vehicles.[2] But, in reality, Defendants intentionally ignored available insurance information, then frequently, and without any notice, automatically deducted CPI charges from the customers' bank accounts, along with the regularly scheduled principal and interest payment for the auto loan. Compounding the problem, Defendants' failure to properly disclose the CPI and/or the resulting automatic deductions from customers' bank accounts often put them in a financial tailspin.

7. In furtherance of their scheme to wrongfully force-place CPI, Defendants falsely represented to, and concealed from, customers—through form insurance placement letters, uniform bank statements, and online balance reports—that customers owed Wells Fargo more money (because of the CPI charges) than they actually did. In fact, a Wells Fargo internal audit determined that the bank's billing statements were "deceptive" as to CPI charges.[3] Examples of these misrepresentations and omissions are detailed below.

8. Wells Fargo knew it was the only major bank or large auto finance company with a CPI scheme.[4] Although senior Wells Fargo executives had long known that the CPI scheme harmed customers, Wells Fargo only shut it down in September 2016 after recognizing that maintaining the CPI scheme "could lead to reputational risk and potential legal exposure."[5]

## II. THE PARTIES

### A. Plaintiffs

9. Plaintiff Angelina Camacho ("Camacho") is currently a resident and a citizen of the State of New Jersey. Plaintiff Camacho obtained an auto loan through Wells Fargo

[2] Wells Fargo Dealer Services, Financial Education, Understanding Your Auto Loan, available at https://www.wellsfargodealerservices.com/consumers/financialeducation/understandingyourautoloan/default.asp#fees.

[3] WFCPI_00035207 at 214; WFCPI_00050483 at 484.

[4] WFCPI_00050483 at 484.

[5] WFCPI_00035207 at 208.

Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

10. Plaintiff Odis Cole ("Cole") is currently a resident and a citizen of the State of Illinois. Plaintiff Cole obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

11. Plaintiff Nyle Davis ("Davis") is currently a resident and a citizen of the State of Missouri. Plaintiff Davis obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

12. Plaintiff Duane Fosdick ("Fosdick") is currently a resident and a citizen of the State of California. Plaintiff Fosdick obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

13. Plaintiff Regina Gonzalez ("Gonzalez") is currently a resident and a citizen of the State of Minnesota. Plaintiff Gonzalez obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

14. Plaintiff Brandon Haag ("Haag") is currently a resident and a citizen of the State of Wisconsin. Plaintiff Haag obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

15. Plaintiff Paul Hancock ("Hancock") is currently a resident and a citizen of the State of Indiana. Plaintiff Hancock obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

16. Plaintiff Dustin Havard ("Havard") is currently a resident and a citizen of the State of Mississippi. Plaintiff Havard obtained an auto loan through Wells Fargo Bank,

N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

17. Plaintiff Brian Miller ("Miller") is currently a resident and a citizen of the State of Mississippi. Plaintiff Miller obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

18. Plaintiff Analisa Moskus ("Moskus") is currently a resident and a citizen of the State of California. Plaintiff Moskus obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

19. Plaintiff Keith Preston ("Preston") is currently a resident and a citizen of the State of Nevada. Plaintiff Preston obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

20. Plaintiff Victoria Reimche ("Reimche") is currently a resident and a citizen of the State of Colorado. Plaintiff Reimche obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

21. Plaintiff Dennis Small ("Small") is currently a resident and a citizen of the State of Tennessee. Plaintiff Small obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

22. Plaintiff Bryan Tidwell ("Tidwell") is currently a resident and a citizen of the State of California. Plaintiff Tidwell obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, was assessed charges for CPI and/or related fees, and was damaged thereby.

**B. Defendants**

23. Defendant Wells Fargo & Company is a Delaware corporation and bank holding company with its principal place of business in San Francisco, California. Wells Fargo & Company is one of the nation's largest corporations, providing a wide-range of financial services to customers throughout the United States. Wells Fargo & Company participated in the force-placement of CPI alleged herein from its California offices, including the decision (and/or ratification of the decision) to enter into agreements with its CPI Vendor to wrongfully force-place CPI on hundreds of thousands of borrowers throughout the United States.

24. Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and is a national bank organized and existing as a national association under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, with its principal place of business in San Francisco, California. Wells Fargo Bank, N.A. owns the automobile loans secured by Class members' vehicles, which are located throughout the United States. Wells Fargo Bank, N.A. is the primary entity used by Wells Fargo & Company for the origination and servicing of automobile loans. Wells Fargo Bank, N.A., originates and services loans to consumers through its Wells Fargo Dealer Services division, headquartered in Irvine, California.

25. As detailed herein, Wells Fargo Dealer Services is the successor-in-interest to Wachovia Dealer Services, Inc. ("Wachovia") and WFS Financial Inc. ("WFS"), both of which served the same roles and functions in the CPI scheme as Wells Fargo Dealer Services. WestFin Insurance Agency, Inc. ("WestFin") is also a wholly-owned subsidiary of Wells Fargo Bank, N.A.

26. At all material times herein, each Wells Fargo defendant and their predecessors and affiliates were the agents, servants, or employees of, and acted within the purpose, scope and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Wells Fargo defendants, and ratified and approved the acts of the other Wells Fargo defendants.

27. Wells Fargo & Company exercises specific and financial control over the operation of Wells Fargo Bank, N.A. and its affiliates, and it dictates the policies and practices of Wells Fargo Bank, N.A. Wells Fargo & Company also exercises power and control over the specific activities in this lawsuit, and it is the ultimate recipient of the revenue and profits from the conduct described herein.

28. Defendant National General Holdings Corp. is a Delaware corporation and an insurance holding company headquartered in New York, New York. National General Holdings Corp. is a specialty personal lines insurance holding company that traces its roots to 1939, and provides personal and commercial automobile, homeowners, umbrella, recreational vehicle, motorcycle, supplemental health, and other niche insurance products. National General Holdings Corp. participated in the force-placement of CPI alleged herein, including the decision (and/or ratification of the decision) to enter into agreements with Wells Fargo to wrongfully force-place CPI on hundreds of thousands of borrowers throughout the United States.

29. Defendant National General Insurance Company ("National General" or "NGIC") is a national insurance agency incorporated in Missouri, with its principal place of business in Winston-Salem, North Carolina. National General administers the CPI division of the National General Lender Services business on behalf of its parent corporation, National General Holdings Corp. National General also provides insurance tracking and CPI throughout the United States. National General was the CPI Vendor for all aspects of Wells Fargo's CPI Program from 2015 until the termination of the CPI Program in September 2016. The scope of its services included, among other things, insurance tracking, borrower identification, policy placement, and underwriting CPI that Wells Fargo force-placed on auto loan borrowers throughout the United States.

30. As detailed herein, National General is the successor-in-interest to several other entities that operated as Wells Fargo's CPI Vendor. Those entities included Newport Management Corporation ("Newport"), Meritplan Insurance Company ("Meritplan"), and Balboa Insurance Company ("Balboa") which underwrote CPI and provided insurance

tracking services during the period 2002 to 2011. These companies' participation in the force-placed CPI scheme was approved of and managed by executives located in Irvine, California. These companies issued CPI from Irvine, California.

31. On June 1, 2011, QBE First Insurance Agency, Inc. ("QBEF") acquired the assets and liabilities of Newport, Meritplan, and Balboa, then becoming the CPI Vendor. QBEF underwrote CPI and provided insurance tracking services during the period 2011 to 2015. QBEF's participation in the force-placed CPI scheme was approved of and managed by executives located in Irvine, California. QBEF issued CPI from Irvine, California. On July 15, 2015, National General Holdings Corp. announced the acquisition of the assets and liabilities of the parent company of QBEF.

32. At all material times herein, each National General defendant and their predecessors and affiliates were the agents, servants, or employees of, and acted within the purpose, scope and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other National General defendants, and ratified and approved the acts of the other National General defendants.

33. Whenever, in this Complaint, reference is made to any act, deed or conduct Defendants committed in connection with Defendants' force-placed CPI scheme and the related enterprise, the allegations mean that each of the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives, each of whom was actively engaged in the management, direction, control or transaction of Defendants' ordinary business and affairs, and the affairs of the enterprise.

## III. JURISDICTION AND VENUE

34. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 based on the federal claims asserted under the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*., and 18 U.S.C. §§ 1331, 1334, 1962, and 1964, and the Bank Holding Company Act, 12 U.S.C. § 1972 *et seq*.

35. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of

diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

36. This Court may exercise supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because all of Plaintiffs' state-law claims are derived from a common nucleus of operative facts and are of the kind Plaintiffs would ordinarily expect to try in one judicial proceeding.

37. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and 12 U.S.C. § 1975.

38. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Wells Fargo maintains its principal places of business in California. Moreover, Defendants are considered to reside in this District because their contacts with it are sufficient to subject them to personal jurisdiction herein. Furthermore, the acts giving rise to Plaintiffs' claims occurred, among other places, in this District. At oral argument before the Judicial Panel on Multidistrict Litigation, "Wells Fargo represented that the primary witnesses would be found in the Central District of California." *In re Wells Fargo Auto Ins. Marketing & Sales Practices Litig.*, MDL No. 2797, Dkt. No. 90 at 2 (J.P.M.L. Oct. 5, 2017).

## IV. INTRA-DISTRICT ASSIGNMENT

39. This action is properly assigned to the Santa Ana Division of this District pursuant to the Central District Local Rules because a substantial portion of the events or omissions giving rise to Plaintiffs' claims arise in the counties served by the Santa Ana Division of this Court. Several named Plaintiffs and proposed Class Representatives, as well as thousands of Class members, obtained automobile loans, had CPI force-placed on their loans, and suffered injuries as a result of Defendants' CPI scheme in the counties served by this Division. Moreover, Defendants conduct substantial business in the counties served by this Division. Finally, the Judicial Panel on Multidistrict Litigation centralized this litigation as MDL No. 2797 before the Honorable Andrew J. Guilford, presiding in the Santa Ana Division of this District.

## V. FACTS COMMON TO ALL COUNTS

### A. Collateral Protection Insurance and Force-Placed Insurance

40. Vehicles in the United States are typically covered by one of the following three categories of insurance: liability insurance, collision insurance, and comprehensive insurance.

41. Liability insurance provides coverage when the insured is the at-fault driver in an incident that causes property damage or injury to a person. Consumers are required by laws in most states to maintain liability insurance. Collision insurance covers the vehicle when it is in a collision with another driver or stationary object. Comprehensive coverage handles all other kinds of non-collision damages, such as flooding, fires, and natural disasters, among other things.

42. The auto insurance policies at issue in this case are commonly referred to as CPI. Unlike auto insurance policies commonly taken out by vehicle owners, which not only cover the insured vehicle, but also liability for collisions with other vehicles, property loss, and bodily injury, CPI only covers the cost of damage to the insured vehicle. Although vehicle owners are not required to maintain collision or comprehensive coverage by law, according to a 2013 Insurance Information Institute report, 78% of insured drivers purchase comprehensive coverage and 73% purchase collision coverage, in addition to the mandatory liability insurance.[6]

43. When vehicle owners take out loans to purchase their vehicles, their lender may obligate them to carry insurance.[7] If borrowers do not obtain insurance to protect the loan collateral, namely their vehicles, their lender may purchase it for them. Yet, Wells

---

[6] William Hoffman, Forced Protection: How Will the Industry Respond to Wells Fargo's Insurance Scandal, Auto Finance News (October 5, 2017), available at https://www.autofinancenews.net/forced-protection-how-will-the-industry-respond-to-wells-fargos-insurance-scandal/.

[7] Wells Fargo, Car Loan FAQ's, available at https://www.wellsfargo.com/help/faqs/auto-loans/.

Fargo's internal documents show that it is the only major lender that force-placed CPI on its auto loan borrowers.[8]

44. As described in detail throughout this Complaint, Wells Fargo purchased CPI from National General and its predecessors, force-placed CPI on its auto loan borrowers' accounts, and tacked on CPI charges for premium, interest, and unearned commissions to the borrowers' principal, thus raising the borrowers' monthly payments. The unearned commissions were paid by the CPI Vendor as kickbacks to one of Wells Fargo's affiliates for the force-placement of CPI. These kickbacks ensured that the CPI charges to Wells Fargo's borrowers were more expensive than the premiums for coverage borrowers obtained on their own. Indeed, Wells Fargo's consultant Oliver Wyman [redacted][9] These unearned commissions generated undisclosed charges even when CPI was properly placed on borrowers' accounts. Even after Wells Fargo stopped receiving commissions in 2013, it continued to assess CPI charges on borrowers' accounts in excess of the cost of CPI or other auto insurance products.

45. In this regard, the CPI market created by the partnership between Wells Fargo, National General, and their predecessors was "rigged" against the borrower because it pushed up costs for consumers, rather than down.[10] Instead of competing in the open insurance marketplace, the CPI Vendor offered compensation and other considerations to Wells Fargo, which Wells Fargo accepted, for its CPI business. The compensation and considerations—in other words, kickbacks—were paid for by the CPI Vendor through unreasonable expenses included in the CPI premium charged to Wells Fargo, which were

---

[8] WFCPI_00035207 at 214; WFCPI_00050483 at 484.

[9] WFCPI_00030113

[10] Kristin Broughton, Do problems with lender-placed auto insurance go beyond Wells? American Banker (August 8, 2017, 5:31 p.m. EST), available at https://www.americanbanker.com/news/do-problems-with-lender-placed-auto-insurance-go-beyond-wells.

then passed-on to the unsuspecting borrowers. These expenses included not only the unearned commissions but also the cost of tracking services for Wells Fargo's indirect auto loan portfolio, which were passed-on at a disproportionate rate only to those borrowers who paid charges for force-placed CPI. The structure of the CPI Program so benefitted Wells Fargo that it did not seek to obtain a competitive insurance product or conduct a request for proposals ("RFP") for 12 years from the inception of the CPI Program in 2002 until 2014.[11]

46. The CPI market was characterized by "reverse competition" in that borrowers who were forced to pay CPI charges lacked the ability to exert market power over prices. Wells Fargo's auto loan borrowers were vulnerable to excessive CPI charges, because they did not request CPI but were forced to pay for it at a cost far greater than an independent auto insurance policy. In fact, for hundreds of thousands of borrowers, they had no choice but to pay the CPI charges that were crammed onto their accounts, despite the fact that they had their own independent auto insurance. Again, in the words of Wells Fargo's consultant Oliver Wyman, [redacted][12]

47. After Defendants force-placed a CPI policy on a Wells Fargo borrower, Wells Fargo assessed a full year's worth of CPI charges against the borrower's account, and then charged interest each month on the CPI before applying payments to the principal loan balance. This ensured that Wells Fargo's CPI charges got paid first, and any deficiency resulted in the borrower falling short on the underlying loan.[13]

48. The core decisions concerning the force-placed CPI scheme were made by Defendants in their California offices and headquarters. These decisions implemented a nationwide practice of force-placing Defendants' unnecessary CPI on Wells Fargo's

---

[11] WFCPI_00017004 at 009; WFCPI_00040990 at 992.

[12] WFCPI_00030113.

[13] *See* Understanding Your Auto Loan, *supra* at note 2.

automobile loan customers and assessing improperly inflated premiums against their accounts in exchange for lucrative kickbacks from the CPI Vendors.

49. Defendants are no strangers to force-placed insurance abuse in the more traditional home mortgage CPI market. For example, in May 2013, Wells Fargo Bank N.A., QBE Specialty Insurance Co., and a class of Florida homeowners reached a settlement which required Wells Fargo to pay up to $19.25 million to Florida homeowners. The suit charged Wells Fargo, among others, with deriving improper financial benefits from force-placed insurance.[14] Additionally, in 2014, while Wells Fargo's automobile CPI scheme was in full-swing, a Florida federal judge approved a $281 million settlement reached by Wells Fargo and Assurant Inc. in a suit over their force-placed homeowners insurance practices.[15] The suit, which involved about 1.3 million class members, alleged Wells Fargo allowed Assurant to automatically issue force-placed insurance on mortgage loans if a borrower's *voluntary* insurance lapsed. After collecting high premiums on the new coverage, Wells Fargo passed the payments along to Assurant, who would later funnel a portion of the premiums back to Wells Fargo as "commissions."

50. Finally, in 2015, Wells Fargo and Assurant settled a putative class action in Illinois federal court in which they were accused of conspiring to inflate the cost of force-placed hazard insurance in order to provide kickbacks to Wells Fargo.[16]

---

[14] LendersRisk.com, Regulatory Landscape for 2016: Lender-Placed Insurance and What You Need to Know, February 8, 2016, available at *http://lendersrisk.com/index.php/regulatory-landscape-for-2016-lender-placed-insurance-and-what-you-need-to-know/*.

[15] Kelly Knaub, Law360, Wells Fargo's Contested $281M Force-Placed Deal Approved, October 30, 2014, available at https://www.law360.com/articles/591839/wells-fargo-s-contested-281m-force-placed-deal-approved.

[16] Dani Kass, Law360, Wells Fargo, Assurant Settle Force-Placed Insurance Suit, May 11, 2015, available at https://www.law360.com/articles/654372/wells-fargo-assurant-settle-force-placed-insurance-suit.

## B. Defendants Unlawfully Force-Place CPI on Millions of Borrowers' Automobile Loan Accounts for More Than 14 Years

51. Wells Fargo's CPI Program existed from 2002 to 2016. During that time period, Wells Fargo and its predecessors forced-placed CPI on millions of auto loan borrowers, even when borrowers maintained sufficient insurance to protect Wells Fargo's collateral. Wells Fargo effectuated the CPI Program with and through its CPI Vendors including National General and its predecessors under Insurance Administration Agreements ("IAA") and General Agency Agreements ("GAA"). The Wells Fargo companies involved in the CPI Program were WFS, Wachovia, WestFin, and WFDS. The National General companies involved in the CPI Program were Newport, Meritplan, Balboa, QBEF, and NGIC.

### 1. The CPI Vendor Provided Tracking Services and Insurance Placement Services for the CPI Program

52. On March 15, 2002, Wells Fargo's predecessor, WFS, entered into the original IAA with National General's predecessor, Newport.[17] Like Wells Fargo, WFS was engaged in the business of extending credit and financing for automobile buyers and lessors.[18] WFS and Newport replaced the original IAA with another IAA effective October 1, 2005.[19]

53. Pursuant to the IAA, Newport provided "Tracking Services." Specifically, Newport was charged with tracking the vast majority of the loans in WFS's indirect auto loan portfolio to determine whether the borrowers maintained acceptable insurance covering the underlying collateral, namely, the vehicles.[20]

54. Under the IAA, Newport provided daily reports to WFS of borrowers which Newport did not verify had obtained or maintained acceptable insurance. Newport also

---

[17] WFCPI_00015256 at 296.

[18] *Id.*

[19] WFCPI_00015256 at 296-322.

[20] *Id.*

identified those borrowers to its affiliates, Meritplan and Balboa, both of which had issued a CPI Master Policy to WFS for the placement of CPI on individual borrowers' accounts.

55. Under the CPI Master Policy, which covered all eligible vehicles in WFS's indirect auto loan portfolio, certificates of coverage for specific vehicles were added (or removed) if WFS and the CPI Vendor determined these vehicles required CPI coverage. Meritplan and Balboa added CPI to those borrowers' accounts and billed WFS, which in turn, charged the borrowers for CPI.

56. The CPI Vendor's Tracking Services were distinct from its Insurance Placement Services. Tracking Services included loading insurance information into a database, maintaining and monitoring the insurance tracking database, contacting borrowers, insurance companies and agents about inadequate insurance, and providing customer service to borrowers submitting evidence of adequate insurance. These Tracking Services were the responsibility of WFS (and later Wells Fargo) which, here, outsourced them to the CPI Vendor. The CPI Vendor performed Tracking Services for most of the loans in WFS's indirect auto lending portfolio, irrespective of whether CPI was force-placed on those borrowers' accounts. WFS paid a Tracking Fee to the CPI Vendor for each loan that it tracked.[21]

57. In contrast, the CPI Vendor's Insurance Placement Services were specific to those borrowers' accounts on which CPI was force-placed. Insurance Placement Services included notifying WFS that CPI would be force-placed, adding a certificate of coverage for individual borrowers' accounts to the CPI Master Policy, collecting premium payments from WFS, providing premium refunds to the lender following cancellation, and providing customer service about insurance claims made against the CPI policy.

---

[21] Rule 30(b)(6) Deposition of Wells Fargo & Co. and Wells Fargo Bank, N.A. By and Through its Designee James William McLawhorn ("McLawhorn Dep.") at 213:9-11.

### 2. The CPI Vendor Paid an Undisclosed Kickback in the Form of an Unearned Commission to Wells Fargo's Subsidiary

58. On March 4, 2002, WestFin, which is presently a subsidiary of Wells Fargo,[22] entered into the original GAA with Meritplan and Balboa. On October 18, 2005, WestFin, Meritplan and Balboa replaced the original GAA with another GAA.[23] Under each GAA, Meritplan and Balboa designated WestFin as their insurance agent.

59. The GAA enabled WestFin to collect a commission on the net written premium for CPI placed on individual borrowers' accounts. That WestFin was an insurance agency was critical to the CPI scheme, because the lender (WFS and its successors through and including Wells Fargo) were banks that could not legally receive a commission on CPI. In fact, Wells Fargo's Rule 30(b)(6) witness testified to the following:

> Q. It's your understanding, though, that the reason for [WestFin's] existence is in order to collect the commission that is paid by the vendor. Right?
>
> A. Correct.
>
> Q. Because it's an insurance agency?
>
> A. Correct.
>
> Q. And Wells Fargo Bank or Wells Fargo Auto or Wells Fargo Dealer Services is not an insurance agency?
>
> A. Correct.[24]

60. Insurance companies commonly pay commissions to their licensed agents, even those affiliated with commercial lenders, to compensate those agents for *actual* services performed. Agency services that are compensable by commissions include promoting and selling the insurance product, collecting insurance premiums from

---

[22] WFCPI_00002776 at 778.

[23] WFCPI_00003667 at 372-97.

[24] McLawhorn Dep. at 35:16-25.

customers, and forwarding those premiums to insurers. In contrast, the payment of commissions to a bank-affiliated insurance agent that fails to perform these services should internally raise red flags of improper, and even unlawful business practices. These commissions are in essence an undisclosed and unearned kickback.

61. According to the GAA, WestFin's primary responsibility was to produce insurance business for Meritplan and Balboa, but at no point did WestFin do so. Wells Fargo's Rule 30(b)(6) witness could not identify a single action WestFin took to produce insurance business.[25] Wells Fargo's corporate designee testified that WestFin did not sell, market or promote CPI to borrowers; collect insurance premiums; communicate with borrowers; or handle inbound or outbound calls with the CPI Vendor, borrowers, or their insurance agencies. In fact, under the GAA, Meritplan and Balboa were responsible for the collection of premiums and issuing refunds, not WestFin.[26]

62. Nor did WestFin have any other management or administrative role in the CPI Program. Wells Fargo's Rule 30(b)(6) witness testified that WestFin did not engage in the management or oversight of the CPI Vendor or provide the CPI Vendor with support related to uninsured accounts, claims processing, or vehicle inspections.[27]

63. Instead, WestFin was merely there to collect unearned commissions. WestFin received commissions from the CPI Vendor on every CPI policy placed on individual borrowers' accounts, despite the fact that it did not perform any work traditionally associated with an insurance agent. The traditional role of an insurance agent is to assist the policyholder in determining her insurance needs, shopping the market for the insurance product that meets the policyholder's needs, and seeking the most competitive price for the product. WestFin did not perform any of these functions. In reality, and unbeknownst to customers, Wells Fargo's internal documents reveal that "Commissions are obtained as

[25] McLawhorn Dep. at 272:13-273:2.

[26] McLawhorn Dep. at 35:7-15, 271:10-20, 273:3-5, 273:19-22, 274:3-14.

[27] McLawhorn Dep. at 273:25-274:2, 274:18-275:12.

part of the WFDS CPI program with QBE in order ***to offset the expenses WFDS incurs as a result of the program***."[28]

64. As a subsidiary of Wells Fargo, WestFin's commissions were booked as revenue to the bank.

65. The CPI Vendor's payment of commissions to WestFin was not justified by any service provided by WestFin or any other legitimate business reason. Instead, these unearned commissions, which generated undisclosed charges, were a kickback to WFS and its successors (through and including Wells Fargo) for force-placing CPI on the accounts of unsuspecting borrowers.

### 3. Defendants Operated the CPI Program as a Single, Continuous Enterprise Since Inception

66. Wells Fargo, National General, and their predecessors operated the CPI Program as a single, continuous enterprise from its inception in March 2002 until its termination in September 2016. Defendants were systematically linked through continually coordinated activities to operate the CPI Program.

67. Throughout the duration of the CPI Program, Defendants employed the use of U.S. wire facilities by electronically exchanging information and money with each other about the CPI Program and individual borrower's accounts on a daily basis. These electronic exchanges included files on new loans within Wells Fargo's portfolio to be tracked by the CPI Vendor; lists of accounts on which CPI would be placed or cancelled and removed; dollar amounts of premium to be paid to, and refunded from, the CPI Vendor by Wells Fargo; and dollar amounts of commissions to be paid to, and refunded from WestFin by the CPI Vendor. Throughout the duration of the CPI Program, Defendants settled premium payments and refunds with each other on a daily basis via wire transfer.[29]

---

[28] WFPI_00017004 at 016 (emphasis added).

[29] WFCPI_00046240 at p.2.

68. Throughout the duration of the CPI Program, Defendants held monthly management review meetings by telephone to discuss the CPI scheme including its performance, metrics (including volume of telephone calls with borrowers, number of claims made against CPI, and dollar amount of claims), and additional action items. The CPI Vendor prepared a "scorecard" of metrics for the CPI Program and circulated the scorecard to Wells Fargo, generally by electronic mail, in advance of the monthly management review meetings. Participants in the monthly management review meetings from Wells Fargo regularly included John Van Fossen (Operations Manager, supervisor of the CPI team), James McLawhorn (Customer Services Manager), James Tann Pace (Customer Service Manager), Brian Cheeseman (Insurance Support Manager), and others from Wells Fargo's finance team or remarketing team. Participants in the monthly management review meetings from the CPI Vendor included [redacted][30]

69. Throughout the duration of the CPI Program, Defendants also held quarterly business review meetings in-person to discuss the CPI scheme including its performance, metrics, and additional action items. Participants in the quarterly business review meetings discussed these topics in much more detail than they did during monthly management review meetings. The CPI Vendor prepared a business review deck which it circulated to Wells Fargo, generally by electronic mail, in advance of the quarterly business review meetings. The business review deck contained detailed data about the CPI Program including loan volume and CPI penetration; gross and net written premium; average premium per loan; CPI premium and commission trends; CPI distribution by state; borrower account balances and premium rate percentages; CPI letter volume; CPI cancel percentages;

---

[30] McLawhorn Dep. at 119:4-124:2; Defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s Initial Disclosures; National General Defendants' Initial Disclosures.

CPI loss experience and trends including by month and policy year; CPI financial results; year-over-year comparisons; CPI claims experience and performance; CPI claim severity, frequency, and payments; and other operational statistics and results.[31]

70. Although referred to as "quarterly" business review meetings, these meetings occurred two to four times per year at Wells Fargo's offices or the CPI Vendor's offices. Many of the individuals who attended quarterly business review meetings also attended monthly management review meetings. Participants in the quarterly business review meetings from Wells Fargo regularly included John Van Fossen, James McLawhorn, James Tann Pace, Brian Cheeseman, Lori Millard (Customer Contact & Collection Manager), and others from Wells Fargo's finance team or remarketing team. Participants in the monthly management review meetings from the CPI Vendor included [redacted][32]

71. Wells Fargo's Rule 30(b)(6) witness testified, consistent with internal documents, that there were no material changes in the way the CPI Program was administered throughout its duration.[33] This was the case despite the fact that the companies running the CPI Program changed over time and modified the IAA and GAA accordingly. Although the names of the specific Wells Fargo and National General entities changed, their roles and responsibilities did not.

72. As explained above, WFS and Newport replaced the original IAA with another IAA effective October 1, 2005.[34] Around the same time, WestFin, Meritplan and Balboa

---

[31] McLawhorn Dep. at 124:3-125:15; NatGen00292685; WFCPI_00004484-522; WFCPI_00004272-306; WFCPI_00008247-279.

[32] McLawhorn Dep. at 124:3-125:15; Defendants Wells Fargo & Company and Wells Fargo Bank, N.A.'s Initial Disclosures; National General Defendants' Initial Disclosures.

[33] McLawhorn Dep. at 18:19-29:1.

[34] WFCPI_00015256 at 296-322.

replaced the original GAA with another GAA effective October 1, 2005.[35] These agreements did not otherwise materially change the operation or administration of the CPI Program.

73. WFS changed its name to Wachovia effective March 1, 2007. WFS and Newport amended the IAA to replace all references to WFS with Wachovia. This amendment did not materially change the operation or administration of the CPI Program.[36]

74. Wachovia changed its name to Wells Fargo Dealer Service, Inc. ("WFDS") effective March 20, 2010. WFDS was a wholly-owned subsidiary of Wells Fargo Bank, N.A. Wachovia and Newport amended the IAA to replace all references to Wachovia with WFDS. This amendment did not materially change the operation or administration of the CPI Program.[37]

75. Effective July 1, 2011, Wells Fargo Dealer Services, Inc. dissolved its separate corporate status, merged into Wells Fargo Bank, N.A., and was renamed Wells Fargo Dealer Services. This change to the corporate structure of WFDS did not materially change the operation or administration of the CPI Program.[38]

76. Effective May 1, 2012, Balboa and Meritplan assigned their duties, obligations, liabilities, rights, title, and interest under the GAA to QBEF. QBEF also succeeded to Newport's roles and responsibilities with respect to the IAA. Wells Fargo's internal documents confirm that these changes did not materially change the operation or administration of the CPI Program.[39] For example, according to an internal Wells Fargo presentation entitled "Collateral Protection Insurance" from 2012, the "WFDS/QBE

---

[35] WFCPI_00003667 at 372-97.

[36] WFCPI_00015256 at 284.

[37] WFCPI_0015256 at 281.

[38] WFCPI_0015256 at 279.

[39] WFCPI_00003367 at 369.

relationship started in 2002[.] QBE provides tracking, placement and claims processing[.] Minimal changes to pricing or structure of program since inception."[40]

77. Effective on or about July 15, 2015, National General acquired the assets and liabilities of QBE, and succeeded to QBEF's roles and responsibilities with respect to the IAA. Wells Fargo's internal documents confirm that this change did not materially change the operation or administration of the CPI Program. For example, an internal Wells Fargo presentation entitled "CPI Update: Collateral Protection Insurance" from April 2016 explains that the relationship between Wells Fargo and National General dated to 2002, and states that "National General is formerly known as QBE and Balboa."[41]

78. Wells Fargo terminated the CPI Program effective September 30, 2016.[42]

**4. The CPI Program Was Lucrative for Defendants**

79. Between 2005 and 2016, Defendants force-placed more than 2.9 million CPI certificates on Wells Fargo's auto loan borrowers.[43]

80. Between 2005 and 2016, the CPI Program generated over [redacted] in net written premiums for National General and its predecessors.[44]

81. Between October 2005 and 2017, the CPI Program generated more than $72 million in commissions and more than $71 million in interest on force-placed CPI premiums for Wells Fargo.[45] On information and belief, Wells Fargo generated tens of millions of

---

[40] WFCPI_00008981 at 982.

[41] WFCPI_00052015 at 016.

[42] WFCPI_00051954.

[43] National General Defendants' Response to Plaintiffs' Second Set of Interrogatories to All Defendants, Response to Interrogatory Nos. 6(a), dated June 15, 2018.

[44] National General Defendants' Response to Plaintiffs' Second Set of Interrogatories to All Defendants, Response to Interrogatory Nos. 6(c), dated June 15, 2018.

[45] Defendants' Supplemental Responses and Objections to Plaintiffs' Interrogatories – Set Two, Supplemental Responses to Interrogatory No. 6(e) and 6(f), dated July 13, 2018.

dollars in late fees, NSF fees, repossession fees, reinstatement fees, and other charges in connection with the CPI Program.

82. Even in the waning months of the CPI Program, Wells Fargo acknowledged that there had been "minimal changes to pricing or structure of [the] program since inception."[46]

83. Between March 2002 and September 2005, the CPI Vendor paid to WestFin a commission of 15 percent of net written premium on CPI force-placed on individual borrowers' accounts under the GAA.

84. Between October 1, 2005 and December 15, 2005, the parties executed various addenda to the GAA, setting the rate of commission paid to WestFin at 17.2 percent, 17.25 percent, and 17.3 percent of net written premium on CPI placed on individual borrowers' accounts. The parties settled on a commission of 17.3 percent of net written premium, which was paid to WestFin, on CPI placed on individual borrowers' accounts between December 15, 2005 and February 20, 2013.[47]

85. Effective February 20, 2013, Wells Fargo and QBEF terminated the GAA, eliminating the commission paid to WestFin.[48] However, as described below, Wells Fargo ***deliberately chose not to pass on the full savings from the elimination of the commission to its customers.*** Instead, Wells Fargo retained a portion of that money, in essence pocketing another kickback.

86. That WestFin stopped accepting commissions in February 2013 further demonstrates that the commissions it had accepted were in fact kickbacks. Had WestFin been providing essential and valuable services to the CPI Vendor, WestFin could not (and would not) have continued to perform those services without compensation.

---

[46] WFCPI_00055693 at 697.

[47] WFCPI_00003367 at 389-97.

[48] WFCPI_00003367 at 368.

87. Between March 2002 and February 2013, Wells Fargo and its predecessors paid a Tracking Fee of [redacted] to the CPI Vendor for Tracking Services.[49]

88. The parties amended the IAA to reduce the Tracking Fee to [redacted] effective March 1, 2013.[50] After this time, the CPI Vendor provided the same service for the same CPI Program as it had before the Tracking Fee had been reduced.[51]

89. That Defendants cut the Tracking Fee [redacted] at the same time they eliminated commissions was not coincidental. Wells Fargo sought to offset the loss of income from the commissions by reducing the cost of Tracking Fee. While the elimination of the commission also reduced the CPI premium, not all of that savings was passed on to the borrower. As Dawn Martin Harp, Head of Wells Fargo Dealer Services explained, "an alternative to reducing the 17.3 [percent commission] entirely is to offset a portion of that to pay for tracking and [have] the remaining go to the customer."[52]

90. Consistent with Ms. Harp's statement, an internal Wells Fargo presentation from July 2012 explained that rather than pass to the customer the full savings from the elimination of the commission, the bank would instead "[e]liminate commission and ***split savings between consumer and WFDS***."[53]

91. Following the elimination of the commission and reduction in Tracking Fee, CPI premiums were reduced, but not by 17.3 percent. Instead, the average annual CPI premium dropped by only 10.7 percent, from [redacted] in the first quarter of 2013 to [redacted] in the second quarter of 2013.[54] Wells Fargo pocketed the remaining 6.6 percent of the

---

[49] McLawhorn Dep. at 216:12-19.

[50] WFCPI_00015256 at 265.

[51] McLawhorn Dep. at 216:19-217:25.

[52] WFCPI_00047065 at 067; *see also* McLawhorn Dep. at 222:7-22.

[53] WFCPI_00017004 at 010 (emphasis added).

[54] WFCPI_00045980 at p. 2.

costs that were "saved" by eliminating the commission, amounting to another kickback to Wells Fargo.

92. Although Wells Fargo terminated the CPI Program in September 2016, National General continued to provide Tracking Services to Wells Fargo, and Wells Fargo continued to pay Tracking Fees to National General. In fact, National General demanded that the Tracking Fee increase from [redacted].[55]

93. Although the Tracking Fees pertained to *every* eligible loan in Wells Fargo's indirect auto lending portfolio, Wells Fargo did not apply those fees to all auto loan borrowers. Rather, Wells Fargo passed-on the *entire* cost of the Tracking Fees only to those borrowers on whom it force-placed CPI. Forcing borrowers to pay the cost of the Tracking Fees associated with servicing the entire loan portfolio was unlawful, because those expenses were not part of the cost to insure the individual borrower's collateral and were not disclosed to borrowers.

### 5. Charges to Wells Fargo's Auto Loan Borrowers Were Not Insurance Premiums

94. Charges for CPI that Wells Fargo assessed to borrowers were not insurance premiums and were not subject to state insurance rate regulation. Instead, CPI was a commercial insurance policy purchased by Wells Fargo from the CPI Vendor. Wells Fargo was both the policyholder and the insured.[56] Throughout the duration of the CPI Program, Wells Fargo paid the premium for CPI to the CPI Vendor.

95. Wells Fargo then assessed charges to borrowers for CPI. As explained in an internal Wells Fargo presentation, Wells Fargo "lends the Obligor [borrower] funds equivalent to the CPI premium and charges the Obligor interest at the same rate as appears

[55] NatGen00237999.

[56] McLawhorn Dep. at 146:3-6.

on their retail installment contract."[57] Although Wells Fargo purchased CPI in 12-month terms, it assessed a full-year of premiums on borrowers' accounts over a 9-month period.

96. Wells Fargo structured customers' loan payments to maximize the interest customers paid on CPI over the life of their automobile loan. Wells Fargo describes the order in which it applies payments as follows:

> Loan interest - the daily amount due on your loan;
>
> Collateral Protection Insurance (CPI) Interest - the amount of interest on your insurance premium (**<u>if applicable</u>**);
>
> Principal - the principal payment amount due on your loan;
>
> CPI principal - the principal payment on your insurance premium (**<u>if applicable</u>**)
>
> Payment variance - any amount remaining due from previous payments;
>
> CPI variance - any amount remaining due from previous insurance premium payments (**<u>if applicable</u>**); and
>
> Other charges - fees such as nonsufficient funds.[58]

97. Wells Fargo's deliberate decision to structure payments in this order had the predictable effect of increasing the overall interest customers paid to Wells Fargo on their loans, because less of their payment went to the actual outstanding loan principal each month. This increased the likelihood of underpayments, late payments, fees for insufficient funds, and ultimately repossessions.

98. The payment structure was lucrative for Wells Fargo, in part because Wells Fargo knew that the CPI Program disproportionately affected subprime borrowers with high interest rates on their auto loans, and accordingly high CPI interest. Wells Fargo

---

[57] WFCPI_00002776 at 780.

[58] *See* <u>Understanding Your Auto Loan</u>, *supra* at note 2 (emphasis added).

deliberately excluded super prime borrowers, expensive luxury vehicles, and Tesla owners from the CPI Program,[59] instead choosing to target subprime borrowers aggressively, because their high interest rates and greater likelihood of delinquencies translated into more revenue for the bank. As one National General executive explained, Wells Fargo was "financing car loans from 0% **to 29.99%.** Considering they were adding a finance charge to the loans, that would be killer to have a loan at 18.99%, then add the CPI insurance to the car payment across 8 payments and the Finance Charge."[60]

99. According to an internal Wells Fargo presentation dated February 2016, Defendants were 10 times more likely to force-place CPI on subprime loans than on prime loans: "High risk/non-prime loans have a much higher proportion of CPI than lower risk, prime loans. (20% of highest risk loans have CPI vs. 2%-3% on lowest risk loans.)"[61] Similarly, an internal Wells Fargo presentation dated June 2016 illustrates this fact: "CPI is more prevalent among lower credit grade customers who may have difficulty obtaining insurance through a major carrier, or refuses to secure such coverage."[62]

100. Neither the CPI policy nor state insurance laws required Wells Fargo to assess premium and interest charges to borrowers. In fact, lenders generally pay for CPI through a "blanket policy" covering the collateral for an entire class of loans without assessing

---

[59] Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, five types of loans were excluded from the CPI Program: (1) super prime (A0) loans, Tesla customers, and loans with balances greater than $75,000, on which Wells Fargo concluded the risk of loss was minimal; (2) loans made in Ohio and New Hampshire, which prohibited the use of collateral protection insurance by state law; (3) loans financing recreational vehicles, which were longer term loans and luxury items that Wells Fargo concluded were not beneficial to insure; (4) bankruptcy accounts, because the bankruptcy laws prevented the increase of funds owed to Wells Fargo; and (5) loans with balances less than $2,500, which Wells Fargo determined did not benefit the borrower and were low risk to the bank. *See* WFCPI_00052720 at 730. These loans were deemed "not eligible" for the CPI Program. All other loans in Wells Fargo's indirect auto loan portfolio were deemed "eligible" for force-placement of CPI.

[60] NatGen00033469 at 472 (emphasis in original).

[61] WFCPI_00029418 at 421.

[62] WFCPI_00052720 at 721.

charges for the premium on borrowers, a fact well-known by Wells Fargo as it maintained this type of blanket insurance on loans originated by motor vehicle dealers in Ohio, which precludes the use of CPI.[63]

101. Wells Fargo's baseline practice of conditioning auto loans on borrowers paying Wells Fargo for CPI was not a customary industry banking practice—even when isolated from the bank's deceptive billing procedures and duplicative CPI placements. Wells Fargo knew the CPI scheme was an industry outlier. According to an internal Wells Fargo presentation entitled "CPI—Program Review Executive Summary" dated August 25, 2016, "WFDS is the only large auto finance company with a CPI program."[64] Similarly, in an internal Wells Fargo email dated January 7, 2016, a member of Wells Fargo's operational risk team acknowledged that "none of the big banks or captives force place at the customer level. We are a 55 billion dollar portfolio … we should be able to self-insure!!"[65]

102. While self-insuring would have been far more efficient, Wells Fargo chose not to self-insure[66] because doing so would have cost it money. Instead, Wells Fargo kept the CPI Program in place to obtain lucrative kickbacks in the form of unearned commissions and other compensation, inflated interest charges, and other fees and charges for late payments, insufficient funds, and the like, all of which went straight to the bottom line as essentially pure profit.

---

[63] WFCPI_00015256 at 314-15; McLawhorn at 242:6-10 ("Q. Loans originated in Ohio. You understood those were exempt because of regulatory issues specific to Ohio law? A. Yeah. State of Ohio would not allow you to place CPI on loans originated in the State of Ohio.").

[64] WFCPI_00035207 at 214.

[65] WFCPI_00050483 at 484.

[66] McLawhorn Dep. at 169:21-23.

### 6. Wells Fargo and Its CPI Vendor Unlawfully Force-Placed CPI

#### a. Wells Fargo Obtained Borrowers' Insurance Information from the Automobile Dealer at the Time of Sale

103. Throughout the duration of the CPI Program, consumers who purchased or leased automobiles through a dealer either had financing approved directly from a lender in advance of the transaction or worked with the dealer to obtain financing indirectly from a lender, such as Wells Fargo. In the latter case, the financing contract was a standard form agreement, called a Retail Installment Sale Contract ("RISC"). The financial obligations under the RISC were later assigned to the lender.

104. The RISC was an integrated agreement that typically contained the following language: "This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding."[67]

105. The RISC required the borrower to maintain physical damage insurance on the vehicle to protect the collateral. A standard disclosure in a RISC was as follows:

> **Insurance you must have on the vehicle.**
> You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.[68]

---

[67] WFCPI_00000045.

[68] WFCPI_00000045 at 046.

106. Throughout the duration of the CPI Program, Wells Fargo claimed it expected that its indirect auto loan borrowers would learn about the collateral protection insurance requirement from the dealer at the time of the transaction.[69] Wells Fargo understood that the dealer disclosed that requirement through the standardized RISC.[70] Wells Fargo did not customize the RISC for its own purposes.[71]

107. Wells Fargo relied on the dealer to verify that the borrower had adequate insurance to satisfy the collateral protection insurance requirement at the time of the transaction.[72] The dealer typically photocopied the borrower's proof of insurance[73] and filled out a standard form document called, an "Agreement to Furnish Insurance (To Be Used with Security Agreement on Sale of Vehicle)," which identified the borrower's insurance carrier, the carrier's address and/or phone number, and policy number.[74] In the Agreement to Furnish Insurance, the dealer also identified Wells Fargo (or its predecessor) as the "Loss Payee," *i.e.*, the entity to which the claim from any loss should be paid.[75]

108. Upon completion of the transaction, the dealer submitted to Wells Fargo all documents pertaining to the origination of the loan—including proof of insurance and the Agreement to Furnish Insurance—either through U.S. mail, overnight mail or courier, or

---

[69] McLawhorn Dep. at 41:2-10.

[70] McLawhorn Dep. at 41:15-18, 44:7-15.

[71] McLawhorn Dep. at 41:3-43:3.

[72] McLawhorn Dep. at 50:2-11.

[73] *E.g.*, WFCPI_00000045 at 057.

[74] *E.g.*, WFCPI_00000045 at 053.

[75] *Id.*

electronic file transfer.[76] Wells Fargo then saved electronic documents or imaged hard copy documents in its imaging repository.[77]

**b. Defendants Disregarded Borrowers' Proof of Insurance**

109. Wells Fargo opened a loan file on a borrower after it received the loan origination documents. Wells Fargo then electronically transferred a "Daily New Loan File" to its CPI Vendor. That electronic transmission identified information about each day's new loan originations including the borrower's name, address, vehicle, VIN number, year, make, model, and other unique account identifiers.[78]

110. The CPI Vendor was responsible for identifying the insurance policy that matched up with the borrower's account.[79] Nonetheless, Defendants deliberately disregarded the available information about a borrower's auto insurance—including the borrower's proof of insurance or Agreement to Furnish Insurance provided by the borrower with the origination of the loan—in favor of force-placing CPI.

111. The CPI Vendor performed Tracking Services either by receipt of paper files from insurance carriers or, more generally, through an electronic data interchange ("EDI") throughout the duration of the CPI Program. EDI was an agreement among insurance companies to share information electronically with the identified loss payee (or its third-party vendor) whenever there was a change in the status of insurance on a vehicle, such as the addition of a vehicle on an insurance policy or the cancellation of an insurance policy.[80]

112. Although the CPI Vendor received EDI information when there was a change in the status of insurance on a vehicle, Wells Fargo chose not to obtain this data itself.[81]

---

[76] McLawhorn Dep. at 54:14-55:25.

[77] McLawhorn Dep. at 56:1-57:17.

[78] McLawhorn Dep. at 66:24-67:20.

[79] McLawhorn Dep. at 68:6-17.

[80] McLawhorn Dep. at 68:18-73:1.

[81] McLawhorn Dep. at 79:1-7.

Nor did Wells Fargo attempt to obtain such information in hard copy.[82] Wells Fargo instead relied on the CPI Vendor to perform Tracking Services and did not independently confirm the existence or non-existence of insurance on vehicles in its indirect auto loan portfolio.[83]

### c. Defendants Sent False and Misleading "Insurance Request" Letters to Borrowers

113. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor sent via U.S. mail a first letter entitled "Insurance Request" to any "eligible" borrower 42 days after a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[84] Regardless of whether a given borrower maintained adequate auto insurance, and regardless of whether proof of that insurance was available to Defendants, the Insurance Request invariably stated that proof of the borrower's insurance was lacking.

114. The Insurance Request was a standardized form letter sent to borrowers that included the borrower's contact, vehicle, and loan information.[85] The Insurance Request was written and sent by the CPI Vendor and reviewed and approved by Wells Fargo (or its predecessors).[86] As a result, the representations in the Insurance Request letter are attributable to both companies.

115. Although drafted by the CPI Vendor, the Insurance Request was placed on Wells Fargo's letterhead and signed by Wells Fargo.[87] Wells Fargo approved the use of its

---

[82] McLawhorn Dep. 79:1-4.

[83] McLawhorn Dep.79:8-80:1.

[84] WFCPI_00045980 at p.6.

[85] *See, e.g.*, NatGen00576109.

[86] McLawhorn Dep. at 76:12-24.

[87] McLawhorn Dep. at 75:19-22, 76:12-20; *see also, e.g.*, NatGen00576109.

letterhead.[88] And, although the address beneath Wells Fargo's logo was for the CPI Vendor, the name of the CPI Vendor did not appear anywhere in the Insurance Request,[89] leaving the borrower to believe that he or she was receiving correspondence from Wells Fargo. According to Wells Fargo's Rule 30(b)(6) witness, the Insurance Request was on Wells Fargo letterhead because, "it's a Wells Fargo Dealer Services account, and the customer knows Wells Fargo Dealer Services and does not know the vendor."[90]

116. Wells Fargo's Rule 30(b)(6) witness admitted that Wells Fargo reviewed and approved the Insurance Request letters sent to borrowers, but did nothing to confirm their accuracy.[91]

117. Nor did the CPI Vendor do anything to determine whether a vehicle had auto insurance for the seven-week period from the time it had received a Daily New Loan File on an account until it sent the Insurance Request, despite the fact that such insurance information was generally available. Wells Fargo's Rule 30(b)(6) witness testified as follows:

> Q. And do you know what the CPI vendor as of this time did to determine whether [Plaintiff] Ms. Moskus had insurance on the vehicle?
>
> A. So I would say up – up at the time of this letter drafting, they probably haven't taken any action on this account. They haven't received any insurance information, so that's what's prompting this letter to go out to the customer.[92]

---

[88] McLawhorn Dep. at 76:25-77:4.

[89] *See, e.g.*, NatGen00576109; *see also* McLawhorn Dep. at 80:18-20.

[90] McLawhorn Dep. at 82:6-11.

[91] McLawhorn Dep. at 79:16-22.

[92] McLawhorn Dep. at 78:4-11.

118. The Insurance Request falsely stated, "Please be advised that we have not received insurance information for your financed vehicle."[93] Of course, that statement contained a false or misleading representation of material fact, as Wells Fargo had received proof of the borrower's insurance from the dealer at the time of the purchase transaction. Insurance information was also available through EDI.

119. The Insurance Request further falsely stated, "If we do not receive evidence of adequate insurance with an effective date on or before [42 days prior to the date on the Insurance Request], we may buy insurance to protect our interest in your vehicle."[94] This statement was false or misleading as Wells Fargo knew at the time that it did not need to purchase insurance to protect its interest in the borrower's vehicle. The Insurance Request also identified the cost of the annual insurance premium and provided the approximate amount by which the borrower's monthly payment would increase.[95]

120. Letters issued before February 2013 also falsely stated that "the insurance agency, which is an affiliate of Wells Fargo Dealer Services [or its predecessors], will earn a commission if this insurance is purchased."[96] This statement contained a false or misleading representation of material fact. At no point during the CPI Program was the commission "earned" by Wells Fargo's insurance agent affiliate, WestFin. As described above, WestFin did nothing to earn the commission it received. WestFin did not sell, market or promote CPI to borrowers; collect insurance premiums; communicate with borrowers or the CPI Vendor; assist the policyholder in determining her insurance needs; shop the market for the insurance product that meets the policyholder's needs; or seek the most competitive price for the product. The commission that Wells Fargo's affiliate received was an unlawful kickback for the placement of CPI on borrowers' accounts.

---

[93] NatGen00576109.

[94] *Id.*

[95] *Id.*

[96] *See, e.g.*, *id.*

121. Wells Fargo internally acknowledged that WestFin did not "earn" a commission for producing CPI business. Instead, Wells Fargo attempted to justify WestFin's receipt of a commission because WFDS incurred expenses to administer the CPI Program: "Commissions are obtained as part of the WFDS CPI program with QBE in order ***to offset the expenses WFDS incurs as a result of the program***. WFDS still has to maintain management oversight, handle inbound and outbound calls with QBE, customers and insurance agencies, provide QBE with support related to uninsured accounts, cliams [sic] processing, inspections, and many other associated tasks."[97] But nothing within the RISC permitted Wells Fargo to charge borrowers for administrative fees to run the CPI Program, and Wells Fargo concealed from borrowers that they were being charged for these administrative fees. None of the communications Wells Fargo sent to consumers disclosed such charges.

122. Many letters issued between October 2005 and February 2013 also stated that the commission was "15% of the premium."[98] That statement contained a false or misleading representation of material fact. No commissions during that time period were 15 percent of the premium. Under the GAA and its addenda, the commissions for the vast majority of this time period were 17.3 percent, and ranged from 17.2 to 17.25 percent for CPI force-placed during a few months in late 2005.

123. The Insurance Request included specified means by which the borrower could provide information in response to the letter. The borrower's options included an "Insurance Service Center" post office box, toll-free telephone number, fax number, and the website www.ihaveinsurance.com.[99] Although the CPI Vendor owned each of these points of contact, the Insurance Request never identified the CPI Vendor by name.[100] As a

---

97 WFPI_00017004 at 016 (emphasis added).

98 *See, e.g.*, NatGen00576109.

99 *See id.*

100 *See id.*

result, a borrower who engaged with any of these points of contact would have reasonably believed that he or she was communicating directly with Wells Fargo. The CPI Vendor never identified itself when answering inbound telephone calls from Wells Fargo's auto loan borrowers, and instead began calls, "Thank you for calling the Insurance Service Center."[101]

124. Wells Fargo reviewed and approved the scripts the CPI Vendor devised for its customer services representatives to respond to borrowers.[102]

**d. Wells Fargo Had No Practice of Monitoring the CPI Vendor's Telephone Calls to Borrowers**

125. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor used the facilities of the U.S. wires by placing outbound telephone calls to the borrower, the borrower's insurance agent (if known), or the borrower's insurance company (if known), 63 days after a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[103]

126. The CPI Vendor satisfied this obligation if it merely attempted to make one outbound telephone call. Nothing required the CPI Vendor to speak with the borrower before force-placing CPI.[104]

127. The CPI Vendor was required to make notations of these outbound telephone calls and borrowers' responses in its online database, Client Source. Wells Fargo had access to Client Source to verify that the CPI Vendor had in fact made those telephone calls in order to ensure that its borrowers' interests were protected. However, Wells Fargo had no

[101] NatGen00563655 at p.5.

[102] McLawhorn Dep. at 81:16-82:5.

[103] McLawhorn Dep. at 85:25-86:19; WFCPI_00045980 at p.6.

[104] McLawhorn Dep. at 91:2-16.

practice of doing so at any time during the CPI Program, instead only reviewing Client Source on an "as needed" basis.[105]

128. In fact, Wells Fargo's Rule 30(b)(6) witness designated to testify on the topic could not identify any internal controls over the CPI Program that Wells Fargo had in place during the program's operation.[106]

**e. Defendants Sent False and Misleading "Coverage Issued" Letters to Borrowers**

129. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor sent via U.S. mail a second letter entitled "Coverage Issued" to the borrower 77 days after a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[107]

130. Like the Insurance Request, the Coverage Issued Letter was a standardized form letter sent to borrowers that included the borrower's contact, vehicle, and loan information.[108] The Coverage Issued Letter was written and sent by the CPI Vendor and reviewed and approved by Wells Fargo (or its predecessors).[109] As a result, the representations in the Coverage Issued Letter are attributable to both companies.

131. Like the Insurance Request, the Coverage Issued Letter was placed on Wells Fargo's letterhead and signed by Wells Fargo.[110] Wells Fargo approved the use of its letterhead. Although the address beneath Wells Fargo's logo was for the CPI Vendor, the

---

[105] McLawhorn Dep. at 86:20-89:11.

[106] Rule 30(b)(6) Deposition of Mark Turner dated Aug. 16, 2018 ("Turner Dep.") at 62:15-63:13.

[107] McLawhorn Dep. at 89:18-90:1; WFCPI_00045980 at p.6.

[108] *See, e.g.*, NatGen00576035.

[109] McLawhorn Dep. at 90:14-18.

[110] McLawhorn Dep. at 90:19-20; *see also, e.g.*, NatGen00576035.

name of the CPI Vendor did not appear anywhere in the Coverage Issued Letter,[111] leaving the borrower to believe that he or she was receiving correspondence from Wells Fargo.

132. The Coverage Issued Letter falsely stated, "Our records indicate an absence of required insurance coverage since [77 days prior to the date on the Coverage Issued Letter]." This statement contained a false or misleading representation of material fact. In fact, Wells Fargo had received proof of the borrower's insurance from the dealer at the time of the purchase transaction. Wells Fargo maintained that proof of insurance in its records. Moreover, such proof existed through electronic records.

133. The Coverage Issued Letter further falsely stated, "Since we have not received proof of the required coverage, we have exercised our contractual right to purchase insurance coverage at your expense to protect our interest in your financed vehicle."[112] This statement was likewise false or misleading as Wells Fargo knew it did not need to purchaser insurance coverage to protect its interest in the vehicle.

134. The Coverage Issued Letter falsely represented that Defendants were exercising their "contractual right to purchase coverage" at the borrower's expense. Nothing in the RISC disclosed to borrowers that Defendants would charge borrowers for a commission, the cost of administering the CPI Program, or the cost to pay for Tracking Services for Wells Fargo's indirect auto loan portfolio. Also, nothing in the RISC disclosed to borrowers that Defendants would force place a CPI policy without verifying that the borrower failed to maintain adequate collateral insurance.

135. The Coverage Issued Letter also identified the cost of the annual insurance premium, finance charge, and the amount by which the borrower's monthly payment would

[111] *See, e.g.*, NatGen00576035.

[112] *Id.*

increase.[113] Per the IAA, the CPI Vendor's force-placement of CPI on these accounts was [redacted][114]

136. The Coverage Issued Letter was also false or misleading as it omitted to disclose the material fact that the identified premium included an unearned commission paid to WestFin for CPI issued during the period from March 2002 to February 2013.[115] As Wells Fargo's Rule 30(b)(6) witness explained:

> Q. There's no disclosure in [the Coverage Issued Letter] about the commission though?
>
> A. Correct.
>
> Q. That was a decision that was made by Wells and the CPI vendor, to eliminate that sentence that I showed you from [the Insurance Request] in the notice that goes out in [the Coverage Issued letter]. Right?
>
> A. Correct, it would have been a decision – agreed-upon decision not to include that sentence.[116]

137. Throughout the duration of the CPI Program, the Coverage Issued Letter was also false or misleading as it indicated that CPI was forced-placed effective on the date a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[117] In other words, Defendants back-dated the force-placed CPI by 77 days. However, Defendants chose not to do anything to determine the condition of the vehicle before force-placing

---

[113] *See id.*

[114] WFCPI_00015256 at 300; McLawhorn Dep. at 280:17-22.

[115] McLawhorn Dep at 93:3-9.

[116] McLawhorn Dep. at 96:1-9.

[117] *E.g.*, NatGen00576111; McLawhorn Dep. at 97:18-98:3.

CPI.[118] As a result, Defendants collected payments for two and one-half months of CPI premiums for which they knew the likelihood they would have to pay claims was minimal.

138. This was not the only way in which Defendants employed the CPI Program to minimize the likelihood of paying claims. As explained above, Wells Fargo admitted that Defendants force-placed duplicative and unnecessary CPI on the accounts of hundreds of thousands of borrowers who already had adequate auto insurance of their own. In the event a claim was made on a vehicle with duplicative CPI and private insurance coverage, the CPI Vendor would forward the claim to the private insurance carrier, thus avoiding having to for claims on CPI for which borrowers had been charged.[119] Moreover, borrowers who maintained private insuarnce coverage were less likely to place a claim through CPI in the first place, because their first recourse generally was to place a claim with their own auto insurance company.

139. Wells Fargo also employed the CPI Program to avoid losses on repossessed, damaged vehicles in its auto loan portfolio that lacked insurance at the time of damage. Upon discovering that such a vehicle had been repossessed, Wells Fargo purchased CPI for that vehicle, which the CPI Vendor backdated to cover the claim. Then Wells Fargo included the cost of the premium as an expense to the borrower's account post-repossession.[120] This practice minimized the risk to Wells Fargo, enabling the bank to pass costs for CPI to the borrower who had never received disclosures that they would be so charged.

### 7. Wells Fargo Sent Admittedly Deceptive Account Statements to Borrowers

140. Per the agreed-upon policies, practices, and procedures of Wells Fargo and its CPI Vendor, the CPI Vendor billed Wells Fargo for the placement of CPI, and Wells Fargo

118 McLawhorn Dep. at 98:10-18.

119 McLawhorn Dep. at 99:8-100:10.

120 McLawhorn Dep. at 228:17-229:10.

added CPI premiums and interest charges to the borrower's account, 100 days after a borrower appeared in the Daily New Loan File or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled.[121]

141. However, Wells Fargo concealed CPI charges—for premium, interest, and commissions—on borrowers' billing statements at all times between inception of the CPI Program in March 2002 and September 2016, less than one month before Wells Fargo terminated the CPI Program. An internal Wells Fargo audit in August 2015 concluded in its own words that the bank's CPI billing practices were "deceptive":

> Current billing statement does not provide an itemized break down of charges including CPI that makes up the total due balance. As a result the monthly statements do not clearly identify monthly payment requirements, payment allocation, and charges and fees. ***Customers may not be aware that CPI charges are included and balance due has increased and are negatively impacted with potential NSF and late fees.***
>
> ***Risks: Negative impact to customer (deceptive)*** and violation of regulations (CFBP)
>
> Note: There is a statement re-design project that doesn't address the issue [emphasis added.][122]

142. When confronted with the results of the audit, Wells Fargo Rule 30(b)(6) witness admitted that Wells Fargo's CPI billing practices had been deceptive:

> Q. And what was your conclusion? Did that observation have merit?
>
> A. Yes.

* * *

[121] WFCPI_00045980 at p.6.

[122] WFCPI_00048650; *see also* WFCPI_00006404.

Q. What does "deceptive" mean to you?

A. Deceiving.

* * *

Q. You agreed with the conclusion that the conduct that's being described here was deceptive to customers?

A. I think I agreed with the conclusion that the information listed above that, you know, probably needed some changes made to it, yes.

* * *

Q. How long had the practice that's being described above been underway?

A. To my knowledge, since the inception of the program.

* * *

Q. No one at the bank in 13 years decided that it was a good idea to have a CPI charge as a separate line item on a statement to a customer?

A. Apparently not. The change hadn't been made until now [late summer 2016].[123]

143. Wells Fargo's deceptive billing practices harmed borrowers including Plaintiffs and Class members. Wells Fargo's failure to disclose on customer billing statements the addition of charges for CPI premiums and interest increased the likelihood that borrowers would suffer adverse consequences such as underpayments, late payments, fees for insufficient funds, and repossessions. Wells Fargo's deliberate decision to omit CPI charges on customer billing statements decreased the likelihood that borrowers would call to complain or notice that their payments were deficient. Defendants' actions also caused significant damage to the credit reports of thousands of auto loan borrowers.

[123] McLawhorn Dep. at 135:25-143:23.

144. For borrowers who did discover increased charges due to CPI, working with Defendants to remove the CPI was typically futile. Many borrowers who sent proof of their independent insurance policies to Defendants had no success in getting the unnecessary force-placed CPI removed. In other cases, the CPI charges would stop for a month or two and then inexplicably be reinstated with no explanation or notice. Defendants generally refused to fix the problem, or even grant leniency to borrowers whose vehicles were wrongfully repossessed.

**8. Wells Fargo Identified Other Features of the CPI Program That Harmed Borrowers**

145. By 2016, Wells Fargo finally admitted that other aspects of the CPI Program, which had been in place throughout the duration of the CPI Program, caused great harm to its own customers.

146. Defendants recognized two types of CPI cancellations: "flat cancels" and "partial cancels." Flat cancellations referred to a borrower's submitting to Defendants proof of adequate auto insurance covering the entire time for which they had force-placed CPI. Borrowers who flat cancelled CPI were supposed to receive full refunds of all charges for CPI premiums and interest they paid. Partial cancellations referred to a borrower's submitting to Defendants proof of adequate auto insurance covering a portion, but not all, of the time for which they had force-placed CPI. Borrowers who partially cancelled CPI would not receive refunds of charges for CPI premiums and interest they paid for the period when Defendants concluded they needed CPI.

147. Defendants knew that most force-placed CPI certificates were either fully or partially cancelled. The CPI Vendor calculated CPI cancellation trends and five-year cancellation averages, and reported these statistics to Wells Fargo in their quarterly business report decks. The high cancellation rates were also apparent within Wells Fargo's own system of record because it processed refunds when force-placed CPI certificates were cancelled and reported those cancellations back to the CPI Vendor.

148. On average over the period 2005 to 2016, nearly 70 percent of force-placed CPI certificates were flat or partially cancelled.[124] Between January and May 2016 alone, National General determined that over 88,000 CPI certificates were flat cancelled due to duplicative coverage.[125]

149. But cancellation did not end the harm to borrowers. In January 2016, a Wells Fargo operational risk review revealed that borrowers who flat cancelled their force-placed CPI after having a CPI-related delinquency reported to the credit bureaus were unable to remove that delinquency. "If the policy is flat cancelled, there is no process in place to remove the delinquency from the bureaus. ***Probably one of the biggest complaints! And keep in mind, there is an extremely high percentage of premiums that eventually get flat cancelled.***" [Emphasis added.][126] This practice had been in place and harming borrowers since inception of the CPI Program in 2002.[127] Wells Fargo had no process in place to remove CPI-related delinquencies reported to credit bureaus for partial cancels either.[128] Wells Fargo's Rule 30(b)(6) witness testified:

> Q. Well, has the bank ever taken any steps to address any negative impact to a customer's credit as a result of the CPI program?
>
> A. We did not implement any systemic or automated process to do that.[129]

150. The same January 2016 operational risk review identified the false placement of CPI as a harmful practice to borrowers: "False placement of insurance … insurance is

---

[124] National General Defendants' Response to Plaintiffs' Second Set of Interrogatories to All Defendants, Response to Interrogatory Nos. 6(g) and 6(h), dated June 15, 2018.

[125] NatGen00201645 at 646.

[126] WFCPI_00050483 at 484.

[127] McLawhorn Dep. at 166:23-167:2.

[128] WFCPI_00048472-474.

[129] McLawhorn Dep. at 193:21-25.

added when the customer sent in valid proof but due to our error in system, insurance gets added anyway."[130] This problem of falsely-placed duplicative and unnecessary CPI has turned out to affect hundreds of thousands of Wells Fargo's auto loan borrowers.

151. In June 2016, a Wells Fargo compliance and operational risk review found additional ways in which the CPI Program caused inappropriate delinquencies. For instance, the review determined that approximately 25 percent of customers with CPI-related delinquencies paid their bills at a Wells Fargo bank branch, but the "[b]ankers cannot see the correct amount due when there is an increase due to the addition of CPI."[131] Wells Fargo's Rule 30(b)(6) witness acknowledged that this problem had existed since inception of the CPI Program in 2002.[132] Worse, the issue had been raised prior to 2016 but had not been corrected.[133]

152. The same compliance and operational risk review found that "accounts were charged late fees due to the addition of CPI and were not corrected after the flat cancellation."[134] When asked whether Wells Fargo had a practice of refunding late payments that were placed on customers' accounts as a result of a flat-cancelled CPI policy, Wells Fargo's Rule 30(b)(6) witness testified, "There was no automated process in place or systemic process in place that would automatically reverse late charges or late fees on a customer's account … [f]rom inception."[135]

---

[130] WFCPI_00050483 at 484.

[131] WFCPI_00019260 at 261.

[132] McLawhorn Dep. at 176:12-17.

[133] McLawhorn Dep. at 176:18-177:17.

[134] WFCPI_00019260 at 262.

[135] McLawhorn Dep. at 189:21-190:5.

### 9. Defendants Knowingly Ignored and Failed to Track Consumer Complaints About CPI

153. Defendants deliberately ignored and failed to track consumer complaints despite having force-placed CPI on hundreds of thousands of borrowers and having known that most of CPI certificates were flat or partially cancelled.

154. Prior to 2015, Wells Fargo only tracked borrower complaints concerning CPI or the CPI Program if they came through a Better Business Bureau, state or federal regulator, or attorney general.[136] Only these complaints were escalated for review to the Office of the President at WFDS and statistically tracked.[137]

155. Although Wells Fargo had the capability to track customer complaints that were not escalated to the Office of the President, it chose not to do so. Wells Fargo's Rule 30(b)(6) witness could not identify any report of statistical information concerning non-escalated customer complaints during the period 2002-2015.[138]

156. In fact, if a borrower had called Wells Fargo to dispute CPI charges during the period 2002–2015 but did not mention the Better Business Bureau, a regulator, or an attorney general, Wells Fargo would not have even considered the call to be a complaint.[139]

157. Wells Fargo did not keep track of the complaints that the CPI Vendor received before 2015.[140] Nor did Wells Fargo's Rule 30(b)(6) witness know whether Wells Fargo and the CPI Vendor shared complaint tracking statistics with each other during that time period.[141]

---

[136] Videotaped Deposition of Rule 30(b)(6) Witness Kimberly A. Dee dated July 18, 2018 ("Dee Dep.") at 18:2-24.

[137] *Id.*

[138] Dee Dep. at 27:15-20, 28:5-22.

[139] Dee Dep. at 32:13-22.

[140] Dee Dep. at 35:18-23.

[141] Dee Dep. at 40:4-41:1.

158. In or around 2015, National General began tracking CPI-related consumer complaints and reporting them to Wells Fargo for the first time.[142] National General used a broad definition of "complaint" in its tracking process:

> [redacted].[143]

159. Once National General began to track complaints under this definition, it not surprisingly recognized thousands of consumer complaints about the deceptive CPI scheme. [redacted][144] [redacted][145] [redacted].[146]

160. [redacted] This was not an indication of customer service improvements for the CPI Program. Rather, Wells Fargo and National General intentionally altered their counting procedures to reduce the number of complaints counted. [redacted]

---

[142] NatGen00370224 at 227.

[143] NatGen00295965 at p. 28.

[144] NatGen00295965 at p. 30.

[145] NatGen00295965 at p. 29.

[146] NatGen00255795 at p. 31.

[redacted][147] In other words, Defendants knew that the CPI Program was fraudulent, but rather than fix it, they intentionally changed their internal processes to give the appearance that only a limited number of borrowers were complaining.

161. Thus, Defendants' policy and practice for the vast majority of the CPI Program was to ignore customer complaints and avoid tracking complaint trends so they never had to address them. In this way, Defendants could perpetuate the force-placed CPI scheme to their own financial benefit at their customers' expense.

### C. Wells Fargo's Management, Risk Officers, and Board of Directors Knew That the CPI Program Harmed Its Customers

162. WFDS personnel reported on issues concerning the CPI Program to Wells Fargo Bank's Executive Risk Management Committee ("ERMC") in April and July 2012.[148] The ERMC was comprised of some of Wells Fargo's most senior executives including Pat Callahan (former Chief Administrative Officer), Kenneth Zimmerman (former Executive Vice President, Deposit Products Group), James Strother (former Executive Vice President and General Counsel), David Julian (Chief Auditor), Michael Loughlin (former Chief Risk Officer), Kevin Mosse (former Head of Home Equity Lending, Diversified Products Group), and others.

163. The ERMC were briefed on numerous critical issues related to the structure and operation of the CPI Program including the bank's potential loss exposure under the CPI Program versus an alternative product, the total premium paid, cost comparisons to other insurance products, Wells Fargo's failure to conduct an RFP for vendors since inception of the program in 2002, the commission structure, the payment hierarchy for borrowers, the backdating of CPI certificates, and other matters.[149] Notwithstanding that concerns with the CPI Program were brought to the attention of senior management in 2012,

---

[147] NatGen00255795 at p. 31.

[148] WFCPI_00017004.

[149] *Id.*

the force-placed CPI scheme remained in place with "[m]inimal changes to pricing or structure of [the] program since inception" for four more years.[150]

164. Following a deluge of customer complaints about the deceptive CPI Program, Wells Fargo scrambled to address the issue. In June and July 2016, WFDS and the Wells Fargo Risk Team identified and escalated three issues concerning the CPI Program to Tim Sloan (Wells Fargo's Chief Executive Officer), Michael Loughlin (Wells Fargo's former Chief Risk Officer), the Operating Committee, the ERMC, and the Board of Directors.[151] Those issues were:

- Inadequacy of a 3rd party vendor's process to validate customer had their own insurance, resulting in unnecessary CPI placement;
- Resulting impact on a borrower's delinquency status leading to potentially adverse credit reporting impacts which were corrected on a reactive rather than proactive basis; and
- Potential repossession based solely on past due CPI amounts, contrary to [line of business] policy.[152]

165. In August 2016, Wells Fargo senior executives began contemplating terminating the CPI Program, because "[k]eeping the program could lead to reputational risk and potential legal exposure."[153]

166. Defendants discontinued their unusual practice of force-placing CPI on Wells Fargo's auto loan borrowers' accounts effective September 30, 2016. Nonetheless, Wells

[150] WFCPI_00045980 at p.2.

[151] WFCPI_00062871 at 872.

[152] *Id.*

[153] WFCPI_00035207 at 208.

Fargo chose to continue assessing CPI charges on borrowers for whom it had previously force-placed CPI.[154]

167. In October 2016, Wells Fargo formed a Steering Committee of executive leaders from four teams—Consumer Lending, Risk Management, Legal and Audit—to identify and address legal and reputational issues and to devise proposals to mitigate further harm to borrowers on whose accounts Defendants had force-placed CPI.[155] The Steering Committee communicated about CPI issues with Wells Fargo's CEO Tim Sloan.[156]

168. In November 2016, Wells Fargo hired outside counsel, McGlinchey Stafford, and outside consulting firm, Oliver Wyman, to investigate the CPI Program and develop a "remediation plan" to address the harm Defendants had caused to the bank's auto loan borrowers.[157] Wells Fargo established a Working Group of executives who, along with McGlinchey Stafford and Oliver Wyman, conducted a large number of interviews to understand how the CPI Program worked, but the Working Group never even bothered to interview any of the hundreds of thousands of customers who were defrauded.[158]

169. Following reviews by the Steering Committee of executive leaders and outside advisors, on June 27, 2017, Franklin Codel, Wells Fargo's former Senior Executive Vice President of Consumer Lending, reported to the Board of Directors the following "key findings" and "weaknesses" about the CPI Program:

- Placement of insurance followed a limited insurance verification process outsourced to a vendor.
- Until September 2016, CPI amounts assessed were not itemized on periodic statements, making it difficult for

---

[154] WFCPI_00062871 at 872.

[155] *Id.*

[156] Turner Dep. at 97:15-20.

[157] WFCPI_00062871 at 872.

[158] Turner Dep. at 38:10-40:8.

customers to understand that CPI was the cause of payment increase.

- Customer complaints reflect that customers were required to submit proof of insurance multiple times to achieve cancellation of unneeded coverage.

- The complaint groups were not sufficiently staffed to handle complaint volume, resulting in a backlog and delay in getting customers' concerns addressed.

- There was limited attempt to look holistically at complaint trends and identify root causes both with respect to internal complaints and complaints made to National General.

- Customer payments were allocated to CPI interest prior to loan principal, resulting in delinquency if customers continued to make their scheduled principal and interest payments without additional CPI amounts owed.

- Interest charges related to the pro-rated premiums refunded were not always reversed when CPI was partially cancelled.

- Late fees resulting from CPI were not always refunded adequately.

- When CPI was cancelled, credit reporting may not have been updated to remove delinquency marks caused by charges for unneeded CPI coverage unless affirmatively requested by consumer.[159]

170. Nonetheless, Wells Fargo refused to publicly acknowledge the CPI scheme until information about it was leaked to the press.

### D. The *New York Times* Exposes Defendants' Force-Placed CPI Scheme

171. Defendants' fraudulent CPI scheme finally came to light on July 27, 2017, when *The New York Times* ran an investigative report on the scandal.[160] The *Times* report,

---

[159] WFCPI_00062871 at 873.

[160] Gretchen Morgenson, The New York Times, Wells Fargo Forced Unwanted Auto Insurance on Borrowers, July 27, 2017, available at https://www.nytimes.com/2017/07/27/business/wells-fargo-unwanted-auto-insurance.html.

was based on a copy of the internal report commissioned by and prepared for Wells Fargo by consulting firm Oliver Wyman that detailed the scheme (the "Oliver Wyman Report").

172. The Oliver Wyman Report was commissioned in 2016 and completed in February 2017—five months before it was leaked to the press. The Oliver Wyman Report investigated Defendants' CPI practices, but only between January 2012 and July 2016. It found that Defendants charged roughly 800,000 consumers for CPI they did not need, with an estimated 274,000 becoming delinquent on their account. Approximately 25,000 vehicles were wrongfully repossessed as a result of Defendants' CPI practices. The report estimated Wells Fargo owed $73 million to its customers.[161]

173. But, the scheme began well before 2012, and Wells Fargo's borrowers sustained financial damages far beyond the costs of the insurance.[162] The harm also included repossession costs, late fees, charges for insufficient funds, time spent dealing with overdrafts, unfair charges, bank account deficiencies, attempts to reverse the Defendants' wrongful charges, and damage to consumers' credit reports.

174. In a press release posted to its Dealer Services website on the same day the *Times* story first ran, Wells Fargo announced a purported "remediation" program: "In total, approximately $64 million of cash remediation will be sent to customers in the coming months, along with $16 million of account adjustments, for a total of approximately $80 million in remediation."[163]

---

[161] *Id*. The Oliver Wyman Report [redacted] *See* WFCPI_00030101 at 103.

[162] The *New York Times* reported that the scheme began as early as 2006. *Id*. But, after a subsequent *Times* article questioned the time period of Wells Fargo's study, Wells Fargo subsequently admitted that the CPI scheme began as early as 2005. *See* Wells Fargo, SEC and Other Regulatory Filings, Q3 2017 Form 10-Q, at p.3, November 3, 2017, available at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2017/third-quarter-10q.pdf. As detailed herein, the scheme began in March 2002.

[163] *See* Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage, *supra* at n.1.

175. The core decisions concerning the nationwide remediation program were made by Wells Fargo from it California offices and headquarters.

176. But, Wells Fargo's "remediation" program is not what it purports to be. Wells Fargo has not offered consumers remediation of the financial harm they suffered. Rather, Wells Fargo has informed borrowers that if they submit proof of insurance, they "may be eligible for a refund." Wells Fargo offers no "remediation" for its scheme to apply unnecessary, unauthorized and inflated CPI premiums, and Wells Fargo's remediation program offers no relief for the lucrative kickbacks it received in the form of unearned commissions.[164]

177. Moreover, the Wells Fargo executive tasked with designing a remediation program immediately recognized that the CPI business unit was incapable of assisting, because "1) they are not independent enough (too close to the issues to make proper judgment) and 2) [there were] not enough people around with a customer service mindset to err on the side of the customer."[165]

178. Wells Fargo's announced "remediation" program drew criticism from federal regulators. On October 20, 2017, *The New York Times* ran a follow-up article after having reviewed a preliminary report on the CPI scandal prepared by the Office of the Comptroller of the Currency ("OCC"). The report stated that Wells Fargo had most likely underestimated how much it would cost to reimburse harmed customers.[166] The OCC found that Wells Fargo's claimed $80 million fund to compensate consumers was not enough money to properly reimburse consumers, nor did the money sufficiently cover all of the

---

[164] WFCPI_00030101 at 113; Turner Dep. at 107:6-9, 108:10-13 ("Q. And 2 A says customers that paid higher premiums for CPI due to commissions charged. Do you see that? A. Yes. … Q. And it was a business decision of the bank's not to include that category in the remediation plan; right? A. The – yes.").

[165] WFCPI_00060786.

[166] Gretchen Morgenson, The New York Times, Regulator Blasts Wells Fargo for Deceptive Auto Insurance Program, October 20, 2017, available at https://www.nytimes.com/2017/10/20/business/wells-fargo-auto-insurance-comptroller.html.

consumers impacted. The OCC also found that Wells Fargo used "an overly complicated reimbursement methodology, which lacked clear support for addressing all the customer costs incurred," according to the report.

179. As noted by the *Times*, "[t]he report paints a damning picture of a bank that didn't monitor its contractors, that lacked the impetus to correct problems once they were uncovered and that proved unresponsive to complaints from its customers."[167]

180. Whereas Wells Fargo initially claimed that Defendants' force-placed CPI practices affected only 570,000 borrowers between January 2012 and 2016 and would require $80 million in remediation, Wells Fargo's 2017 3rd Quarter Form 10-Q, filed on November 3, 2017, paints a different picture. Wells Fargo then admitted that "[t]he time period in which customers may be eligible to claim or otherwise receive remediation compensation for certain CPI placements has now been extended back to October 15, 2005."[168] And, whereas Wells Fargo originally pledged $80 million to remediate Defendants' fraudulent practices, Wells Fargo increased its estimate to approximately $130 million.[169] Again, this proposed remediation is insufficient.

181. Soon after the *Times* reported on the OCC's report, Senator Sherrod Brown, a member of the Senate Banking Committee, bluntly noted during a Congressional hearing on Wells Fargo's various scandals: "The company pure and simple lied to this committee—and lied to the public."[170] Senator Brown was referring to the fact that Wells Fargo said it first became aware of the CPI debacle a year earlier, in July 2016. Yet, former Wells Fargo CEO John Stumpf did not disclose the CPI scheme to Congress during a hearing in September 2016 concerning millions of fake bank accounts that Wells Fargo created. And

---

[167] *See id.*

[168] Q3 2017 Form 10-Q, *supra* at n.161, at p. 5.

[169] *Id.*

[170] Matt Egan, CNN, Wells Fargo accused of lying to Congress about auto insurance scandal, October 3, 2017, available at http://money.cnn.com/2017/10/03/investing/wells-fargo-lie-congress-hearing-auto-insurance/index.html.

of course, Wells Fargo failed to acknowledge that the bank's senior executives on the ERMC had been briefed on issues with the CPI Program in 2012.

182. In written questions following the 2016 fake account hearings, the Senate Banking Committee specifically asked Wells Fargo executives if they were "confident that this type of fraudulent activity does not exist" elsewhere in the bank. Lawmakers also asked whether Wells Fargo "discovered other types of misconduct." Wells Fargo responded in November 2016, saying: "We believe that the activity at issue here was limited to certain" employees working in the company's community banking division. Wells Fargo did not mention the auto insurance scandal, which was rooted in its auto dealer services department.[171]

183. Recently, the Honorable John Tigar, United States District Judge for the Northern District of California, rejected similar claims of lack of corporate knowledge or involvement in the "fake accounts" scandal also plaguing Wells Fargo. "Just as it is implausible that the director defendants were unaware of the account-creation scheme given the extent of the alleged fraud and the number of red flags," Judge Tigar wrote, "it is implausible that Wells Fargo's senior management, involved in the day-to-day operations of the bank and with greater access to the underlying cross-sell metrics and employee whistle-blower complaints than independent board members, was unaware of the alleged fraud."[172]

184. In a now-familiar theme, Wells Fargo's 2017 3rd quarter 10-Q filing notes that "a former team member has alleged retaliation for raising concerns regarding automobile lending practices."[173]

---

[171] *Id.*

[172] Gretchen Morgenson, The New York Times, Bringing Accountability to the Wells Fargo Boardroom, November 3, 2017, available at https://www.nytimes.com/2017/11/03/business/wells-fargo-board.html; *see also In re Wells Fargo & Company Shareholder Derivative Litig.* 282 F. Supp. 3d 1074, 1099–1100 (N.D. Cal. Oct. 4, 2017).

[173] *See* Wells Fargo Q3 2017 Form 10-Q, *supra* at n. 161.

185. Federal regulators finally recognized that Wells Fargo's explanations and excuses had been insufficient. In a pair of Consent Orders announced on April 20, 2018, the Consumer Financial Protection Bureau and the OCC found that Wells Fargo's CPI practices violated multiple federal statutes and warranted some of the largest fines in recent memory. Wells Fargo agreed to pay $1 billion to federal regulators in part to settle claims it improperly charged auto loan customers for duplicative, unnecessary, and overpriced CPI.[174]

186. All of this paints a picture of a company—Wells Fargo—driven entirely by profit and its willing co-conspirator—National General—who together rigged an already abusive insurance practice for their own ill-gotten gain.

## VI. PLAINTIFFS' EXPERIENCES

### Plaintiff Angelina Camacho

187. On January 25, 2014, Plaintiff Angelina Camacho purchased a used 2011 Mazda CX-9 from Maxon Mazda in Union, New Jersey.

188. To finance her purchase, Ms. Camacho signed a form RISC that required her to make fixed monthly payments of $595.00. The RISC also included a standard provision that required her to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Ms. Camacho failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Ms. Camacho for the premiums.

189. Wells Fargo's documents reflect that the dealerships verified that Ms. Camacho, and other Plaintiffs, had the required insurance before turning the vehicle over to her. Ms. Camacho provided the dealership with a copy of her insurance card, which included her policy number and the contact information for her insurance agent.

---

[174] *See In the Matter of Wells Fargo Bank*, No. 2018-BCFP-0001 (April 20, 2018), *available at* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bankna_consent-order_2018-04.pdf; *In the Matter of Wells Fargo Bank, N.A.*, No. AAEC-2018-16, (April 20, 2018), *available at* https://www.occ.gov/static/enforcementactions/ea2018-026.pdf.

190. On or around January 9, 2015, Wells Fargo added a $1,282.00 CPI charge to Mr. Camacho's outstanding balance. About a year later, on February 1, 2016, Wells Fargo added another CPI charge to Ms. Camacho's account—this time in the amount of $1,037.00. Wells Fargo added these CPI charges even though Ms. Camacho had provided evidence of the required insurance when she purchased her vehicle, and even though Ms. Camacho continued to maintain the required insurance.

191. According to Ms. Camacho's billing statements, the balance for her loan increased by nearly $1,000 for the period ending January 22, 2015, despite the fact that she had made her regular monthly payment. The January bill separately calls out Ms. Camacho's monthly payment and even a $10 late charge that Wells Fargo charged her since the last statement, but nowhere does Wells Fargo disclose that it added a CPI charge to Ms. Camacho's loan.

192. Ms. Camacho did not learn that Wells Fargo had charged her for CPI coverage until after vehicle was repossessed late in the evening on August 29, 2016.

193. When Ms. Camacho finally learned about the CPI charges from Wells Fargo's representative, she was promptly able to provide the representative with her policy number and Wells Fargo was able to verify through her insurance company that Ms. Camacho did indeed maintain the required insurance. Ms. Camacho's vehicle was then returned to her and Wells Fargo cancelled her CPI coverage. However, Ms. Camacho continues to be harmed from the erroneous CPI charges, since her Wells Fargo loan payments continue to be marked as late.

194. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Ms. Camacho, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

195. Plaintiff Camacho reviewed documents that were made available to her in connection with her auto loan. Had the CPI scheme been disclosed, Plaintiff Camacho would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Odis Cole**

196. On January 17, 2015, Plaintiff Odis Cole purchased a used 2011 Cadillac DTS from Driven Auto Sales in Burbank, Illinois.

197. To finance his purchase, Mr. Cole signed a form RISC that required him to make fixed monthly payments of $330.37. The RISC also included a standard provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle. If Mr. Cole failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Cole for the premiums.

198. Wells Fargo's documents reflect that the dealerships verified that Mr. Cole, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Mr. Cole further provided the dealership with a signed "Agreement to Provide Physical Damage Insurance," which reiterated his obligation to maintain the required insurance.

199. On or around November 10, 2015, Wells Fargo added a $1,116 CPI charge to Mr. Cole's outstanding loan balance. Wells Fargo did so even though Mr. Cole had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Cole continued to maintain the required insurance.

200. On or around November 23, 2015, Wells Fargo partially refunded Mr. Cole in the amount of $842 for the CPI charge erroneously placed on his account. On or around July 6, 2016, Wells Fargo added a second $1,082 CPI charge to Mr. Cole's outstanding loan balance.

201. After Mr. Cole asked his insurer to provide Wells Fargo with another copy of his insurance, Wells Fargo partially refunded Mr. Cole $569 for the CPI charge erroneously placed on his account on or around September 19, 2016. Wells Fargo did not fully refund Mr. Cole for the CPI charges he had already paid.

202. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Cole, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

203. Plaintiff Cole reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Cole would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Nyle Davis**

204. On September 18, 2014, Plaintiff Nyle Davis purchased a used 2013 Dodge Grand Caravan from Griffith Motor Company in Neosho, Missouri.

205. To finance his purchase, Mr. Davis signed a form RISC that required him to make fixed monthly payments of $369.44. The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Mr. Davis failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Davis for the premiums.

206. Wells Fargo's documents reflect that the dealerships verified that Mr. Davis, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Mr. Davis provided Griffith Motor Company with proof of his insurance through Progressive.

207. On or around February 27, 2015, Wells Fargo added a $988.00 CPI charge to Mr. Davis' outstanding loan balance. Wells Fargo did so even though Mr. Davis had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Davis continued to maintain the required insurance. Wells Fargo also added a CPI charge of $933.00 on April 12, 2016 and a charge of $208.99 on October 21, 2016—even though Mr. Davis had the required insurance during those periods.

208. On or around April 21, 2015, Mr. Davis noticed that the amount owing on his loan was higher than it should have been. In fact, the principal Mr. Davis owed was less than what appeared in the balance Wells Fargo reported to him.

209. In late 2016, Mr. Davis' vehicle was repossessed. The repossession company told Mr. Davis that he was purportedly late on his Wells Fargo auto loan payments, and the bank had ordered repossession of his vehicle. Mr. Davis ultimately had to pay $1,200 to recover his vehicle from the repossession company.

210. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Davis, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

211. Plaintiff Davis reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Davis would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Duane Fosdick**

212. On June 28, 2014, Plaintiff Duane Fosdick purchased a used 2008 BMW 3-Series vehicle from Courtesy Motors Auto Center in Chico, California.

213. To finance his purchase, Mr. Fosdick signed a form RISC that required him to make fixed monthly payments of $359.74. The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Mr. Fosdick failed to maintain the required insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Fosdick for the premiums.

214. Wells Fargo's documents reflect that the dealerships verified that Mr. Fosdick, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Mr. Fosdick provided the dealership with proof of insurance, as well as a signed "Agreement to Furnish Insurance Policy" that listed the name of Mr. Fosdick's insurance company (National General, as it turned out), his insurance agent, policy number, and his insurance agent's address.

215. The tellers at the Wells Fargo branch where he tendered his monthly payment did not inform him that, on or about October 7, 2014, Wells Fargo added a $1,423.00 CPI charge to his account and his monthly payments had therefore increased. As a result, Wells Fargo began charging Mr. Fosdick late fees—which were also added to his outstanding balance—and reporting to credit bureaus that Mr. Fosdick had past-due loan payments.

216. Even after Mr. Fosdick proved to Wells Fargo that he was wrongly charged for CPI coverage, Wells Fargo added another CPI charge to Mr. Fosdick's loan balance on October 7, 2015—this time in the amount of $1,393.00. Once again, Wells Fargo did so even though Mr. Fosdick had provided evidence of the required insurance (both when he purchased his vehicle, and again when he called to complain about the first wrongly-placed CPI policy), and it did so even though Mr. Fosdick continued to maintain the required insurance.

217. On August 15, 2016, Wells Fargo mailed Mr. Fosdick a letter advising him that they had cancelled the CPI coverage previously purchased for his vehicle and would be removing the CPI charges previously added to his loan balance. Wells Fargo did not

remove the late charges incurred as a result of the CPI charges or correct the adverse credit reports that resulted from the CPI charges.

218. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Fosdick, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

219. 10. Plaintiff Fosdick reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Fosdick would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Regina Gonzalez**

220. On March 22, 2014, Plaintiff Regina Gonzalez purchased a used Chevrolet HHR station wagon from Inver Grove Ford Lincoln in Inver Grove Heights, Minnesota.

221. To finance her purchase, Ms. Gonzalez signed a form RISC that required her to make monthly payments of $284.21 for 72 months. The RISC also included a standard provision that required her to maintain physical-damage insurance protecting the seller's collateral in the vehicle. If Ms. Gonzalez failed to maintain the required insurance, the RISC gave the seller the option of purchasing insurance for itself and charging her for the premiums.

222. Wells Fargo's documents reflect that the dealerships verified that Ms. Gonzalez, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, while at the dealership, Ms. Gonzalez provided the dealership with a copy of her insurance card. Ms. Gonzalez provided the dealership with a signed "Agreement to Provide Insurance," which reiterated her obligation to maintain the required insurance, and

listed the name of her insurance company, her policy number, and her insurance agent's name and telephone number.

223. On or around March 10, 2015, Wells Fargo added a $1,343 CPI charge to Ms. Gonzalez's outstanding loan balance. Wells Fargo did so even though Ms. Gonzalez had provided evidence of the required insurance when she purchased her vehicle, and it did so even though Ms. Gonzalez continued to maintain the required insurance.

224. In a letter sent by U.S. Mail dated February 26, 2015, Wells Fargo informed Ms. Gonzalez that CPI had been placed on her account for the period between November 29, 2014 and November 29, 2015 but stated that it had cancelled this force-placed CPI for the period from February 19, 2015 to November 29, 2015 because of "duplicate coverage." The letter erroneously maintained that Ms. Gonzalez had not provided proof of insurance for the time period of November 29, 2014 to February 29, 2015 but implicitly acknowledged that she had provided proof of insurance for the remaining time period. On or around March 11, 2015, Wells Fargo partially refunded Ms. Gonzalez in the amount of $1,041 for the CPI charge erroneously placed on her account.

225. On or around June 1, 2015, Wells Fargo added a second $1,303 CPI charge to Ms. Gonzalez's outstanding loan balance. Wells Fargo did so even though Ms. Gonzalez had provided evidence of the required insurance when she purchased her vehicle and continued to maintain the required insurance—and despite the fact that Wells Fargo had acknowledged in its February 26, 2015 letter that CPI was "duplicate coverage" because she already maintained the required insurance.

226. Ms. Gonzalez generally made loan payments by deposit at a Wells Fargo drive-through or with a teller inside her local Wells Fargo branch. She knew the amount of her regular monthly loan payments and did not notice that Wells Fargo had unilaterally and unlawfully increased her outstanding loan balance.

227. In or around August 2015, Ms. Gonzalez received a billing statement by U.S. Mail and discovered that the amount owing on her loan was higher than it should have been. In fact, the principal Ms. Gonzalez owed was less than what appeared in her balance.

Unbeknownst to Ms. Gonzalez, Wells Fargo had been applying portions of her monthly payment toward the CPI charge and interest on that CPI charge—rather than toward the principal amount owing on Ms. Gonzalez's loan.

228. Ms. Gonzalez informed Wells Fargo representatives over the phone that she already had insurance, but Wells Fargo continued to charge her for insurance. Beginning in or around December 2015, she received letters from Wells Fargo by U.S. Mail stating that she had failed to make full monthly payments of $485.62 (reflecting both her agreed upon monthly loan payment of $284.21 as well as the unlawful CPI charges) and that her vehicle would be repossessed if she did not pay a purportedly past due amount. On or around February 16, 2016, Wells Fargo repossessed Ms. Gonzalez's vehicle.

229. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Ms. Gonzalez, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

230. Plaintiff Gonzalez reviewed documents that were made available to her in connection with her auto loan. Had the CPI scheme been disclosed, Plaintiff Gonzalez would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**<u>Plaintiff Brandon Haag</u>**

231. On November 14, 2013, Plaintiff Brandon Haag purchased a used 2008 BMW 5 Series from Dahl Automotive La Crosse in La Crosse, Wisconsin.

232. To finance his purchase, Mr. Haag signed a form RISC that required him to make fixed monthly payments of $484.50. The RISC also included a provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle.

If Mr. Haag failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Haag for the premiums.

233. Wells Fargo's documents reflect that the dealerships verified that Mr. Haag, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, while at the dealership, Mr. Haag signed an "Agreement to Provide Insurance," which reiterated his obligation to maintain the required insurance, and listed the name of his insurance company (Geico), his policy number, the effective date of the policy, and comprehensive and collision deductibles under the policy.

234. On or around October 9, 2014, Wells Fargo added a $1,423.00 CPI charge to Mr. Haag's outstanding loan balance. Wells Fargo did so even though Mr. Haag had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Haag continued to maintain the required insurance.

235. Wells Fargo continued to charge Mr. Haag for the CPI policy and deducted sums from his monthly loan payment to pay for the CPI premium. As a result of such deductions, Mr. Haag was erroneously deemed to be delinquent under his loan agreement and was charged late fees.

236. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Haag, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

237. Plaintiff Haag reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Haag would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Paul Hancock**

238. On February 8, 2016, Plaintiff Paul Hancock purchased a used 2006 Chrysler PT Cruiser from Hubler Ford Center in Shelbyville, Indiana

239. To finance his purchase, Mr. Hancock signed a form RISC that required him to make fixed monthly payments of $119.67. The RISC also included a provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle. If Mr. Hancock failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Hancock for the premiums.

240. Wells Fargo's documents reflect that the dealerships verified that Mr. Hancock, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Mr. Hancock provided the dealership with a signed "Agreement to Provide Insurance," which reiterated his obligation to maintain the required insurance, and listed his policy number and his insurance agent's address and telephone number.

241. On or around May 18, 2016, Wells Fargo added a $598.00 CPI charge to Mr. Hancock's outstanding loan balance. Wells Fargo did so even though Mr. Hancock had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Hancock continued to maintain the required insurance.

242. Wells Fargo increased the amount owing on Mr. Hancock's loan without explanation beginning in May 2016. On or around May 20, 2016, Wells Fargo sent Mr. Hancock a bill by U.S. mail with a current payment due of $180.69. The statement increased his monthly payment due from $119.67 without no stated reason. The bill also reflects a total loan balance of $5,222—an unexplained increase from the $4,903 due on his loan as of February 18, 2016.

243. Only beginning on or around September 2016 did Wells Fargo disclose the CPI charges that had been imposed on Mr. Hancock, sending him statements that included itemized entries for CPI and CPI interest. A Wells Fargo bill dated September 19, 2016

and sent by U.S. mail reflects that Mr. Hancock paid $75.63 towards CPI and $1.38 towards CPI interest in an earlier payment made on September 13, 2016.

244. Wells Fargo mailed Mr. Hancock letters on November 30, 2016 and December 2, 2016 notifying him that it was discontinuing its force placed CPI program. But Wells Fargo still billed Mr. Hancock for CPI and CPI interest in a mailed statement dated January 20, 2017. Furthermore, Wells Fargo did not refund Mr. Hancock for the CPI charges he had already paid.

245. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Hancock, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

246. Plaintiff Hancock reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Hancock would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Dustin Havard**

247. On April 3, 2012, Plaintiff Dustin Havard purchased a used Ford F150 truck from Watson Quality Ford in Jackson, Mississippi.

248. To finance his purchase, Mr. Havard signed a form RISC that required him to make fixed monthly payments of $396.52. The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Mr. Havard failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Havard for the premiums.

249. Wells Fargo's documents reflect that the dealerships verified that Mr. Havard, and other Plaintiffs, had the required insurance before turning the vehicle over. HavardIn this regard, Mr. Havard provided the dealership with a signed "Agreement to Furnish Insurance Policy," which reiterated his obligation to maintain the required insurance, and listed the name of his insurance company, his insurance agent's name and phone number, and the expiration date of his current policy.

250. On or around July 12, 2012, Wells Fargo added a $1,200.00 CPI charge to Mr. Havard's outstanding loan balance. It added another CPI charge, this time for $975.00, on September 16, 2014, and a third CPI charge for $954.00 on January 13, 2016.

251. Shortly after the first CPI charge was added to Mr. Havard's account, he was online checking his account and noticed that his outstanding balance had increased. This was because Wells Fargo was unlawfully charging him for CPI coverage.

252. Mr. Havard repeatedly provided Wells Fargo with evidence that he maintained the required insurance, yet Wells Fargo continued to place CPI charges on Mr. Havard's accounts and apply his monthly loan payments toward the CPI charges and interest on those charges. As a result, Mr. Havard was charged late fees, deemed to be delinquent under his loan agreement, and his vehicle was wrongly repossessed and held for two weeks.

253. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Havard, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

254. Plaintiff Havard reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Havard would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Brian Miller**

255. On October 31, 2014, Plaintiff Brian Miller purchased a used 2005 Chevrolet Avalanche from Desoto Auto Sales in Olive Branch, Mississippi.

256. To finance his purchase, Mr. Miller signed a form RISC that required him to make fixed monthly payments of $367.11. The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Mr. Miller failed to maintain the required insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Miller for the premiums.

257. Wells Fargo's documents reflect that the dealerships verified that Mr. Miller, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, the dealership reviewed and kept a copy of Mr. Miller's insurance card, which included the name of his insurance company, his policy number, his insurance agent, and contact information for both the insurance company and agent. Both the dealership and Mr. Miller also signed an "Agreement to Provide Insurance," which confirmed Mr. Miller had "arranged for the required insurance through the insurance company shown" and stated that Wells Fargo "reserve[d] the right to contact your agent and verify the insurance information provided." The insurance information was not filled in on the form because the dealership instead took a copy of Mr. Miller's insurance card.

258. On or around December 22, 2015, Wells Fargo added a $862.00 CPI charge to the amount owed under Mr. Miller's RISC. Wells Fargo did so even though Mr. Miller had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Miller continued to maintain the required insurance.

259. Mr. Miller had set up an automatic bill pay so his fixed monthly payment would be deducted from his Wells Fargo bank account each month. Once Wells Fargo added a $862.00 CPI charge to his outstanding balance, it began applying a portion of his monthly payments toward the CPI charge and interest on the CPI charge. As a result, under Wells Fargo's false internal accounting, Mr. Miller's monthly payments were insufficient,

and Wells Fargo began charging him late fees—which were also added to the outstanding balance on Mr. Miller's loan—and reporting negative information to the credit bureaus.

260. Mr. Miller did not learn that Wells Fargo had force-placed CPI on his account, imposed late charges, or reported delinquencies to credit bureaus until on or about July 29, 2016. While trying to buy his wife a car, he discovered that his credit score had dropped and was told the reason was six late payments reported by Wells Fargo.

261. Mr. Miller again provided his insurance information to Wells Fargo (which remained unchanged from the information Wells Fargo already had). About a week later, Wells Fargo removed the CPI coverage from Mr. Miller's account. Wells Fargo has not, however, refunded the late charges incurred as a result of its unlawful CPI charges or corrected the negative credit information it provided to the credit bureaus.

262. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Miller, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

263. Plaintiff Miller reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Miller would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**<u>Plaintiff Analisa Moskus</u>**

264. On May 31, 2008, Plaintiff Analisa Moskus purchased a used 2007 Toyota 4Runner from Hawthorne Motors in Lawndale, California.

265. To finance her purchase, Ms. Moskus signed a form RISC that required her to make fixed monthly payments of $327.32. The RISC also included a standard provision that required her to maintain physical damage insurance protecting the seller's collateral in

the vehicle. If Ms. Moskus failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Ms. Moskus for the premiums.

266. Wells Fargo's documents reflect that the dealerships verified that Ms. Moskus, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Ms. Moskus provided the dealership with a signed "Agreement to Furnish Insurance Policy," which reiterated her obligation to maintain the required insurance, and listed the name of her insurance company, her policy number, and her insurance agent's phone number.

267. Ms. Moskus provided Defendants with evidence that she already had insurance through AAA on multiple occasions. But on January 23, 2013, Wells Fargo nonetheless billed Ms. Moskus for CPI, adding $798.00 to her outstanding loan balance.

268. Wells Fargo continued to charge Ms. Moskus for CPI, even after she called to complain, and wrongfully applied portions of Ms. Moskus's monthly loan payment toward the CPI charge and interest on that charge. As a result, Ms. Moskus was erroneously deemed to be delinquent under her loan agreement and Wells Fargo reported that delinquency to credit agencies.

269. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Ms. Moskus, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

270. Plaintiff Moskus reviewed documents that were made available to her in connection with her auto loan. Had the CPI scheme been disclosed, Plaintiff Moskus would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Keith Preston**

271. On September 30, 2007, Plaintiff Keith Preston purchased a new 2008 Mazda3 from Great Valley Chrysler Jeep in Sacramento, California.

272. To finance his purchase, Mr. Preston signed a form RISC that required him to make fixed monthly payments of $364.10. The RISC also included a standard provision that required him to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Mr. Preston failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Preston for the premiums.

273. Wells Fargo's documents reflect that the dealerships verified that Mr. Preston, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, Mr. Preston purchased insurance at the dealership from an insurance agent referred by the dealership, and the dealership received copies of the insurance paperwork. Mr. Preston also signed an "Agreement to Furnish Insurance Policy," which listed the name of Mr. Preston's insurance company, his policy number, his insurance agent, and the agent's address and phone number.

274. On or about May 1, 2008, Wachovia added a $1,583.00 CPI charge to the amount owed on Mr. Preston's loan. Wachovia did so even though Mr. Preston had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Preston continued to maintain the required insurance.

275. Two weeks after Wachovia added the CPI charge, it cancelled the CPI policy it had added to Mr. Preston's account. It reduced—but did not eliminate—the CPI charge that had been added to Mr. Preston's account. The amount remaining on the account was $398.00.

276. The unlawful CPI charge that Wachovia added to Mr. Preston's account resulted in a higher monthly payment, which Mr. Preston struggled to meet. The CPI charge caused or contributed to late charges incurred by Mr. Preston, as well as to a monthly fee that Wachovia charged Mr. Preston for paying his bill by phone. Because of the CPI charge,

the monthly payment Wachovia insisted that Mr. Preston pay varied from month to month, and Mr. Preston needed to call the bank to be sure he was paying the correct amount.

277. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Preston, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

278. Plaintiff Preston reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Preston would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**<u>Plaintiff Victoria Reimche</u>**

279. On December 27, 2010, Plaintiff Victoria Reimche purchased a used 2008 Saturn VUE from Go Buick GMC Park Meadows in Lone Tree, Colorado.

280. To finance her purchase, Ms. Reimche signed a form RISC that required her to make fixed monthly payments of $352.84. The RISC also included a standard provision that required her to maintain physical damage insurance protecting the seller's collateral in the vehicle. If Ms. Reimche failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Ms. Reimche for the premiums.

281. Wells Fargo's documents reflect that the dealerships verified that Ms. Reimche, and other Plaintiffs, had the required insurance before turning the vehicle over to her. Ms. Reimche provided the dealership with a signed "Confirmation of Accidental Physical Damage Insurance," which reiterated her obligation to maintain the required insurance.

282. On or around April 6, 2011, Wells Fargo added a $1,036.00 CPI charge to Ms. Reimche's outstanding loan balance. Wells Fargo did so even though Ms. Reimche had provided evidence of the required insurance when she purchased her vehicle, and it did so even though Ms. Reimche continued to maintain the required insurance.

283. On or around June 21, 2011, Wells Fargo partially refunded Ms. Reimche in the amount of $ 551.00 for the CPI charge erroneously placed on her account.

284. On or around May 22, 2012, Wells Fargo added a second $977.00 CPI charge to Ms. Reimche's outstanding loan balance. Wells Fargo did so even though Ms. Reimche had continued to maintain the required insurance.

285. On or around May 23, 2012, Wells Fargo partially refunded Ms. Reimche in the amount of $761.00 for the second CPI charge erroneously placed on her account.

286. Ms. Reimche paid her loan with Wells Fargo in full on or around August 25, 2015. Because of the wrongfully charged CPI policies placed on her loan, Ms. Reimche's final billing statement was false and paid Wells Fargo more than it was owed.

287. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Ms. Reimche by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

288. Plaintiff Reimche reviewed documents that were made available to her in connection with her auto loan. Had the CPI scheme been disclosed, Plaintiff Reimche would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Dennis Small**

289. On September 29, 2014, Plaintiff Dennis Small purchased a used 2012 Ford F350 truck from AutoNation Ford Memphis in Memphis, Tennessee.

290. To finance his purchase, Mr. Small signed a form RISC that required him to make fixed monthly payments of $674.24. The RISC also included a standard provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle. If Mr. Small failed to maintain physical damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Small for the premiums.

291. Wells Fargo's documents reflect that the dealerships verified that Mr. Small, and other Plaintiffs, had the required insurance before turning the vehicle over. In this regard, while at the dealership, Mr. Small added the vehicle to his existing comprehensive insurance policy, printed out confirmation that he maintained the required coverage, and provided that evidence of insurance to the dealership. Mr. Small provided the dealership with a signed "Agreement to Provide Insurance," which reiterated his obligation to maintain the required insurance, and listed the name of his insurance company, his policy number, and his insurance company's address and telephone number.

292. On or around March 22, 2016, Wells Fargo added a $1,282.00 CPI charge to Mr. Small's outstanding loan balance. Wells Fargo did so even though Mr. Small had provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Small continued to maintain the required insurance.

293. Mr. Small had set up auto-pay with Wells Fargo, so that his loan payments would be transferred from his debit account automatically each month, and at first, because the monthly payments were in the same amount, he did not notice that Wells Fargo had unilaterally and unlawfully increased his outstanding loan balance.

294. In or around October 2016, however, Mr. Small was online checking his balances when he noticed that the amount owing on his loan was higher than it should have been. In fact, the principal Mr. Small owed was less than what appeared in his balance. Unbeknownst to Mr. Small, Wells Fargo had been applying portions of his monthly payment toward the CPI charge and interest on that CPI charge—rather than toward the principal amount owing on Mr. Small's loan.

295. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Small, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

296. Plaintiff Small reviewed documents that were made available to him in connection with his auto loan. Had the CPI scheme been disclosed, Plaintiff Small would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

**Plaintiff Bryan Tidwell**

297. On March 9, 2016, Plaintiff Bryan Tidwell purchased a used 2012 Subaru Outback from Fremont Motor Cody Inc. in Cody, Wyoming.

298. To finance his purchase, Mr. Tidwell signed a form RISC that required him to make fixed monthly payments of $189.96. The RISC also included a provision that required him to maintain physical-damage insurance protecting the seller's collateral in the vehicle. If Mr. Tidwell failed to maintain physical-damage insurance, the RISC gave the seller the option of purchasing insurance for itself and charging Mr. Tidwell for the premiums.

299. Wells Fargo's documents reflect that the dealerships verified that Mr. Tidwell and other Plaintiffs, had the required insurance before turning the vehicle over to him. Mr. Tidwell provided evidence of that insurance while he was at the dealership. Mr. Tidwell also provided the dealership with a signed "Agreement to Provide Insurance," which reiterated his obligation to maintain the required insurance, and listed the name of his insurance company (Progressive), as well as Progressive's address and telephone number.

300. On or around June 17, 2016, Wells Fargo added a $1,398.00 CPI charge to Mr. Tidwell's outstanding loan balance. Wells Fargo did so even though Mr. Tidwell had

provided evidence of the required insurance when he purchased his vehicle, and it did so even though Mr. Tidwell continued to maintain the required insurance.

301. Mr. Tidwell had set up monthly automatic payments for his loan. When Wells Fargo added CPI, it cancelled his auto payment, causing Mr. Tidwell to incur a late fee.

302. Defendants' policies, practices, and procedures were to make other false and misleading statements to Plaintiffs, including Mr. Tidwell, by inflating the outstanding balance on Plaintiffs' loans in billing statements and mailing letters to Plaintiffs 42 and 77 days after loan origination that falsely stated that Wells Fargo lacked evidence of Plaintiffs' insurance and was exercising its contractual right to add CPI fees in good faith, when in fact Defendants had Plaintiffs' insurance information.

303. Plaintiff Tidwell reviewed documents that were made available to her in connection with her auto loan. Had the CPI scheme been disclosed, Plaintiff Tidwell would have seen and been aware of it and would not have would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation.

## VII. STATUTE OF LIMITATIONS

### A. Discovery Rule

304. The discovery rule tolls any statutes of limitation otherwise-applicable to any claims asserted herein.

305. Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants conspired to force-place unnecessary CPI on hundreds of thousands of borrowers and refuse to honor proof of insurance, when provided.

306. Defendants' CPI scheme was elaborate and well-concealed. Despite having received proof of insurance at loan origination, Defendants falsely represented that they had never received such information. Moreover, Wells Fargo chose not to disclose CPI charges, including premium, interest and unearned commissions, in its regular billing statements to

consumers at any point between inception of the CPI Program in 2002 and just before termination in September 2016.[175]

307. Indeed, an internal Wells Fargo audit in August 2015 concluded that the bank's CPI billing practices were deceptive because the billing statements did "not provide an itemized break down of charges including CPI that makes up the total balance. … ***Customers may not be aware that CPI charges are included and balance due has increased and are negatively impacted with potential NSF and late fees. … Risks: Negative impact to customer (deceptive)***[.][176]

308. It was not until Wells Fargo commissioned a report on Defendants' conduct—which was leaked to *The New York Times*—that Plaintiffs and Class members discovered the fraud. Plaintiffs and Class members had no realistic ability to discover the true nature of Defendants' CPI practices until July 27, 2017 at the earliest.

**B. Fraudulent Concealment**

309. Defendants' affirmative and active concealment of their conduct also tolls any otherwise-applicable statute of limitations to any claims asserted herein.

310. Under the fraudulent concealment doctrine, the causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' concealment of the material facts.

311. Plaintiffs and members of the Class, as defined below, were kept ignorant by Defendants of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the true nature of the Defendants' force-placed CPI scheme, including the kickbacks to Wells Fargo from the CPI Vendor, until the publication of *The New York Times* article on July 27, 2017 at the earliest. As described above, Wells Fargo recognized that its own billing practices were

---

[175] WFCPI_00062871 at 873.

[176] WFCPI_00048650; *see also* WFCPI_00006404.

"deceptive" in that they deliberately concealed the CPI charges for all but one month of the fourteen year CPI scheme.

312. Defendants are under a continuous duty to disclose, to Plaintiffs and Class members, the true character, quality and nature of the charges they assess on borrowers' accounts. Defendants actively and affirmatively concealed the true character, quality, and nature of their assessment of force-placed charges for CPI polices on borrowers' accounts. Defendants' concealment includes their false and misleading statement and omissions of material fact in their Insurance Request letters, Coverage Issued letters, billing statements, customer service telephone calls, and elsewhere. Plaintiffs and members of the Class reasonably relied on Defendants' affirmative and active concealment.

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

### A. Class Definitions

313. Plaintiffs bring this action on behalf of themselves and a Nationwide Class and State Classes (collectively, the "Class"), defined as:

**Nationwide Class:**

All residents of the United States of America who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**California State Class:**

All residents of the State of California who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Colorado State Class:**

All residents of the State of Colorado who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Indiana State Class:**

All residents of the State of Indiana who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Minnesota State Class:**

All residents of the State of Minnesota who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Mississippi State Class:**

All residents of the State of Mississippi who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Missouri State Class:**

All residents of the State of Missouri who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Wisconsin State Class:**

All residents of the State of West Virginia who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

**Wyoming State Class:**

All residents of the State of Wyoming who obtained an auto loan through Wells Fargo Bank, N.A., or its predecessors, subsidiaries or divisions, and who were assessed charges for CPI and/or related fees on or after March 1, 2002.

314. Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

315. Plaintiffs reserve the right to amend the Class Definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

**B. Class Certification Requirements: Federal Rule of Civil Procedure 23**

316. This action is brought and properly may be maintained as a class action on behalf of the Nationwide Class and/or State Classes proposed herein under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(3), and satisfies the requirements thereof.

317. Numerosity: While the exact number of members of the Class is unknown to Plaintiffs at this time, and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. At this time, Plaintiffs are informed and believe that the Class includes at least 2 million members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through a class action will be of benefit to the parties and the Court.

318. Ascertainability: Names and addresses of members of the Class are available from Defendants' records. Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

319. Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Class have been subjected to the same unlawful, deceptive, and improper practices and has been damaged in the same manner thereby.

320. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class, because they have no interests which are adverse to the interests of the members of the Class. Plaintiffs are committed to the vigorous

prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

321. Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

a. The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action;

b. If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

c. Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

322. Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3). The common questions of fact include, but are not limited to, the following:

a. Whether Defendants engaged in the unlawful conduct alleged herein:

b. Whether Defendants force-placed CPI on Wells Fargo auto loan customers who maintained independent automobile insurance;

c. Whether Defendants assessed CPI charges to Plaintiffs and other Class members including charges for premiums, interest, unearned commissions, and other fees as a result of their force-placement of CPI;

d. Whether Defendants wrongfully threatened collections, repossessed vehicles, and made adverse notations on credit reports of Plaintiffs and other Class members as a result of their force-placement of CPI;

e. Whether Defendants made misrepresentations and omissions of material fact regarding their loans and their procedures for force-placing CPI;

f. Whether Wells Fargo received kickback payments in the form of unearned commissions from the CPI Vendor for force-placing CPI and, as a result, whether Plaintiffs and Class members were charged unlawfully inflated CPI premiums;

g. Whether Defendants knew or should have known that they failed to properly confirm whether borrowers had independent automobile insurance;

h. Whether Defendants' conduct violates RICO, the Bank Holding Company Act, consumer protection statutes, and other causes of action herein;

i. Whether Plaintiffs and other Class members are entitled to equitable relief, including but not limited to, restitution or injunctive relief;

j. Whether such equitable relief includes Defendants' remediation of Plaintiffs' and Class members' credit reports;

k. Whether Plaintiffs and the other Class members are entitled to damages, including treble damages, punitive damages, exemplary damages and statutory damages (where allowed by state law) and other monetary relief and, if so, in what amount; and

l. Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

323. Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## IX. RICO ALLEGATIONS

324. The following allegations pertain to Plaintiffs' claim for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964, against all Defendants.

325. Plaintiffs and the members of the Class are each "persons" as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

326. Defendants are, and at all relevant times were, "persons" within the meaning of 18 U.S.C. § 1961(3) because they are entities capable of holding legal or beneficial interest in property.

327. Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

328. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).

329. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise generally has three structural features, including: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

330. As alleged below and throughout this Complaint, the Wells Fargo and National General companies orchestrated a scheme to extract millions of dollars from Plaintiffs and members of the Class by force-placing inflated, unlawful, unnecessary and undisclosed CPI in connection with automobile loans issued and held by Wells Fargo. Wells Fargo, National General, and their predecessors conducted their business through an association-in-fact enterprise in violation of section 1962(c) by a pattern of racketeering activity, including mail and wire fraud, for the purpose of improperly profiting from unlawfully force-placed

CPI. The CPI scheme enabled Wells Fargo to enjoy kickbacks in the form of unearned commissions and other compensation for force-placing CPI. The CPI scheme also afforded National General a captive audience of millions of accounts on which it could force-place CPI, earning hundreds of millions of dollars in net written premium at a low risk of payout on insurance claims.

331. Defendants' endeavor had the desired effect. Defendants secured unlawful profits during the pendency of the enterprises. And, as collateral damage, unsuspecting borrowers were charged millions of dollars in excessive premiums, interest, overdraft fees, late fees, and experienced negative credit occurrences and repossession as a result of Defendants' conduct.

## X. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violations of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. § 1962(c)

### (Against All Defendants)

332. Plaintiffs incorporate by reference, in this claim for relief, each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

333. Plaintiffs bring this claim for relief on behalf of themselves and the members of the Nationwide Class pursuant to 18 U.S.C. §§ 1962(c) and 1964 of RICO against Wells Fargo and National General (for purposes of this cause of action, "Defendants").

### A. The CPI Enterprise

334. Defendants Wells Fargo, National General, and their predecessors as detailed throughout this Complaint, formed an association-in-fact enterprise, referred to as the "CPI Enterprise." The CPI Enterprise included: (a) Wells Fargo, its predecessors, subsidiaries, employees, and agents including WFS, Wachovia, WestFin, and WFDS; and (b) National General, its predecessors, subsidiaries, employees, and agents including Newport, Meritplan, Balboa, and QBEF. The CPI Enterprise was formed for the purpose of

unlawfully extracting significant revenue and profits from Plaintiffs and the Class by force-placing CPI on their automobile loans, and sharing kickbacks in the form of unearned commissions and other payments between the members of the enterprise.

335. At all relevant times, each member of the CPI Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in that conduct. Each member of the enterprise reaped substantial profits from the conduct of the enterprise.

336. Each member of the CPI Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But, at all relevant times, the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

337. The members of the CPI Enterprise are systematically linked through continually coordinated activities (including the transmission of the Daily New Loan File, agreements to force-place CPI on borrowers, monthly management meetings, and quarterly business reviews), financial ties (including daily payments of premium, refunds, and commissions), and contractual business arrangements (including the IAAs and GAAs). The CPI Enterprise was an ongoing and continuous enterprise from March 2002 to September 2016.

338. Defendants could not have accomplished the purpose of the CPI Enterprise without the assistance of each other, and all Defendants profited financially from the scheme.

339. The CPI Enterprise described above involved regular communications between Wells Fargo and National General in which insurance and customer information, and payments were exchanged to facilitate the goals of the enterprise. As described below, such communications occurred through the mail and wire facilities of the United States.

340. The members of the CPI Enterprise functioned as a continuing unit for the purposes of implementing the scheme. All members agreed to take actions to hide the existence of the scheme and the CPI Enterprise from others including Wells Fargo's auto loan borrowers.

341. The CPI Enterprise engaged in and affected interstate commerce because, *inter alia*, it affected the price and terms of auto loans and/or CPI that was force-placed on millions of Class members throughout the United States. The CPI Enterprise further required that Class members make payments for CPI premiums, interest, and unearned commissions in interstate commerce to Wells Fargo.

342. The effects of the CPI Enterprise are still felt today, as many Wells Fargo auto loan customers continue to be damaged by CPI-related negative reports to credit reporting agencies.

**B. Conduct of the CPI Enterprise**

343. During the Class Period, Wells Fargo, National General, and their predecessors identified in this Complaint exerted control over the CPI Enterprise and participated in the operation and management of its affairs, directly and indirectly.

344. Wells Fargo and its predecessors participated in the operation and management of the enterprise as described throughout this Complaint, including but not limited to the following ways:

a. Misrepresenting to customers, and failing to adhere to, the terms of its auto loans at loan origination;

b. Transmitting borrower information to the CPI Vendor in the form of the Daily New Loan File;

c. Disregarding the borrowers' proof of insurance provided at the time of loan origination;

d. Misrepresenting the circumstances under which it would force-place CPI on borrowers' accounts;

e. Authorizing the issuance of false and misleading Insurance Request Letters and Coverage Issued Letters to borrowers;

f. Force-placing unnecessary and undisclosed CPI on borrowers' accounts;

g. Concealing CPI charges on borrowers' billing statements, a practice which the bank itself deemed to be "deceptive";

h. Receiving concealed kickbacks in the form of unearned commissions and other compensation from the CPI Vendor for force-placing CPI;

i. Participating in monthly management review meetings and quarterly business review meetings with the CPI Vendor, during which it discussed the high percentage of flat and partial cancellations due to the force-placement of duplicative and unnecessary CPI;

j. Paying CPI premiums to the CPI Vendor;

k. Assessing CPI charges and collecting monthly payments from Class members, including premium charges and interest, which falsely represented that those charges were due and owed;

l. Misrepresenting to credit agencies and to Class members that there were delinquencies when CPI premiums and insurance were not paid; and

m. Misrepresenting to credit agencies, Class members, and the Courts that repossession of Class members' vehicles was authorized because Class members were delinquent on their loan accounts.

345. Far from being a mere outside service provider, National General and its predecessors also were knowing, willing, and active participants in the CPI Enterprise. National General and its predecessors participated in and conducted the affairs of the CPI Enterprise as described throughout this Complaint, including but not limited to the following ways:

a. Underwriting CPI that Wells Fargo force-placed, with the knowledge and intent that it be used in the CPI Enterprise's fraudulent scheme;

b. Misrepresenting that it did or would search hard copy and electronic data to determine whether borrowers maintained adequate insurance on their vehicles;

c. Issuing CPI certificates for loans it knew or should have known were secured by sufficient automobile insurance;

d. Ignoring and/or disregarding proof of insurance submitted by borrowers after they learned about force-placed CPI;

e. Accepting payments from Wells Fargo for premiums due on CPI;

f. Paying kickbacks in the form of unearned commissions and other compensation to Wells Fargo for the force-placement of CPI;

g. Drafting and sending false and misleading Insurance Request Letters and Coverage Issued Letters to borrowers;

h. Participating in monthly management review meetings and quarterly business review meetings with the CPI Vendor, during which it discussed the high percentage of flat and partial cancellations due to the force-placement of duplicative and unnecessary CPI; and

i. Transmitting to Wells Fargo lists accounts on which CPI was force-placed or removed.

**C. Pattern of Racketeering Activity**

346. Defendants carried out their force-placed CPI scheme through a pattern of racketeering activity that employed the use of United States mail and wire facilities. Defendants accomplished this scheme by committing, conspiring to commit, and/or aiding-and-abetting the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.

347. Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)(B)) including, but are not limited to:

- Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending and/or receiving, or causing to be sent and/or received, materials via U.S. mail or

commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI.

- Wire Fraud: Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from force-placed CPI.

348. The CPI Enterprise's pattern of racketeering involved thousands of separate instances wherein the U.S. Mail or interstate wire facilities were knowingly and intentionally used to further the enterprise's pattern of racketeering activity, including mail and wire fraud. These instances included but were not limited to the following:

a. Daily use of interstate wire facilities for the electronic transmission of the Daily New Loan File between members of the CPI Enterprise;

b. Daily use of interstate wire facilities for the electronic transmission of lists accounts on which CPI was force-placed or removed between members of the CPI Enterprise;

c. Daily use of interstate wire facilities between members of the CPI Enterprise to settle premium and refund payments.

d. The CPI Vendor's use of the U.S. mail to send false and misleading Insurance Request Letters to Wells Fargo's auto loan borrowers on or about 42 days after a borrower appeared in the Daily New Loan file or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled;

e. The CPI Vendor's use of interstate wire facilities to attempt to contact via telephone the borrower, the borrower's insurance agent (if known), or the borrower's insurance company (if known) on or about 63 days after a borrower appeared in the Daily New Loan file or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled;

f. The CPI Vendor's use of the U.S. mail to send false and misleading Coverage Issued Letters to Wells Fargo's auto loan borrowers on or about 77 days after a borrower appeared in the Daily New Loan file or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled;

g. Wells Fargo's use of the U.S. mail and wire facilities to send billing statements with charges for CPI premium, interest, and unearned commissions—which an internal Wells Fargo audit acknowledged were deceptive—to borrowers on or about 100 days after a borrower appeared in the Daily New Loan file or after the CPI Vendor received information reflecting that the borrower's auto insurance had expired or been cancelled;

h. Use of interstate wire facilities for the electronic transmission of a "scorecard" of metrics between members of the CPI Enterprise in advance of each monthly management review meeting; and

i. Use of interstate wire facilities for the electronic transmission of quarterly business review presentations between members of the CPI Enterprise in advance of each quarterly business review meeting.

349. The CPI Enterprise also communicated by U.S. Mail, interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the CPI Enterprise's mail and wire fraud.

350. Defendants knew, and intended that, Plaintiffs and the members of the Class would be induced by their fraudulent scheme to pay for unnecessary and unlawful CPI charges. Defendants further knew, and intended that, Plaintiffs and members of the Class would rely on their false and misleading representations and omissions of material fact and would incur increased costs as a result. Indeed, if Plaintiffs and the Class did not pay for unnecessary and unlawful CPI, the CPI Enterprise could not succeed.

351. Each of these mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these

violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Defendants intended to and did defraud Plaintiffs, and members of the Class.

352. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

353. The pattern of racketeering activity alleged herein and the CPI Enterprise are separate and distinct from each other. Likewise, Wells Fargo, National General, and their predecessors, subsidiaries, and affiliates identified in this Complaint are distinct from the CPI Enterprise. They each have separate existences from the CPI Enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

354. Defendants' final racketeering activity occurred within five years of the commission of a prior incident of racketeering.

**D. Damages**

355. Defendants' pattern of racketeering activity, directly and proximately caused Plaintiffs and members of the Nationwide Class, injury in their business and property because Plaintiffs paid charges for CPI—including premiums, interest, and unearned commissions—that were inflated, unlawful, unnecessary and undisclosed, as well as increased interest on their automobile loans, diminished credit scores and the costs of repossession.

356. Plaintiffs are the most directly harmed individuals and entities and there are no other Plaintiffs better suited to seek a remedy from Defendants for the economic harms at issue here.

357. Any remediation program that Wells Fargo may implement will not provide complete legal relief to all Plaintiffs and Class Members. Such remediation is unlikely to compensate Plaintiffs and Class Members for their payment of kickbacks through unearned commissions and other forms of compensation. Indeed, the Oliver Wyman Report, [redacted]

[redacted][177] And according to Wells Fargo's Rule 30(b)(6) witness, [redacted][178] Similarly, such remediation, even if it were to compensate Plaintiffs and Class Members for single damages, would not satisfy their claims for treble damages under RICO. Damages must be trebled under RICO first, before remediation payments, if any, could be an offset.

358. Plaintiffs also seek all legal relief as allowed by law, including *inter alia*, actual damages and treble damages. Plaintiffs seek equitable relief, including but not limited to the elimination of adverse notations on their credit reports and remediating reduced credit scores, as deemed proper by the Court. Plaintiffs also seek attorneys' fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF

**Violation of the Bank Holding Company Act**

**12 U.S.C. § 1972**

**(Against Wells Fargo)**

359. Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

360. Wells Fargo & Company and Wells Fargo Bank, N.A. are a "bank holding companies" and "banks" within the meaning of 12 U.S.C. § 1971 and 12 U.S.C. § 1841(a) and (c).

361. Wells Fargo Bank, N.A. is a "subsidiary" of Wells Fargo & Company, as defined in 12 U.S.C. § 1971 and 12 U.S.C. § 1841(d).

[177] WFCPI_00030101 at 113.

[178] Turner Dep. at 107:6-9, 108:10-13.

362. Wells Fargo Dealers Services is a "subsidiary" of Wells Fargo Bank, N.A. and Wells Fargo & Company as defined in 12 U.S.C. § 1971 and 12 U.S.C. § 1841(d).

363. WestFin Insurance Agency, Inc. is a "subsidiary" of Wells Fargo Bank, N.A. and Wells Fargo & Company as defined in 12 U.S.C. § 1971 and 12 U.S.C. § 1841(d).

364. The Bank Holding Company Act ("BHCA") 12 U.S.C. § 1972 prohibits a bank extending credit from requiring the borrower to obtain or provide some additional property or service from the bank, the holding company of the bank, or a subsidiary of the holding company of a bank.

365. Specifically, the BHCA states that "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . *that the customer shall obtain some additional credit, property, or service* from [such bank or] a bank holding company of such bank, or from any other subsidiary of such bank holding company . . . [or] *that the customer provide some additional credit, property, or service* to [such bank] or a bank holding company of such bank, or to any other subsidiary of such bank holding company." [Emphasis added.]

366. A claim under the BHCA requires (1) the banking practice to be unusual in the banking industry, (2) the existence of an anti-competitive tying arrangement, and (3) the practice to benefit the bank.

367. Unlike under general antitrust statutes, however, a violation of the BHCA does not require one to establish the anti-competitive effects of the tie-in, the bank's market share, or any showing of coercion by the bank. This is because Congress perceived conditional transactions involving credit as inherently anti-competitive and intended to regulate banks' credit-related transactions more stringently than the Supreme Court does under other antitrust laws. Accordingly, the "anti-competitive" modifier in the above test either drops out or is presumed to exist.[179]

---

[179] *S & N Equip. Co. v. Casa Grande Cotton Fin. Co.*, 97 F.3d 337, 346 (9th Cir. 1996).

368. Here, Wells Fargo violated the BHCA because it "extended credit" and "furnished a service" to Plaintiffs—auto loans—on the condition that Plaintiffs "provide additional property" to Wells Fargo related to CPI and "obtain additional" "services" and "credit" from Wells Fargo related to CPI.

369. Wells Fargo required Plaintiffs to "provide additional property" to Wells Fargo by requiring Plaintiffs to make additional monetary payments to Wells Fargo for CPI charges. Wells Fargo required Plaintiffs to "obtain additional services" from Wells Fargo's by requiring Plaintiffs to obtain Wells' Fargo's CPI-placement services. Wells Fargo required Plaintiffs to "obtain additional credit" from Wells Fargo by billing Plaintiffs for CPI charges that Wells Fargo made to CPI Vendors and passed-on to Plaintiffs.

370. These required additional payments, services, and credits related to CPI were both *de facto* conditions of Wells Fargo's initial extension of credit to Plaintiffs, as well as explicit conditions of Wells Fargo's ongoing extension of credit to Plaintiffs (*i.e.* requirements for Plaintiffs to avoid foreclosure and/or additional fees).

371. These additional requirements were *de facto* conditions of Wells Fargo's initial extension of credit because each Plaintiff and Nationwide Class member who obtained an auto loan from Wells Fargo was charged for CPI, regardless of whether they maintained independent automobile insurance coverage. In other words, despite purporting to allow Plaintiffs and members of the Nationwide Class to maintain their own auto insurance in lieu of purchasing CPI, Wells Fargo in practice required all Plaintiffs and members of the Nationwide Class to accept and pay for its CPI-related services as a basic condition of their auto loan.

372. These additional CPI-related payments, services, and credits were also explicit conditions of Wells Fargo's ongoing extension of credit to Plaintiffs because Wells Fargo conditioned its forbearance from foreclosing on existing loans on Plaintiffs' payment of CPI charges to Wells Fargo. When Plaintiffs did not make such CPI payments, Wells Fargo threatened to—and often did—cease extending credit, repossess vehicles, and assess other additional charges on Plaintiffs. These threats and actions to foreclose on or alter the

conditions of Plaintiffs' existing auto loans constitutes unlawful conduct under the BHCA.[180]

373. Wells Fargo's initial and ongoing extension of credit to Plaintiffs in the form of auto loans constitutes the "tying" product. Wells Fargo's CPI-related services, credit, and associated demand for payment from Plaintiffs constitute "tied" products.

374. Wells Fargo's provision of auto loans and Wells Fargo' CPI-related services are separate products that engender separate consumer demand.

375. Wells Fargo's practice of conditioning its auto financing on customers obtaining and paying for additional CPI services was unusual and not traditional in the banking industry in several respects.

376. Auto lenders typically do not require borrowers to purchase CPI, even when borrowers lack independent auto insurance. Wells Fargo's internal documents acknowledge that "WFDS is the only large auto finance company with a CPI program,"[181] and that other than Wells Fargo, "none of the big banks or captives force place at the customer level. We are a 55 billion dollar portfolio … we should be able to self-insure!!"[182]

377. Also unusual and not traditional in the banking industry was Wells Fargo's practice of profiting from its CPI program through the generation of kickbacks from CPI Vendors, which inflated the true cost of CPI to borrowers.

378. It is similarly unusual and not traditional in the banking industry for auto lenders to require borrowers to pay for duplicative and unnecessary CPI, even when they maintain independent auto insurance coverage. Wells Fargo's related practice of repeatedly re-assessing duplicative charges, threatening collections, and repossessing vehicles despite customers' objections was similarly unusual and not traditional in the banking industry.

---

[180] *Akiki v. Bank of Am., N.A.*, 632 Fed. Appx. 965, 969 (11th Cir. 2015).

[181] WFCPI_00035207 at 214.

[182] WFCPI_00050483 at 484.

379. As set forth above, Wells Fargo's extension of credit under these conditions—including its forbearance from collecting on existing loan—constituted an anticompetitive tying arrangement in violation of 12 U.S.C. § 1972(1).

380. Wells Fargo's extension of credit on these terms benefited Wells Fargo because the force-placed CPI generated revenue for Wells Fargo as kickbacks in the form of unearned commissions and other compensation from the CPI Vendor, increased interest payments, and fees, among other methods.

381. Wells Fargo's provision of CPI to Plaintiffs and members of the National Class constituted both a "service" and "credit" under 12 U.S.C. § 1972(A) and (B).

382. Plaintiffs' and National Class Members' payments to Wells Fargo for CPI charges and related fees constituted "property" under 12 U.S.C. § 1972(C) and (D).

383. As a direct and proximate result of Wells Fargo's violation of 12 U.S.C. § 1972(1), Plaintiffs have suffered damage and are entitled to treble damages pursuant to 12. U.S.C. § 1975.

384. Any remediation program that Wells Fargo may implement will not provide complete legal relief to all Plaintiffs and Class Members. Such remediation is unlikely to compensate Plaintiffs and Class Members for their payment of kickbacks through unearned commissions and other forms of compensation. Indeed, the Oliver Wyman Report, [redacted][183] And according to Wells Fargo's Rule 30(b)(6) witness, [redacted][184] Similarly, such remediation, even if it were to compensate Plaintiffs and Class Members for single damages, would not satisfy their claims for treble damages

---

[183] WFCPI_00030101 at 113.

[184] Turner Dep. at 107:6-9, 108:10-13.

under the BHCA. Damages must be trebled under BHCA first, before remediation payments, if any, could be an offset.

**THIRD CLAIM FOR RELIEF**

**Violation of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200 *et seq.***

**(Against All Defendants)**

385. Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

386. Plaintiffs bring this claim for relief on behalf of themselves, the Nationwide Class, and, in the alternative, on behalf the California State Class (for purposes of this claim, the "Class").

387. California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200 *et seq.*, prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

388. Defendants' practice of force-placing CPI and charging customers for inflated premiums due to kickbacks in the form of unearned commissions and other compensation, and interest on those policies, as alleged herein, constitutes unfair business acts or practices because Defendants' conduct was injurious to consumers, offended public policy, and was unethical and scrupulous. Defendants' unfair business acts and practices caused harm to consumers in California and nationwide. The gravity of the harm suffered by hundreds of thousands of consumers greatly outweighs the utility of force-placing unnecessary CPI.

389. Defendants' practice of force-placing CPI and charging customers for inflated premiums due to kickbacks in the form of unearned commissions and other compensation, and interest on those policies, as alleged herein, constitute unlawful business acts or practices because they violate multiple state, federal and common laws, including, but not limited to: 18 U.S.C. §§ 1341, 1341; 18 U.S.C. § 1962; 12 U.S.C. § 1972, *et seq.*; Cal Civ. Code §§ 1572, 1573; Tenn. Code § 56-49-113, *et seq.*; Wash. RCW 448.22.115, *et seq.*;

Miss. Code § 83-54-25, *et seq.*; Mich. Comp. Laws § 500.1625, *et seq.*; AR Code § 23-101-113, *et seq.*; and the common law.

390. Defendants' practice of force-placing CPI and charging customers for inflated premiums due to kickbacks in the form of unearned commissions and other compensation, and interest on those policies, as alleged herein, also constitutes a fraudulent business act or practice. Defendants' representations regarding CPI, including the statements regarding charges, and omissions of material fact regarding its pattern and practice of force-placing unnecessary CPI were false, misleading, and likely to deceive the public, including Plaintiffs and members of the Class.

391. Plaintiffs and the other Class members relied on the reasonable expectation that Defendants comply with the law. Plaintiffs and the Class also relied on Defendants' representations that the force-placed CPI charges were lawful, not inflated, and necessary and required to maintain their loans in good standing, and to avoid repossession.

392. Accordingly, Plaintiffs and the other Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

393. Plaintiffs requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## <u>FOURTH CLAIM FOR RELIEF</u>

### Fraud by Concealment

### (Against All Defendants)

394. Plaintiffs incorporate by reference each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

395. Plaintiffs bring this claim for relief on behalf of themselves and the Nationwide Class, and, in the alternative, on behalf of the California State Class (for purposes of this claim, the "Class").

396. Each Defendant committed fraud through their scheme to force-placing unlawful, unnecessary and undisclosed CPI on the automobile loans of the Plaintiffs and Class members. Defendants concealed from Plaintiffs and the Class members that they engaged in a pattern of practice of force-placing CPI on borrowers' automobile loans and sharing in kickbacks in the form of unearned commissions and other compensation for the force-placed CPI, without regard for the insurance policies already maintained by Plaintiffs and the Class members.

397. Wells Fargo began requiring insurance on automobile loans as early as March 2002. In conjunction with the insurance requirement, Wells Fargo represented to Plaintiffs and Class members that they needed to maintain active comprehensive and collision insurance naming Wells Fargo as a loss payee, and that proof of insurance was required.

398. Force-placed CPI was not applicable unless the Plaintiffs or Class members did not maintain insurance on their vehicles. But, when Wells Fargo made these representations, it intentionally concealed, suppressed, omitted and failed to disclose the material facts that Wells Fargo, National General, and their predecessors force-placed CPI polices without regard for the insurance Plaintiffs or Class members maintained on their vehicle. Wells Fargo intentionally concealed, suppressed, omitted and failed to disclose the material fact that it received kickbacks in the form of unearned commissions and other compensation from the CPI Vendor for force-placing CPI, all of which resulted in excessive charges or premiums, all of which resulted in excessive charges or premiums.

399. National General and its predecessors represented to Plaintiffs and Class members that premiums for the force-placed CPI were necessary and proper because they were required by Wells Fargo. National General and its predecessors also represented that they would not force-place CPI if the Plaintiffs and Class members maintained insurance on their vehicles. But National General and its predecessors intentionally concealed,

suppressed, omitted, and failed to disclose the material facts that they, in conjunction Wells Fargo, force-placed CPI without regard for the insurance Plaintiffs or Class members maintained on their vehicle. National General and its predecessors intentionally concealed, suppressed, omitted, and failed to disclose the material fact they paid kickbacks in the form of unearned commissions and other compensation to Wells Fargo for force-placing CPI.

400. A reasonable consumer who maintained the insurance coverage required by Defendants would not have expected to be charged premiums or interest for force-placed CPI, or to contribute to the kickbacks between Wells Fargo and its CPI Vendor. Plaintiffs and the members of the Class did not know of the facts which were concealed from them by Defendants. Moreover, as consumers, Plaintiffs and the members of the Class did not, and could not, unravel the deception on their own.

401. Defendants had a duty to disclose that they had a pattern and practice of force-placing CPI without regard for the insurance policies maintained by Plaintiffs or the Class members, and sharing kickbacks in the form of unearned commissions and other compensation for force-placing CPI. Defendants had such a duty because they had superior knowledge. The true facts were known only to them and they knew that these facts were not known to or reasonably discoverable by Plaintiffs or members of the Class. Defendants also had a duty to disclose the true nature of their CPI scheme because they actively concealed the truth from Plaintiffs and the members of the Class.

402. Finally, Defendants had a duty to disclose the true nature of their fraudulent CPI scandal in light of their statements and partial representations about the circumstances under which they would force-place CPI, the validity of their CPI practices, and the charges for CPI premiums, interest, and unearned commissions, as alleged herein. Having volunteered to provide information to Plaintiffs and the Class members, Defendants had the duty to disclose the whole truth.

403. Plaintiffs and the Class members reviewed documents that were made available to them in connection with their auto loans. Wells Fargo also intentionally concealed CPI charges on borrowers' billing statements, a practice which the bank itself

deemed to be "deceptive."[185] Had the truth concerning the CPI scheme been disclosed, Plaintiffs and the Class members would have seen and been aware of it, and would not have obtained an auto loan from Wells Fargo, would not have paid the CPI charges, and/or would have disputed the CPI charges and demanded full compensation. Defendants should have disclosed this material information in the RISC, Insurance Request Letters, telephone calls with borrowers, Coverage Issued Letters, and billing statements.

404. Plaintiffs and members of the Class sustained damages because they were forced to pay inflated premiums and insurance for unlawful, unnecessary and undisclosed CPI. Plaintiffs and members of the Class also sustained damages when the incurred late fees, insufficient funds fees, damage to their credit scores, and repossession of their vehicles. Accordingly, Defendants are liable to Plaintiffs and the members of the Class for damages in an amount to be proven at trial.

405. Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs; and to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## **FIFTH CLAIM FOR RELIEF**

### **Unjust Enrichment**

### **(Against All Defendants)**

406. Plaintiffs incorporate by reference, in this cause of action, each and every allegation of the preceding paragraphs with the same force and effect as though fully set forth herein.

407. Plaintiffs bring this Claim for Relief on behalf of themselves and the Class (for purposes of this Claim identified herein) as follows:

---

[185] WFCPI_00048650; WFCPI_00006404; McLawhorn Dep. at 135:25-143:23.

a. Plaintiffs Duane Fosdick, Analisa Moskus, and Keith Preston bring this Claim for Relief on behalf of themselves and on behalf of the Nationwide Class, or in the alternative, the California State Class under California law;

b. Plaintiff Nyle Davis brings this Claim for Relief on behalf of himself and on behalf of the Missouri State Class under Missouri law;

c. Plaintiff Regina Gonzales brings this Claim for Relief on behalf of herself and on behalf of the Minnesota State Class under Minnesota law;

d. Plaintiff Brandon Haag brings this Claim for Relief on behalf of himself and on behalf of the Wisconsin State Class under Wisconsin law;

e. Plaintiff Paul Hancock brings this Claim for Relief on behalf of himself and on behalf of the Indiana State Class under Indiana law;

f. Plaintiffs Dustin Havard and Brian Miller bring this Claim for Relief on behalf of themselves and on behalf of the Mississippi State Class under Mississippi law;

g. Plaintiff Victoria Reimche brings this Claim for Relief on behalf of herself and on behalf of the Colorado State Class under Colorado law; and

h. Plaintiff Bryan Tidwell brings this Claim for Relief on behalf of himself and on behalf of the Wyoming State Class under Wyoming law.

408. Defendants force-placed unnecessary and undisclosed CPI on Plaintiffs and the Class members' automobile loan accounts, resulting in the payment of CPI premium, interest, late fees, and other charges to Defendants.

409. Defendants were unjustly enriched at the expense of Plaintiffs and the Class members. Money and property belonging to the Plaintiffs and members of the Class were unjustly taken by Defendants.

410. It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from the conduct alleged herein.

411. Plaintiffs and Class members seek restitution from Defendants, and an order disgorging all profits, benefits, and other compensation obtained by Defendants from their unlawful practice of force-placing unlawful, unnecessary and undisclosed CPI.

412. In the alternative, Plaintiffs and Class members seek an order establishing a constructive trust over all money or property wrongfully obtained by the Defendants' conduct alleged herein.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide Class and State Classes, including the designation of Plaintiffs as the named representatives of the Nationwide Class and respective State Classes, the appointment of the undersigned as Class Counsel, and the designation of any appropriate issue classes and/or subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A. A declaration that any applicable statute of limitations are tolled under the discovery rule or due to the fraudulent concealment alleged in this Complaint, and that Defendants are estopped from relying on any statutes of limitation as a defense;

B. An order enjoining, temporarily and permanently, from continuing the unlawful, deceptive, fraudulent and unfair business practices alleged in this Complaint;

C. Injunctive and equitable relief in the form of a comprehensive program to fully reimburse and make whole all Class members for all costs and economic losses, including credit repair and the costs of vehicle repossession;

D. Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under RICO and the BHCA, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law;

E. Rescission of all force-placed CPI, including reimbursement of and/or compensation for the full cost of CPI, including any interest, taxes, license and other fees;

Case 2:20-cv-08537-CJC-JEM Document 1 Filed 09/16/20 Page 109 of 111

F. A determination that Defendants are financially responsible for all Class notice and administration of Class relief;

G. Any and all applicable statutory and civil penalties;

H. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I. An award of attorneys' fees and costs, including expert costs;

J. Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

K. Such other or further relief as the Court may deem appropriate, just and equitable.

## XII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of any and all issues in this action so triable by right, pursuant to Federal Rule of Civil Procedure 38(b).

Dated: August 17, 2018

Respectfully submitted,

By: */s/ Roland Tellis*

Roland Tellis

BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

By: */s/ Aaron M. Sheanin*

Aaron M. Sheanin

Roman M. Silberfeld (SBN 62783)
rsilberfeld@robinskaplan.com
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, California 90067
Telephone: (310) 552-0130

Facsimile: (310) 229-5580

Aaron M. Sheanin (SBN 214472)
asheanin@robinskaplan.com
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041

*Plaintiffs' Co-Lead Counsel*

GIBBS LAW GROUP LLP
Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510)-350-9700
Facsimile: (510 350-9701

Levin Sedran & Berman
Charles E. Schaffer (*Pro Hac Vice*)
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone: (215) 592 1500
Facsimile: (215) 592-4663

WEITZ & LUXENBERG, P.C.
Paul F. Novak (*Pro Hac Vice*)
Chrysler House
719 Griswold, Suite 620
Detroit, Michigan 48226
Telephone: (313) 800-4170
Facsimile: (646) 293-7992

*Plaintiffs' Steering Committee*

CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD, LLP
David S. Casey, Jr. (SBN 060768)
Gayle M. Blatt (SBN 122048)

Case 2:23-cv-08533-KES-SM Document 1-2 Filed 11/06/23 Page 191 of 191

110 Laurel Street
San Diego, California
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Plaintiffs' Liaison Counsel*